SANTANA PRODUCTS, INC. Plaintiff

v.

BOBRICK WASHROOM EQUIPMENT, INC., Bobrick Corporation, the Hornyak Group, Inc., and Vogel Sales Co. Defendants

No. 3:CV–96–1794.

United States District Court, M.D. Pennsylvania.

March 7, 2003.

See also 69 F.Supp.2d 678.

464

B. Aaron Schulman, Larson & Taylor, Alexandria, VA, Gerald J. Butler, Butler & LaBelle, Scranton, PA, Linda R. Poteate, Larson & Taylor, Alexandria, VA, Paul J. LaBelle, Scranton, PA, Sarah Grace Wittig, William E. Jackson, Larson & Taylor, Alexandria, VA, for Plaintiff.

Carl W. Hittinger, Stevens & Lee, P.C., Philadelphia, PA, Donald E. Wieand, Jr., Stevens & Lee, Lehigh Valley, PA, Walter F. Casper, Jr., Carbondale, PA, for Defendants.

Christine A. Murphy, Berick Pearlman Mills, Cleveland, OH, for Unknown Party Type.

George A. Reihner, Scranton, PA, Pro se.

## OPINION

VANASKIE, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................469

II. *BACKGROUND* ...................................................471
 A. The Toilet Compartment Industry .......................................471
 B. The ASTM E–84 Test and Santana's Fire Rated Compartment ...............473
 C. The 1994 TPMC Litigation ...........................................475
 D. Bobrick's "Fire Scare" Marketing Campaign ..............................476
 E. Procedural History ..................................................477

III. *DISCUSSION* .................................................478
 A. Summary Judgment Standard ...........................478
 B. The *Noerr/Pennington* Defense ........................479
 1. Defendants' Activities Are Within the Ambit of *Noerr/Pennington*
 Immunity.......................................480
 2 There Is No "Commercial" Exception to *Noerr/Pennington* Immunity.....487
 3. There Is No "Fraud" Exception to *Noerr/Pennington* Immunity ..........491
 4. The *Noerr/Pennington* Doctrine Is Applicable to Each of Santana's
 Claims ........................................492
 C. Affirmative Defenses Pertaining to the Timeliness of the Filing of this
 Action .........................................494
 1. Timeliness of the Sherman Act Claims.....................494
 2. Timeliness of the Lanham Act Claims .....................497
 3. Timeliness of the Interference With Prospective Contract Claim ..........501
 D. Santana's Claim under Section 1 of the Sherman Act......................503
 1. Concerted Action ..................................503
 a. *The alleged concerted action of Bobrick's sales representatives* ........505
 b. *The alleged concerted action of Bobrick* .............................506
 2. Unreasonable Restraint of Trade .......................508
 a. *The Per Se Rule* .....................................509
 b. *Application of the Rule of Reason*................................512
 3. Anticompetitive Effects.............................515
 E. The Sherman Act Section Two Claim .....................518
 F. The Lanham Act Claims ..............................520
 1. Advertising Statements Not Identified in the Complaint .................522
 2. Unclean Hands ...................................523
 3. Literal Falsity ...................................525
 a. *The Formica Videotape*.......................................526
 b. *The TB–73 Technical Bulletin* ....................................535
 c. *The Bobrick "You Be The Judge" Videotape* ........................536
 d. *Bobrick's Box Lunch Program and Slides*............................537
 e. *Bobrick's Ads in Sweet's Architectural Catalogs* .....................537
 f. *National Trade Journal Advertisements* ............................538
 g. *Bobrick's Thrislington "Script"* ..................................539
 4. Likelihood of Injury to Santana.........................539
 G. Tortious Interference with Prospective Contract ..........................542

IV. *CONCLUSION* ...................................................545

## I. *INTRODUCTION*

On October 1, 1996, plaintiff Santana Products, Inc. (Santana) instituted this action against defendants Bobrick Washroom Equipment and Bobrick Corporation (collectively "Bobrick"), The Hornyak Group, Inc. ("Hornyak"), Vogel Sales Company ("Vogel"), Sylvester & Associates, Ltd., and Fred Sylvester. Santana, which manufactures and sells restroom and toilet partitions made of high density polyethylene ("HDPE"), alleges that Bobrick and other toilet compartment manufacturers conspired to enforce a product standard that had the effect of excluding Santana's HDPE compartments from the relevant market. Specifically, Santana claims that Bobrick along with members of a now-defunct trade association, the Toilet Partition Manufacturers Council ("TPMC"), collectively embarked on a campaign to convince prospective customers that (1) toilet partitions had to meet fire code flame spread and smoke development requirements for "wall finish"; and (2) HDPE did not meet such requirements. Santana has asserted claims under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2; the false advertising provision of the Lanham Act, 15 U.S.C. § 1125(a); and the common law

tort of intentional interference with prospective contractual relationships.

Following protracted and, at times, acrimonious discovery, the parties filed cross-motions for summary judgment. Santana has filed a partial summary judgment motion on its Sherman Act section 1 claim, (Dkt. Entry 43), and a summary judgment motion as to the defendants' liability under section 43(a) of the Lanham Act, (Dkt. Entry 271), while the motions of Bobrick, Hornyak, and Vogel attack all of Santana's claims. (Dkt. Entries 287, 291, 294.)

The motions present several important and difficult issues for which there is no controlling precedent in this Circuit. For example, the defendants contend that their marketing activities directed toward public entities, such as school districts, are shielded from liability under the *Noerr/Pennington* doctrine. Defendants present this threshold defense not only with respect to the Sherman Act and common law claims, causes of action to which the *Noerr/Pennington* doctrine is plainly applicable, but also to the Lanham Act claim, an assertion for which there is little case law guidance. Because it is clear that the overwhelming bulk of the toilet partition market is directed at public construction, resolution of this issue in defendants' favor would have a significant impact on the scope of Santana's claims; effectively eliminate Hornyak and Vogel as defendants inasmuch as their marketing activities were limited to public institutions; and severely limit Bobrick's liability. Pointing out that Santana is complaining of conduct that occurred seven years before the filing of this action, and that Santana had settled an earlier lawsuit against the members of the TPMC, defendants have also presented a substantial challenge to the timeliness of Santana's claims, especially its Lanham Act cause of action, to which the doctrine of laches applies and for which there is no controlling precedent in this jurisdiction.

Having carefully considered the parties voluminous submissions,[1] the comprehensive evidentiary record, and the applicable law, I have concluded that the *Noerr/Pennington* doctrine is indeed applicable to all of Santana's claims, thereby limiting any recovery to the non-public sector. I have further determined that none of Santana's claims is time-barred, but recovery is limited to violations occurring within the applicable limitations period. In this regard, a four-year limitations period governs the Sherman Act claims, Pennsylvania's six-year limitations period for claims based upon statutory violations controls the Lanham Act claim, and a one year limitations period defines the compensable parameters of the tortious interference claim.

As to the substantive merits of Santana's claims, I have concluded that Hornyak and Vogel, as captive sales representatives of Bobrick, cannot be held liable under section 1 of the Sherman Act. I have further found that the assailed marketing campaign did not constitute an unlawful restraint on trade and that, in any event, Santana has shown no more than a *de minimis* effect on competition, thus warranting summary judgment in favor of the defendants on the Sherman Act § 1 claim. Defendants are also entitled to summary judgment on the § 2 claim because, for essentially the reasons articulated by Judge Mishler in the parallel case of *Santana Products, Inc. v. Sylvester & Associates, Ltd.*, 121 F.Supp.2d 729 (E.D.N.Y. 1999), the "shared monopoly" claim presented by Santana is not cognizable under section 2 of the Sherman Act. Summary judgment in favor of the defendants on the tortious interference claim is warranted because Santana has failed to present evidence of the loss of a prospective contract

---

1. The "briefs" and statements of material facts alone exceed 1,000 pages.

with a non-public customer within the one-year limitations period. Finally, there are issues of material fact that preclude summary adjudication of the Lanham Act claim.

As a result of these rulings, Santana's claims have been severely limited. In recognition of the fact that appellate court consideration of difficult and close questions prior to any trial may serve the interests of the parties and of judicial economy, that the need for appellate review will not be mooted by further proceedings in this Court, and that there is "no just cause for delay," *see Berckeley Inv. Group, Ltd. v. Colkitt,* 259 F.3d 135, 140–42 (3d Cir.2001), I will direct entry of final judgment in favor of Bobrick as to the Sherman Act claims (Counts I and II of the complaint), and the tortious interference claim (Count IV), and in favor of Hornyak and Vogel as to all claims, in accordance with Fed.R.Civ.P. 54(b). Furthermore, because of the impact of the *Noerr/Pennington* ruling on the scope of the Lanham Act claim, and because that decision involves a "controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), I will certify the accompanying order for immediate appeal pursuant to 28 U.S.C. § 1292(b).

## II. BACKGROUND

### A. The Toilet Compartment Industry

The toilet compartment industry consists of a number of national distributors[2]

of toilet partitions[3] and a smaller number of regional distributors. These distributors offer several different materials for use as partitions, including metal, stainless steel, plastic laminate, solid phenolic, and HDPE. (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 5.) Other materials can be used for toilet partitions, but generally have drawbacks that prevent widespread use (for example, marble is now rarely employed because of its expense and weight). (Ex. 295, Supp. Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 411, Final Report: The Prospects for HDPE in the Market for Lavatory Partitions and Panels, April 1990, at 5.)

The specification process for public building contracts is central to competition within the toilet partition industry because, by definition, toilet partitions are installed only in public restroom facilities. Bidding on a public building contract is a two-part process. It is the first part—specification—that is the focus of this litigation. Prior to competitive bidding on price, the architect or "specifier" on a building project writes specifications for the materials to be used. Once the specifications are finalized, only those companies whose products satisfy the specifications may ultimately bid on the project. *See generally Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 525 (5th Cir.1999). Thus, the toilet partition suppliers actively lobby architects and specifiers for public building projects to specify their product or not to

---

**2.** The parties dispute the exact number of distributors. Santana claims that in the mid-1980s there were ten companies who nationally marketed their compartments and about five regional companies. (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 4.) Bobrick, however, contends that in 1990 there were nineteen market players. (Bo-

brick's Response to Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 410, ¶ 4.) Either way, the market for toilet compartments involved multiple competitors.

**3.** The terms "toilet compartments" and "toilet partitions" are used interchangeably in this opinion.

specify a competitor's product. The companies compete on such varied grounds as durability, resistance to vandalism, ease of installation, and aesthetics. After specification, competitors whose products satisfy the specifications compete only on price.

This litigation deals with the business practices of two participants in the toilet partition industry. Santana, based out of Scranton, Pennsylvania, was formed in the late 1970s and was the first manufacturer to offer solid plastic restroom toilet partitions as an alternative to conventional toilet partitions. (Complaint, ¶ 21.) In the early 1980s, Santana introduced HDPE partitions. (Pl.Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 1.) These partitions were advertised as vandal resistant because of the ease of cleaning and ease of repairing scratches, both due to the partition's solid plastic construction. In its Sweet's Catalog advertisements,[4] Santana listed as advantages of HDPE its cost, durability, ease of maintenance, particularly in highly vandalized areas, and lack of absorbency.[5] (Ex. 60, Appx. to Mem. in Support of Bobrick's S.J. Motion, Dkt. Entry 298, 1986 Sweet's Catalog, at S 66786.) Santana also promoted its partitions' fire-resistant characteristics. As of mid–1989, several companies offered HDPE toilet partitions: Knickerbocker, Sanymetal, Capital Partitions, General Partitions, and Santana. (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 3.)

Bobrick Washroom Equipment, Inc. and The Bobrick Corporation are California corporations. Bobrick manufactures toilet partitions made of both solid phenolic and laminated plastic over a particle board core (plastic laminate). Phenolic is composed of craft paper impregnated with resins and compressed under high pressure and temperature to form a solid core. The core material is covered on each side with a laminated plastic material to provide a decorative surface. (Ex. 4, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Thompson Dep. Tr., at 95–97; Ex. 5, *id.*, Mahony Dep. Tr., at 30–31; Ex. 7, *id.*, Henry Dep. Tr. at 56–57.) Bobrick's marketing strategy—in addition to the "fire scare" campaign at the heart of this dispute—focused on the durability of its partitions. For example, Bobrick claimed in one ad:

> With Bobrick's solid phenolic construction and heavy-duty stainless steel hardware, it takes more than 2,000 pounds of force to knock a door off a stile. Plus, DuraLine compartments are available to meet Class A and B fire safety stan-

---

4. The Sweet's Catalog is a compilation of catalogs of numerous manufacturers of various building products and materials used in architectural and engineering fields. Manufacturers pay a fee to place their catalogs and specifications in the Sweet's Catalog. (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶ 38.) Architects annually subscribe and routinely refer to the Sweet's Catalog before selecting and specifying building and construction products. One section of the Catalog is devoted entirely to toilet partitions. (*Id.,* ¶¶ 39–40.)

5. Santana's 1986 Sweet's Catalog claimed:
There are a number of reasons for Santana's astounding success in the highly competitive industry it entered so recently and dominated so quickly. First, of course, is the product. Solid, one-piece construction of polymer resins just about says it all: there are simply no seams to come apart. In addition, solid plastic doesn't rust or dent like metal, peel away like plastic laminates, or absorb odors like marble. Additionally, POLY–MAR HD ® has Santana's unique Plasti–Glaze 280 finish, which repels moisture, odors, mildew, and stains. Pencil, ink, and even cosmetic marks wash off easily with an industrial-grade cleaner. (Exhibit 60, Def. Appx. to Mem. in Support of S.J. Mot., Dkt. Entry 298, 1986 Sweet's Catalog, at S 66786.)

dards. Smooth graffiti-resistant surfaces wipe clean. School-engineered hardware can be concealed from the outside or through-bolted, and you can select from a variety of colors. (Vol. II, Ex. A. 11, Appx. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 280, Klein Dep. Ex. 12, at B 148756.) Toilet partitions constitute approximately ten percent of Bobrick's total sales, with the remaining ninety percent consisting of various washroom accessories. (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶ 3.) Bobrick is considered one of the largest washroom accessories manufacturers in the United States. (*Id.*)

Two of Bobrick's independent sales representatives are also defendants in this action. Hornyak is a Delaware corporation that serves as a Bobrick architectural representative in Pennsylvania. Similarly, Vogel is a Pennsylvania corporation based out of Pittsburgh that acts as a sales representative for Bobrick, *inter alia*, in the western part of the state. (Complaint, ¶¶ 4–5.)

## B. The ASTM E–84 Test and Santana's Fire Rated Compartment

In the construction industry, materials are often tested for flammability before use in construction. One common flammability test is the American Standard Test Methods (ASTM) E–84 Test. The ASTM E–84 test, also called the "Steiner Tunnel Test," [6] creates comparative values for the speed at which a flame spreads across the surface of a material and the rate at which smoke develops when the material burns. Specifically, the test develops "flame

spread" and "smoke developed" indices by comparing the rate of flame spread and smoke developed of the test material with that of select grade red oak and inorganic reinforced cement board surfaces under the same fire exposure conditions. (Vol. IV, Ex. 3, Appx. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 280, ASTM E–84–95b, ¶ 4.1) The ASTM E–84 test does contain two caveats:

> This standard should be used to measure and describe the response of materials, products, or assemblies to heat and flame under controlled conditions and should not be used to describe or appraise the fire-hazard or fire-risk of materials, products or assemblies under actual fire conditions. However, results of the test may be used as elements of a fire-hazard assessment or a fire-risk assessment which takes into account all of the factors which are pertinent to an assessment of the fire hazard or fire risk of a particular end use.

> This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.

(*Id.*, ¶¶ 1.7, 1.8.)

Some building codes and the National Fire Protection Association's ("NFPA") Life Safety Code 101 use the indices generated by the ASTM E–84 test to determine a material's fire rating. The following rating system is the subject of this dispute: [7] a Class A fire rating is the

---

**6.** The test is officially entitled "Standard Test Method for Surface Burning Characteristics of Building Materials." (Vol. IV, Ex. 3, Appx. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 280, ASTM E–84–95b.)

**7.** Santana disputes the contention that most building codes use this standard, instead arguing that model building codes and other building codes have a fire rating standard called "noncombustible." (Pl. Response to Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 393, ¶ 4.) Although not using the same

highest fire rating, requiring a flame spread index of 0–25; Class B is the next highest rating and requires a flame spread index between 26 and 75; finally, Class C fire rating requires a flame spread rating between 76 and 200. All three classes require a "smoke developed" index of less than 450. Any product that falls below the Class C fire rating is considered unrated.

The NFPA Life Safety Code 101 requires different fire ratings for materials depending on the characterization of their use in the building project. For example, the NFPA requires materials considered part of the "interior finish" or "wall finish" to possess a Class B fire rating. If, however, the material is considered part of a "furnishing" or "fixture," no fire rating is required. Central to this dispute is the categorization of toilet partitions as either an "interior finish," requiring a Class B rating, or as a "fixture," requiring no fire rating.

In the early 1980s, Santana began to develop a fire rated toilet partition, using the ASTM E–84 test to measure the fire rating of its test panels. (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶¶ 8–10.) This effort led to the 3000 Series toilet partition (also called the "FR"

partition by Santana), which Santana advertised as meeting a Class A rating. (*Id.*, ¶ 12.) One Santana brochure stated that *only* the FR partition met or exceeded "mandatory building code requirements for flame spread, smoke generation, and toxicity. These requirements were established and are currently enforced by the NFPA, BOCA, and other federal, state, and local municipality safety agencies nationwide." (Ex. 24, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298.) The reverse side of the brochure contained proposed specifications, which specified a fire rated toilet partition and referenced the ASTM E–84 test.[8] (*Id.* at B 403–04.) A description of the FR partition and its fire rating was included in at least one of Santana's Sweet's Catalog advertisements as well.[9] (Ex. 60, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, 1986 Sweet's Catalog, at S 66786.)

Bobrick and Santana also dispute the reasons for Santana's gradual withdrawal of its FR product. Bobrick contends that Santana experienced quality problems with the FR product. It was difficult to produce and lost most of the benefits of HDPE. Specifically, the FR material was

---

terminology, many of these codes use the numerical ratings produced by the ASTM E–84 test. Indeed, both Santana and Bobrick have, at some time, used this fire rating system in their promotional materials.

8. The parties dispute the circulation of this brochure. Bobrick contends such brochures were distributed nationwide for several years, while Santana argues that this brochure was developed for the New York City area only— New York City required Santana to meet a wall finish (Class B) standard—and that, at most, one copy was sent to Albany, New York on January 4, 1991. (Pl. Response to Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 393, ¶¶ 12–14.)

9. The advertisement states:
 **FR SERIES**

Santana Products has the manufacturing capability to custom compound polymer resins with fire retardants designed to meet the most strict fire code requirements within certain states or local municipalities.... Flame-spread index and smoke-generation values have been established using ASTM E–84, Steiner Tunnel Test or equivalent of NFPA's 255. (Test data available upon request.)
(Ex. 60, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, 1986 Sweet's Catalog, at S 66786.) Earlier on the same page, Santana claims that its Poly–Mar HD series "consists of standard high-density polymer resin compounds with an equivalent Class 'B' flame-spread." (*Id.*)

brittle, heavy, cuts and scratches were difficult to fix, the color choices were limited, and it was very expensive. (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶¶ 18–19.) Moreover, Santana experienced difficulty in making a consistently Class A product. The FR partition varied in its fire rating. (Pl. Response to Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 393, ¶ 20.)

While not disputing that its FR partition suffered from these various defects, Santana argues that this was not the reason for its decision to stop promoting the fire rated partition. Rather, Santana asserts that it stopped promoting the sale of fire rated compartments "once it realized that the market was being skewed in that direction by the competitors," (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 67), and after realizing that a Class A rating was not required by building codes. Competitors, according to Santana, were able to sell more competitively against the FR partition precisely because of the negative characteristics listed above, particularly price. No matter which interpretation of Santana's actions is adopted, however, it is undisputed that by the 1990s, Santana was phasing out its Class A product in favor of its standard, non-rated[10] product, Poly–Mar HD.

## C. The 1994 TPMC Litigation

In late 1989, several alleged non-party co-conspirators formed the Toilet Partitions Manufacturers Council ("TPMC").

According to Santana, Formica, one of the largest plastic laminate suppliers in the United States, and its customers in the toilet compartment industry had become concerned with Santana's sales success in the marketplace. To combat this success, Formica and most of its plastic laminate customers[11] had a series of group meetings beginning in October 1989, and continuing until the summer of 1991. At these meetings, the companies agreed that sales of HDPE compartments were a threat and that they would assert to specifiers that HDPE compartments, in particular Santana's compartments, exceeded fire code standards for wall finish. The TPMC urged Formica to test its thick stock (solid phenolic) product as to its compliance with the ASTM E–84 test for "wall finish" and add the results to Formica's Technical Data Sheet. (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 12.) Additionally, Formica and Metpar prepared a videotape that (according to Santana) falsely depicted the flammability of Santana's HDPE partitions. The videotape was produced for use by the sales representatives of the TPMC members.[12]

Santana claims that the TPMC bylaws excluded HDPE toilet compartment manufacturers from membership. (*Id.*, ¶¶ 27–30.) Bobrick, on the other hand, argues that the by-laws did not exclude manufacturers of HDPE from membership and that Santana was itself invited to join. (Bobrick's Rev. Stat. of Material Facts,

---

10. Although Santana advertised is Poly–Mar HD series as meeting a Class B flame spread, Bobrick asserted in its "fire scare" marketing campaign—and Santana does not dispute—that the Poly–Mar HD partition's smoke generation exceeded that allowed by the fire ratings.

11. These customers included AAMCO, Knickerbocker, Global Partitions, Sanymetal, Weis/Robart, Metpar, Accurate, All American,

Flush Metal and Columbia Partitions. (Pl. Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 8.)

12. The Formica videotape showed one of Santana's HDPE toilet partitions being set on fire with a lighter. This segment of the videotape had been produced by Metpar, a competitor of Santana.

Dkt. Entry 407, ¶ 78–80.) Regardless, the three members of the TPMC that marketed HDPE partitions prior to 1990—Knickerbocker, General Partitions, and Sanymetal—ceased to do so by the early 1990s (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶¶ 19, 36A.)

Bobrick was aware of the formation of the TPMC, but declined to join it. It did, however, interact with Formica and Metpar on the question of HDPE's fire characteristics. In July of 1989, Bobrick received a copy of a Metpar Fact Sheet comparing HDPE and phenolic and stating that HDPE had a smoke developed rating of 625, exceeding the limit of 450. (*Id.,* ¶ 6A.) Later, Metpar and Bobrick shared data regarding Bobrick's testing of Santana's Poly–Mar HD toilet compartments. (*Id.,* ¶ 13–15A.) Alan Gettelman and Bob Gillis of Bobrick were taken on a tour of a Formica plant and shown the Formica videotape. (*Id.,* ¶ 22A.) Bobrick received a copy of the Formica videotape in early 1990 and, with Formica's permission, sent copies to various architectural representatives. (*Id.,* ¶¶ 23–24; 34; 36.) The only condition put on Bobrick's use of the tape was that Bobrick was not to use it at trade shows. (*Id.,* ¶ 36.) While Bobrick did not join the TPMC, it promised the Chairman of the TPMC that it "would be happy to help support the Council in any way we could." (*Id.,* ¶ 32.)

On November 30, 1994, Santana filed a complaint in this Court against Formica, Metpar, ten other toilet partition manufacturers and the TPMC under the caption *Santana Products, Inc. v. Toilet Partition Manufacturers Council,* Civ. A. No. 3:CV–94–1962. As in this case, Santana's claims in the TPMC action included alleged violations of sections 1 and 2 of the Sherman Act, section 43(a) of the Lanham Act, as well as tortious interference with prospective contractual relations. The TPMC action focused on an alleged conspiracy "to use scare tactics to discourage specification and acceptance of Santana's HDPE partitions in lieu of or as a replacement material for conventional [toilet partition] materials by falsely alleging that Santana's partitions posed a dangerous fire hazard." (Ex. 225, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, TPMC Complaint, ¶ 21.)

On January 27, 1995, the TPMC, Formica and the eleven toilet partition manufacturers settled the 1994 TPMC litigation with Santana in a confidential agreement. (Ex. 229, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Settlement Agreement and Releases.) The 1994 TPMC lawsuit was then dismissed.

### D. Bobrick's "Fire Scare" Marketing Campaign

Santana alleges that both before and after the 1994 TPMC lawsuit, Bobrick engaged in an unlawful marketing campaign designed to persuade architects and specifiers that Santana's HDPE compartments did not meet building code requirements and were a fire hazard. In addition to acquiring the Formica videotape in 1990, (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶ 81), and distributing the Formica videotape to its sales representatives, Bobrick also distributed to its sales representatives a "Technical Bulletin" (TB–73) that provided a comparison of the results of an ASTM E–84 test performed on Bobrick's 1080 DuraLine Series partitions and on HDPE partitions. (*Id.,* ¶ 57.) The TB–73 bulletin was included in Bobrick's Architectural Manual from 1990 to at least 1994 and allegedly beyond. (*Id.,* ¶ 59; Pl. Response to Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 393, ¶ 59.) Bobrick also produced its own videotape in 1992–1993, entitled "You Be The Judge," that included a side-by-side comparison of

fire tests performed on solid phenolic and HDPE bathroom stalls. (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶ 108; Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 81.) In addition to these comparisons, some Bobrick representatives also conducted live demonstrations of burning HDPE for architects and specifiers.

Bobrick also addressed fire ratings in its national advertisements. Bobrick placed advertisements in the American School & University magazine ("AS & U") in the early 1990s that described HDPE as a "fire hazard" that "far exceeds the maximum allowable smoke contribution standard of the National Fire Protection Association Life Safety Code ... according to a recent ASTM E–84 test ...." (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶ 131.) Similar comparative statements were included in Bobrick's Sweet's Catalog advertisements. Bobrick also created slide presentations and sales scripts for its representatives that sought to portray HDPE as a fire hazard in comparison to its solid phenolic core compartments and its Thrislington series plastic laminate compartments.

### E. Procedural History

On October 1, 1996, Santana filed its Complaint in this matter, naming as defendants Bobrick, Hornyak, Vogel, Sylvester & Associates, Ltd., and Fred Sylvester. (Dkt. Entry 1.) On June 1, 1998, Bobrick filed a Third–Party Complaint against Formica, asserting counts for (1) contribution, (2) indemnification, (3) fraud, and (4) negligent misrepresentation. (Dkt. Entry 174.) Bobrick's Third–Party Complaint was dismissed by Memorandum and Order of August 30, 1999. *See Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,* 69

F.Supp.2d 678, 690–91 (M.D.Pa.1999)(holding that there is no right to contribution or indemnification under the Sherman Act or the Lanham Act, that the release between Formica and Santana barred Bobrick's contribution claim against Formica, that because Santana's underlying action depends upon Bobrick's knowing and intentional acts, a third-party claim for indemnification was unavailable, and that claims for fraud and negligent misrepresentation are not derivative claims for secondary liability, but rather independent tort claims which may not be maintained independently through a third-party complaint under Rule 14(a)). Sylvester & Associates and Fred Sylvester were earlier dismissed from the case for lack of personal jurisdiction by Memorandum and Order dated July 24, 1998. *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,* 14 F.Supp.2d 710 (M.D.Pa.1998).[13]

Between March 3, 1997 and September 12, 2000, the parties engaged in massive discovery. During the course of discovery, the parties inspected over a million pages of responsive documents and exchanged nearly 500,000 pages of these documents and more than two dozen videotapes. These responsive documents were the result of subpoenas for documents issued to over 270 third party architects, specifiers, public schools, municipalities, and testing laboratories nationwide, as well as every sales representative of both Bobrick and Santana. Subpoenas to defendants of the 1994 TPMC litigation and other competitors produced more than 50,000 additional pages of responsive documents. Several extensive computer databases were produced on seven compact discs and approximately two dozen computer diskettes. The parties deposed 181 witnesses, whose testimony filled more than 25,000 pages of

---

**13.** Santana then commenced litigation against Sylvester in the Eastern District of New York. That action has been stayed pending the resolution of this case.

transcripts. These include depositions of 156 fact witnesses in 22 states, 8 expert witnesses, and 17 expert-related fact witnesses. Moreover, a number of interrogatories were served during the course of this litigation. Such considerable discovery required the appointment of a Special Master, George A. Reihner, in late 1997 for the purpose of overseeing discovery and resolving discovery disputes.[14]

Following the conclusion of discovery, each party presented summary judgment motions. In support of its arguments, Santana proffered reports and testimony of its expert witnesses. Defendants moved in limine to have the court conduct *Daubert*[15] hearings to determine the admissibility of Santana's expert witness opinions. In response, Santana elected to withdraw its expert witness opinions. The parties then submitted revised memoranda of law that deleted references to the withdrawn opinions of Santana's experts. Oral argument on the motions was held on April 30, 2002.

### III. *DISCUSSION*

#### A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

---

**14.** The Court is most grateful for the excellent work performed by Mr. Reihner in superintending the sometimes contentious discovery problems that are often encountered in litigation of this complexity.

**15.** *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## B. The *Noerr/Pennington* Defense

■ "Rooted in the First Amendment and fears about the threat of liability chilling political speech, the [*Noerr/Pennington*] doctrine was first recognized in two Supreme Court cases holding federal antitrust laws inapplicable to private parties who attempted to influence governmental action—even where the petitioning had anticompetitive effects." *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.,* 263 F.3d 239, 250 (3d Cir.2001). The first Supreme Court decision was *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), which held that the concerted efforts of railroads to influence the passage of legislation adverse to the trucking industry were immune from liability under the federal antitrust laws. The second decision came in *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), which ruled that parties petitioning a government agency to curtail coal purchases could not be held to account to an injured coal producer in an antitrust case. The *Noerr/Pennington* doctrine has been extended to commercial tort claims, *e.g. Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 128 (3d Cir.1999), as well as federal statutory claims other than the Sherman Act. *E.g., Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.,* 196 F.3d 818, 826 (7th Cir.1999)(*Noerr/Pennington* applied to claim under the Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. § 1962).

Bobrick, Hornyak, and Vogel have each moved for summary judgment on the ground that liability on Santana's federal statutory and state common law claims is foreclosed or severely restricted by application of the *Noerr/Pennington* doctrine. Specifically, defendants contend that the *Noerr/Pennington* doctrine precludes liability for alleged injuries resulting from decisions of governmental actors to adopt bid specifications that effectively excluded Santana's HDPE toilet partitions.

As explained by our Court of Appeals, *Noerr/Pennington* immunity extends to two separate types of injury:

> A petitioner may be immune from the antitrust injuries which result from the petitioning itself. *See Noerr,* 365 U.S. at 143, 81 S.Ct. 523, 5 L.Ed.2d 464 (finding trucking industry plaintiffs' relationships with their customers and the public were hurt by the railroads' petitioning activities, yet the railroads were immune from liability). Also, ... parties are immune from liability arising from the antitrust injuries caused by government action which result from the petitioning. *See Pennington,* 381 U.S. at 671, 85 S.Ct. 1585, 14 L.Ed.2d 626 (holding plaintiffs could not recover damages resulting from the state's actions) .... Therefore, if its conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning.

*Bedell,* 263 F.3d at 251. Defendants assert that Santana's claims are premised upon decisions made by governmental actors, and are therefore barred by *Noerr/Pennington.*

■ "[T]he right to petition extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Protected "petitioning" activity runs the gamut of efforts to persuade governmental actors, extending well be-

yond "filing formal grievances directly with the government." *Bedell*, 263 F.3d at 252. It encompasses not only direct lobbying of legislative and executive officials, but also publicity campaigns and other marketing efforts. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 510, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988)("Petitioner, and others concerned about the safety or competitive threat of polyvinyl chloride conduit, can, with full antitrust immunity, engage in concerted efforts to influence [state and local] governments through direct lobbying, publicity campaigns, and other traditional avenues of political expression.").

In this case, the conduct challenged by Santana consisted of a multi-faceted advertising campaign that sought to address the "competitive threat" of HPDE toilet partitions by representing that the partitions were subject to flammability requirements for wall finish, as opposed to those applicable to furniture and fixtures, and by disseminating information concerning the flammability of HPDE compartments. Such a campaign, to the extent it targeted governmental decisionmakers, falls within the broad ambit of *Noerr/Pennington*. *Id.*

Santana, however, contends that the nature and context of the defendants' activities remove this case from the *Noerr/Pennington* doctrine. Santana alternatively asserts that this case falls within several purported exceptions to *Noerr/Pennington* immunity.

### 1. Defendants' Activities Are Within the Ambit of *Noerr/Pennington* Immunity

 Observing that the scope of immunity nonetheless "depends on the source, context, and nature of the anticompetitive restraint at issue," *id.* at 499, 108 S.Ct. 1931, Santana argues that Bobrick's conduct is not entitled to protection. In

support of its position, Santana relies principally on *Allied Tube*.

The "relevant context" for the anticompetitive activity at issue in *Allied Tube* was "the standard-setting process of a private association." *Id.* at 500, 108 S.Ct. 1931. Specifically, manufacturers of steel electrical conduit conspired to exclude polyvinyl chloride ("PVC") conduit from the National Fire Protection Association's National Electrical Code. Plaintiff itself had sought to have PVC conduit included in the 1981 edition of the Code as an approved type of electrical conduit. The defendant and other steel conduit manufacturers agreed to rig the voting on the plaintiff's proposal by packing the annual meeting of the NFPA with persons whose only function would be to vote against the PVC proposal. Defendant's effort was successful: PVC was not approved as an electrical conduit material in the 1981 Code. The Court ruled that, although it was likely that state and local governments would adopt the 1981 Code, thereby excluding PVC conduit, the activity in question, directed at a private standard-setting association, was not entitled to Noerr/*Pennington* immunity. Rejecting the "absolutist position that the *Noerr* doctrine immunizes every concerted effort that is genuinely intended to influence governmental action," *id.* at 503, 108 S.Ct. 1931, the Court concluded that "the *Noerr* immunity of anticompetitive activity intended to influence the government depends not only on its impact, but also on the context and nature of the activity." *Id.* at 504, 108 S.Ct. 1931. The Court found that *Noerr* immunity did not apply to the conduct of the defendant because it occurred "within the confines of a private standard-setting process ... [and][t]he validity of conduct within that process has long been defined and circumscribed by the antitrust laws without regard to whether the private standards are likely to

be adopted into law." *Id.* at 506, 108 S.Ct. 1931.

Asserting that "Bobrick's and its co-conspirators' actions took place within the context of 'standard' setting and enforcement by a private group of competitors who set and enforced the ASTM E–84 standard against HDPE toilet compartments because it was known that those products did not meet the smoke development index of the NFPA Life Safety Code," (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 25), Santana argues that "the context and nature of the present horizontal conspiracy is [sic] very clearly the type of commercial activity regulated by the antitrust laws." (*Id.*) There are indeed excerpts from the majority opinion in *Allied Tube* that support Santana's position. For example, the Court's observation that "the antitrust laws should not necessarily immunize what are in essence commercial activities simply because they have a political impact," *Allied Tube,* 486 U.S. at 507, 108 S.Ct. 1931, viewed in isolation, supports a conclusion that *Noerr* immunity should not pertain here. Bobrick's activities were plainly commercial in nature, and application of the antitrust laws to such activity has intuitive appeal. But the Court in *Allied Tube* carefully circumscribed the reach of its decision: "Our holding is expressly limited to cases where an 'economically interested party exercises *decisionmaking* authority in formulating a product standard for a private association that comprises market participants.'" *Id.* at 511 n. 13, 108 S.Ct. 1931 (emphasis in original).

The facts of this case do not fall within *Allied Tube's* narrow holding. Bobrick and its alleged co-conspirators, individually or in combination, did not exercise any decisionmaking authority in the formulation of a product standard. This is not a case where a private standard-setting association was manipulated by machinations of Santana's competitors to exclude HDPE toilet compartments from applicable safety codes. Bobrick and its alleged co-conspirators simply advocated an interpretation of an applicable code that was adverse to Santana's position. This advocacy did not occur within the confines of a private standard setting association, but occurred in the context of a marketing campaign that encompassed public building projects. In this setting, Santana had the ability to advocate its position that toilet compartments should not be subjected to the requirements of wall finish standards and to refute assertions concerning the flammability and smoke characteristics of its product. The decisionmaker at issue in this case is not Santana's competitors, but the government agent—the specifier—who does not have a commercial interest to advance in determining the building code provisions applicable to toilet partitions. Bobrick merely attempted to influence the specifier's decision. It did not formulate a product standard, exercise decisionmaking authority, or direct its activities towards a private standards-setting organization. Thus, Santana's reliance upon *Allied Tube* is misplaced.

There is another delimiting factor in *Allied Tube* that makes its holding inapplicable here. The plaintiff in *Allied Tube* did not seek damages resulting from the adoption of the rigged Code standard by any governmental entity. *Id.* at 500, 108 S.Ct. 1931. Instead, plaintiff's recovery was limited to the theory that "the stigma of not obtaining [Code] approval of its product and Allied's 'marketing' of that stigma caused *independent marketplace harm* to [plaintiff] in those jurisdictions *permitting use of PVC conduit,* as well as those that later adopted the 1984 NEC, which *permitted use of PVC conduit ....*" *Indian Head, Inc. v. Allied Tube & Conduit Corp.,* 817 F.2d 938, 941 n. 3 (2d

Cir.1987)(emphasis added), *aff'd*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). Thus, damages resulting from the adoption of the 1981 Code by various government agencies were explicitly excluded from the claim considered by the Supreme Court. *See* 486 U.S. at 498 n. 2, 108 S.Ct. 1931. Here, by way of contrast, Santana seeks recovery of damages resulting from the effective exclusion of its product from public building specifications attributable to the efforts of Bobrick and its alleged co-conspirators.

Illustrating the significance of this distinguishing feature of *Allied Tube* is the Ninth Circuit's decision in *Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.*, 17 F.3d 295 (9th Cir.), *cert. denied*, 513 U.S. 813, 115 S.Ct. 66, 130 L.Ed.2d 23 (1994). At issue in *Sessions* was the activity of a storage tank manufacturer in the amendment of a model fire code to the disadvantage of the defendant's competitor, Sessions Tank Liners, Inc. ("Sessions"). Sessions was involved in the business of "repair[ing] leaking storage tanks in place by cutting them open, lining their interiors with a protective coating of epoxy, and resealing them." *Id.* at 296. The defendant, Joor Manufacturing, Inc., produced underground storage tanks. While the cost of lining a leaking new tank was approximately the same as the cost of a new replacement, tank lining proved "cheaper than tank replacement … because lining [did] not entail the additional costs of removing and discarding the leaking tank and installing a new one," and "[did] not require the lengthy interruption of business that tank replacement often involve[d]." *Id.* Tank lining, however, required a government permit. Joor caused the amendment of a model fire code to require that leaking tanks be removed. In effect, the amendment was tantamount to a ban on tank lining. *Id.* at 297.

Claiming that this conduct violated federal antitrust laws and California tort law, Sessions brought an antitrust and unfair competition action in federal court. The district court ruled that Joor was entitled to *Noerr* immunity, No. 84–6363 MRP, 1986 WL 31689 (C.D.Cal. Jan. 17, 1986), and the Ninth Circuit, in relevant part, agreed. 827 F.2d 458 (9th Cir.1987). The Supreme Court, however, vacated the Ninth Circuit ruling and remanded the matter for further consideration in light of *Allied Tube. Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.*, 487 U.S. 1213, 108 S.Ct. 2862, 101 L.Ed.2d 899 (1988).

The case then went back to the district court, which conducted a bench trial. The trial court found that Joor had knowingly made false statements to the standard setting organization that caused the effective ban on tank lining. The district court further found that prior to and immediately after the adoption of the code amendment, "Joor 'marketed' the stigma which it had caused the [standards-setting organization] to place on tank lining by sending letters to public agencies and customers urging its prohibition." 786 F.Supp. 1518, 1532 (C.D.Cal.1991). As does Santana here, Sessions claimed, and the district court found, that prior to the amendment of the code, Sessions' business was expanding, but that it declined sharply following adoption of the code amendment. Sessions also proved that it was receiving permits freely before the code amendment, but was denied them thereafter and that it was denied permits even before any local government would have been able to adopt the code amendment. *Id.* The district court concluded that, under these circumstances, *Allied Tube* dictated the conclusion that Joor was not shielded by *Noerr* immunity.

The Ninth Circuit reversed. In finding that *Allied Tube* did not abrogate immuni-

ty for Joor's conduct, the Ninth Circuit explained that *Noerr* petitioning immunity "has its roots in the Supreme Court's decision in *Parker v. Brown,* 317 U.S. 341, 350, 63 S.Ct. 307, 87 L.Ed. 315 (1943)." *Sessions,* 17 F.3d at 298. *Parker* "held that the Sherman Act does not prohibit an anticompetitive restraint imposed by a state as an act of government." *Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1035 (3d Cir.1997). The holding in *Noerr* was "a corollary to *Parker:* The federal antitrust laws ... do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 379–80, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). Thus, " 'where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Allied Tube,* 486 U.S. at 499, 108 S.Ct. 1931. The Ninth Circuit in *Sessions* recognized the critical distinction between harm caused by the inability to procure a government permit (valid state action) and harm to competition independent of such state action. Holding that the evidence showed that Sessions' injuries were directly attributable to the inability to secure requisite permits from governmental entities, the Ninth Circuit ruled that liability could not be imposed upon Joor:

> In applying *Allied* to Joor's conduct, the district court overlooked a key distinction between *Allied* and this case. The plaintiff in *Allied* was awarded damages only on the theory that the stigma of banning the plaintiff's product from a uniform code caused independent marketplace harm to the plaintiff in jurisdictions that permitted the use of the plaintiff's products. In contrast, Sessions has never proved that it sustained inju-

ries from anything other than the actions of municipal authorities. Sessions has not shown that any potential tank lining customer . in jurisdictions that were not enforcing the ... tank removal provision decided not to engage Sessions' services because of the [Code amendment]. Nor has Sessions adduced any evidence that Joor's actions caused independent marketplace harm in jurisdictions that continued to permit tank lining. Unlike the plaintiff in *Allied,* Sessions was not awarded damages on the theory that Joor's 'marketing the stigma' of [the Code amendment] caused Sessions any loss of business independent of the losses resulting from the permit denials. *The injuries for which Sessions seeks recovery flowed directly from government action. This fact takes the case entirely out of the realm of Allied.*

\* \* \* \* \* \*

To rule otherwise and hold Joor liable for injuries flowing from governmental decision-makers' imposition of an anticompetitive restraint, we would have to find that the restraint was imposed *because of* Joor's petitioning efforts. *Proof of causation would entail deconstructing the decision-making process to ascertain what factors prompted the various governmental bodies to erect the anticompetitive barriers at issue. This inquiry runs afoul of the principles guiding the Parker and Noerr decisions.*

17 F.3d at 299, 300 (citations omitted)(emphasis added).

Santana's argument that *Allied Tube* is controlling here does not distinguish between harm caused as a result of specifications adopted for public building projects that excluded its products and harm resulting from the "stigma" attached to its

products that caused it to lose business in the non-public sector. *Allied Tube* did not sanction the conflation of harm caused by governmental adoption of a product standard or requirement, on the one hand, and harm caused independent of the adoption of the standard.

Buttressing this conclusion is the Third Circuit's analysis in *Massachusetts School of Law*, 107 F.3d at 1034–37. After being denied ABA accreditation, the Massachusetts School of Law ("MSL") sued the ABA and others on the theory that they had conspired to organize and enforce a group boycott in violation of section 1 of the Sherman Act and conspired to monopolize legal education, law school accreditation, and the licensing of attorneys, in violation of section 2 of the Sherman Act. MSL asserted several types of injury resulting from the ABA's allegedly anti-competitive conduct, including a decline in enrollments because graduates of unaccredited schools cannot take the bar examination in most states. Judge Greenberg, writing for the unanimous Third Circuit panel, defined the:

> substantive issues on this appeal [as] whether state or private conduct caused the injury MSL alleges it suffered because its graduates could not take the bar examination in most states, and whether, if MSL suffered an injury as a result of the ABA's conduct, the injury was an incidental effect of the ABA's attempt to influence the states with respect to establishing criteria for bar admission.

*Id.* at 1035. Distinguishing *Allied Tube* on the ground that its holding "specifically excluded from consideration any injury resulting from the adoption of the challenged standards by any government and dealt only with the independent marketplace effect of the defendant's conduct," *id.* at 1036 n. 8, the Third Circuit concluded that

alleged injury arising from the inability of MSL graduates to take the bar examination in most states could not form the basis for antitrust injury. In reaching the result that there was immunity from damages caused by declining enrollments attributable to the states giving effect to the ABA adverse accreditation decision, the Third Circuit cited with approval the Ninth Circuit ruling in *Sessions*. *Id.* at 1036. In short, the Third Circuit recognized that there is immunity from antitrust liability where, as here, "the 'injuries for which [plaintiff] seeks recovery flowed directly from government action.'" *Id.* (quoting *Sessions*, 17 F.3d at 299).

This principle was reiterated by the Third Circuit in *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154 (3d Cir.1999). In *Armstrong*, the plaintiff claimed, *inter alia*, that the defendants' threat to boycott plaintiff's outpatient surgery center violated the federal antitrust laws. Defendants claimed immunity to liability on the ground that the threatened boycott had been communicated to the Pennsylvania Department of Health during its consideration of plaintiff's Certificate of Need ("CON") application, and that the plaintiff's alleged injuries resulted solely from the decision of the Department of Health to deny the CON. The Third Circuit agreed with the defense position. Writing for the majority in *Armstrong*, Judge Stapleton observed:

> [E]ven where the same petitioning conduct might give rise to antitrust liability for injury *directly* caused to a competitor in the marketplace, if relief is sought solely for injury as to which the state would enjoy immunity under *Parker*, the private petitioner also enjoys immunity. . . .
>
> \* \* \* \* \* \*

In sum, where, as here, all of the plaintiff's alleged injuries result from state

action, antitrust liability cannot be imposed on a private party who induced the state action by means of concerted anticompetitive activity.

*Id.* at 159, 160.

Another argument advanced by Santana is that *Noerr* immunity is not available where the defendant "attempted directly to persuade anyone not to deal with" the plaintiff. (Rev. Memo. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 30 n. 12, quoting *Mass. School of Law*, 107 F.3d at 1038 (quoting *Noerr*, 365 U.S. at 142, 81 S.Ct. 523.)) Specifically, Santana asserts:

> In the present case, it is undisputed that Bobrick and its co-conspirators not only stated the position that the NFPA/ ASTM E-84 standards applied to Santana but that they engaged in actual conduct directed at Santana's customers and potential customers to enforce the standard in the marketplace. In sum, the MSL decision clearly supports a denial of Bobrick's *Noerr* defense.

(*Id.*, citation omitted.)

The language from *Noerr* on which Santana relies was used in responding to the lower court's holding that the railroads sought the legislation with the primary intent to hurt the truckers, even if they secured no legislation. In rejecting this contention, the Court explained:

> The apparent effect of these findings is to take this case out of the category of those that involve restraints through governmental action and thus render inapplicable the principles announced above. But this effect is only apparent and cannot stand under close scrutiny.

> There are no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers. Moreover, all of the evidence in the record, both oral and documentary, deals with the railroads' efforts to influence the passage and enforcement of laws. Circulars, speeches, newspaper articles, editorials, magazine articles, memoranda and all other documents discuss in one way or another the railroads' charges that heavy trucks injure the roads, violate the laws and create traffic hazards, and urge that truckers should be forced to pay a fair share of the costs of rebuilding the roads, that they should be compelled to obey the laws, and that limits should be placed upon the weight of the loads they are permitted to carry. In the light of this, the findings of the District Court that the railroads' campaign was intended to and did in fact injure the truckers in their relationships with the public and with their customers can mean no more than that the truckers sustained some direct injury as an incidental effect of the railroads' campaign to influence governmental action and that the railroads were hopeful that this might happen.

*Noerr*, 365 U.S. at 142-43, 81 S.Ct. 523 (emphasis added).

From this language, our Court of Appeals gleaned an exception to *Noerr* immunity where the defendant attempts directly to persuade anyone not to deal with the plaintiff.[16] *Mass. School of Law*, 107 F.3d at 1038. Santana overlooks, however, the court's limited application of this exception. In the *Mass. School of Law* case, the

---

**16.** This does not appear to be an exception, *per se,* but merely a factor in the Court's analysis. As the Court later stated in *Allied Tube,* "*Noerr* immunity of anticompetitive activity intended to influence the government depends not only on its impact, but also on the context and nature of the activity." **486**

U.S. at 504, 108 S.Ct. 1931. In *Allied Tube,* not only was there evidence that the defendant was attempting to prevent anyone from dealing with the plaintiff, but also that it did so by preventing a *private* association from including the plaintiff's product in its industry standards.

court found the exception inapplicable because, *inter alia:*

> if a claim for stigma injury could be advanced in circumstances [where the plaintiff was mentioned incidental to statements defending the defendant's standard], *Noerr* immunity would be confined severely; a petitioner for governmental action is likely to urge that the action is needed to ensure that standards are met, thereby suggesting that some entities do not meet appropriate standards.

*Id.*

 Upon reviewing the evidence, it is apparent that Santana inaccurately summarizes the defendants' campaign as stating that the NFPA/ASTM E–84 standards applied to *Santana.* (Rev. Memo. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 30 n. 12.) Rather, the defendants attempted through various means to persuade architects and specifiers for public building projects that certain building code standards applied to *toilet partitions.* The defendants then represented to the architects and specifiers that *HDPE* did not meet this standard. While the goal of this campaign was, clearly, to take business away from Santana and other HDPE manufacturers, (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶¶ 69, 71–73, 90, 91, 99, 101, 102, 103, 104, 107, 109, 111, 116), "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose."[17] *Pennington,* 381 U.S. at 670,

85 S.Ct. 1585. Indeed, the fact that the goal of the railroads in *Noerr* was to injure trucking companies did not vitiate their immunity. *See Noerr,* 365 U.S. at 143–44, 81 S.Ct. 523.[18]

Furthermore, such a broad interpretation of this exception is not supported by more recent cases. Both *Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 120 (3d Cir.1999), and *Armstrong,* involved defendants who attempted to persuade the government not to "deal" with a specific entity. In *Cheminor,* an American ibuprofen manufacturer filed petitions with the Department of Commerce and the United States International Trade Commission requesting imposition of anti-dumping and countervailing duties on imports of bulk ibuprofen from an Indian manufacturer. *Armstrong* dealt with the concerted action of a hospital and several doctors to prevent the plaintiff from establishing an ambulatory surgery center. Although these cases involved a different context from the matter *sub judice,* they show that targeting petitioning activity at one entity, by itself, does not fall into the *Noerr* exception for direct persuasion not to deal. Looking at these cases as a whole, this exception should apply only when the petitioning activity consists solely of an attempt to persuade a customer to not deal with the plaintiff, without presenting broader justifications. In *Mass. School of Law,* the ABA did not merely state that "MSL is a bad institution, or that a particular student should not go there," but that the school

---

17. Santana claims that these statements of material fact show that the defendants' campaign was aimed directly at Santana. While these statements certainly demonstrate that the purpose of the marketing campaign was to injure Santana's business, they do *not* show that the defendants sought to dissuade the architects from dealing with Santana specifically, as opposed to specifying HDPE toilet partitions in general.

18. They did so by arguing that the "product"—cargo transportation by truck—caused damage to the roads, violated the law and created traffic hazards. *Noerr,* 365 U.S. at 142–43, 81 S.Ct. 523. Similarly, the defendants' marketing campaign asserted that HDPE partitions did not meet the ASTM E–84 test (adopted into law by some states) and created a fire hazard.

failed to satisfy the ABA's accreditation process. 107 F.3d at 1038. In *Noerr*, the railroads pointed to the negative impact of trucking on roads and safety. Here, the defendants did not coerce the architects or specifiers to not deal with Santana, but argued that HDPE (Santana's product) failed to meet what the defendants considered the governing safety test and could be a fire hazard. Whether or not such assertions are true is not relevant to this analysis.

Thus, to the extent that Santana premises its damages on decisions made by public officials or their agents (i.e., architects and others advising public officials) who approved specifications for phenolic toilet partitions or disapproved specifications for HDPE toilet partitions, defendants are immune from liability. *Cf. TEC Cogeneration, Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1572 (11th Cir.1996)(recognizing *Noerr/Pennington* immunity for defendant's conduct in successfully lobbying agency to vote against construction of competing electrical transmission line because "[a]bsolute immunity from antitrust liability results where the restraint upon trade or monopolization is the result of valid governmental action as opposed to private action"); *Bristol–Myers Squibb Co. v. Ivax Corp.*, 77 F.Supp.2d 606, 612 (D.N.J.2000) (holding that conduct in securing governmental exclusive marketing privileges for an anticancer drug was not subject to antitrust liability because the alleged injuries sustained by the plaintiff "were the 'direct result' of decisions made by government agencies").

## 2. There Is No "Commercial" Exception to *Noerr/Pennington* Immunity

Santana asserts that even if defendants' conduct falls within the *Noerr/Pennington* doctrine, immunity is not available where, as here, governmental units are the purchasers of the products at issue. (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 26.) In support of this assertion, Santana cites *Federal Trade Commission v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990).

In *Trial Lawyers*, attorneys providing representation to indigent criminal defendants under the District of Columbia Criminal Justice Act ("CJA") agreed to decline acceptance of any new cases until the CJA rate of compensation was increased. The group boycott proved to be successful, but prompted a complaint by the Federal Trade Commission that the attorneys had entered into an illegal agreement to restrain trade. The Court distinguished *Noerr* on the ground that "the alleged restraint of trade was the intended *consequence* of public action; in this case, the boycott was the *means* by which respondents sought to obtain favorable legislation." *Id.* at 424–25, 110 S.Ct. 768. The Court further observed that "[t]he restraint of trade that was implemented while the boycott lasted would have had precisely the same anticompetitive consequences during the period even if no legislation had been enacted." *Id.* at 425, 110 S.Ct. 768.

In the matter *sub judice*, Bobrick sought to convince government decisionmakers to specify phenolic compartments or to exclude HDPE partitions. It was the actions of the governmental decisionmakers that imposed the challenged restraint. In *Trial Lawyers*, by way of contrast, the desired governmental action ended the restraint. The Third Circuit in *Armstrong* recognized the significance of this distinction:

> The limitation on *Noerr* immunity recognized in *Trial Lawyers* is inapplicable . . . to a case where the sole antitrust

injury is caused directly by the government action that the private defendant has helped to secure.... [I]f relief is sought solely for injury as to which the state would enjoy immunity under *Parker*, the private petitioner also enjoys immunity.

185 F.3d at 159. As explained in *Sandy River Nursing Care v. Aetna Casualty*, 985 F.2d 1138, 1143 (1st Cir.1993):

> *Trial Lawyers* does not establish a "government-as-market-participant" exception to *Noerr*. What was significant about the concerted activity there was not that the government was the purchaser, but that the defendants had sought to influence the government through an economic boycott that directly affected the marketplace by, *inter alia*, constricting the supply of lawyers available for indigent criminal defendants. The Court emphasized that *Noerr* provides immunity when the alleged restraint of trade is imposed *by the government* as the intended *consequence* of the defendants' concerted activity. [Emphasis in original.]

In this case, the alleged restraint of trade was imposed by governmental actors as the intended consequence of the challenged concerted activity. Thus, this case

falls within *Noerr*, and not within *Trial Lawyers*.

Santana has not cited any other Supreme Court precedent that recognized a "market participant" or "commercial" exception to *Noerr*/Pennington immunity.[19] Indeed, the Court's decision in *Pennington* is inconsistent with the recognition of the "commercial" exception advanced by Santana. In *Pennington*, part of the challenged conduct included lobbying the Tennessee Valley Authority ("TVA") to curtail purchases of coal on the spot market because such sales were not subject to requirements that the coal producers pay the miners a certain minimum wage. The jury had been instructed that this approach to the TVA would be illegal if the TVA was urged to modify its coal purchasing policies for the purpose of driving small producers out of business. The Supreme Court held that such an instruction was error because, under *Noerr*, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." 381 U.S. at 670, 85 S.Ct. 1585. The fact that the conduct in question was aimed at TVA's purchasing policies did not enter into the analysis.

Santana nonetheless persists that there is a "long line of cases that hold ... that the *Noerr* doctrine does not immunize con-

---

**19.** In *City of Columbia*, 499 U.S. at 374–75, 379, 111 S.Ct. 1344, the Court intimated at a "possible market participant exception" to *Parker* state action immunity. The Court, however, did not suggest that such an exception existed in the *Noerr/Pennington* context. Moreover, the Court's citation in *City of Columbia* to *Union Pacific Railroad Co. v. United States*, 313 U.S. 450, 61 S.Ct. 1064, 85 L.Ed. 1453 (1941), as an example of what it meant to be a commercial or market participant suggests that the government must be in competition with the complaining party before the exception to immunity may apply. In *Union Pacific*, Kansas City was held liable for action take in its capacity as the owner and operator of a wholesale produce market integrated with railroad facilities. Here, by way of contrast, the governmental actors are not in the business of making and selling toilet partitions. Thus, any possible market participant exception suggested by the Supreme Court in *City of Columbia* is not applicable here. *See Hedgecock v. Blackwell Land Co.*, 52 F.3d 333 (table), 1995 WL 161649, at *2 (9th Cir.1995)(governmental entity's allocation of water does not fall within any commercial participant exception to *Parker* because "[p]laintiffs are not in competition with the district, rather they feel the economic effect of the district's decision concerning the refusal to sell allegedly excess water to other districts.").

certed action by sellers against the government when the government is acting in a commercial capacity as a buyer of goods or services." (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 27.) Santana's citations to this purported "long line" of decisional law begins with a 1970 First Circuit ruling, *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970), and ends with a 1979 decision from the District of Columbia, *General Aircraft Corp. v. Air America, Inc.,* 482 F.Supp. 3 (D.D.C.1979).[20]

The first case cited by Santana, *Whitten,* was decided in the context of a summary judgment motion in which the defendant conceded for purposes of presenting a *Noerr/Pennington* defense "that it had combined with dealers and others to effect the use of its specifications in the public swimming pool industry, that its specifications were so drawn that only it could comply, and that its purpose was to eliminate competition." 424 F.2d at 27. As described by the appellate court, the applicability of the *Noerr/Pennington* immunity was to be decided in the context of the:

> government acting in a proprietary capacity, purchasing goods and services to satisfy its own needs within a framework of competitive bidding, where the initial responsibility for recommending specifications has been entrusted to a hired professional, and where the selling effort directed at that professional and his public client by a leading supplier was monopolistically motivated and ran the gamut from high pressure salesmanship to fraudulent statements and threats.

*Id.* at 29. The First Circuit rejected the defense contention that liability could not be imposed because state actors decided the content of bid specifications, reasoning that "valid government action confers antitrust immunity only when the government determines that competition is not the *summum bonum* in a particular field and deliberately attempts to provide an alternate form of public regulation." *Id.* at 30. The court also rejected *Noerr/Pennington* immunity because, in its view, immunity was limited to activity of a political nature undertaken in the context of "the 'passage or enforcement of laws.'" *Id.* at 32.

Neither rationale advanced in *Whitten* can withstand critical analysis. Ascertainment of whether the government has determined that competition is not the *"summum bonum"* in determining bidding specifications that concern factors of quality and safety "would require the sort of deconstruction of the governmental process and probing of the official 'intent' that [the Supreme Court has] consistently sought to avoid." *City of Columbia,* 499 U.S. at 377, 111 S.Ct. 1344. The deconstruction of the decisionmaking process to determine the factors that prompted various governmental bodies to impose the challenged anticompetitive restraints was precisely the type of inquiry that the Ninth Circuit found to be contrary to "the principles guiding the *Parker* and *Noerr* decisions." *Sessions,* 17 F.3d at 300; *see also Hedgecock,* 1995 WL 161649, at *3. As to the *Whitten* court's explanation that Noerr/*Pennington* immunity is limited to activity of a "political nature" in the context of "passage or enforcement of laws," 424 F.2d at 32, it is sufficient to observe that Noerr/*Pennington* has been applied to activities other than the publicity campaign at issue in *Noerr* and in contexts that did not involve the passage or en-

---

**20.** The Third Circuit has apparently not addressed the question of whether there should be an exemption from *Noerr/Pennington* immunity when the government is petitioned in its capacity as a consumer or purchaser of goods and services.

forcement of laws. *E.g., Bedell,* 263 F.3d at 250–54 (negotiating settlement agreement to resolve tobacco liability litigation); *Cheminor,* 168 F.3d 119 (petition requesting imposition of anti-dumping and countervailing duties on imports of ibuprofen from India); *Armstrong,* 185 F.3d at 160–64 (representations made in opposing issuance of a CON to a competitor). Finally, recognition of a "commercial" exception as suggested by *Whitten* cannot be reconciled with the Supreme Court's following observation in the subsequent case of *California Motor Transport:*

> [I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view *respecting resolution of their business and economic interests vis-a-vis their competitors.*

404 U.S. at 510–11, 92 S.Ct. 609 (emphasis added).

Other courts have recognized that the holding in *Whitten* may not be consonant with subsequent Supreme Court holdings. *See, e.g., In re Airport Car Rental Antitrust Litig.,* 693 F.2d 84, 87 (9th Cir.1982) ("It is possible that *California Motor Transport* implicitly overruled . . . *Whitten.*"), *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983); *Bustop Shelters, Inc. v. Convenience & Safety Corp.,* 521 F.Supp. 989, 996 (S.D.N.Y.1981)(*Whitten* has "been disapproved in this circuit, as implicitly overruled or weakened by *California Motor Transport*"). Indeed, *Allied Tube* explic-

itly sanctioned concerted efforts to influence governmental actors with respect to *either* the safety *or* the competitive threat of a particular product. 486 U.S. at 510, 108 S.Ct. 1931.

In *Greenwood Utilities Commission v. Mississippi Power Co.,* 751 F.2d 1484, 1505 (5th Cir.1985), the court refused to recognize a commercial exception to *Noerr/Pennington* immunity because, "although such a distinction may be intuitively appealing it proves difficult, if not impossible, of application . . . where the government engages in a policy decision and at the same time acts as a participant in the marketplace." The court explained that rejection of a commercial exception was appropriate because there is no bright line test for determining when the government engages in a purely commercial decision and when it is acting in a regulatory capacity or making a policy decision. *Id.* at 1505 n. 14.[21] In *Independent Taxicab Drivers' Employees v. Greater Houston Transportation Co.,* 760 F.2d 607 (5th Cir.1985), the Fifth Circuit reaffirmed its conclusion that there is no commercial exception to *Noerr/Pennington* immunity, explaining that "[i]t would be anomalous to hold on the one hand that government can contract with private entities to effectuate valid, albeit anticompetitive, policies, while holding on the other hand that private entities cannot petition government to participate in the public endeavor. There is no such case as *Parker v. Noerr/Pennington.*" *Id.* at 613. Other courts have similarly declined to carve out a "commercial" exception to *Noerr/Pennington* immunity. *See, e.g., Bristol–Myers,* 77 F.Supp.2d at 615 ("'If the injury flows directly from a

---

**21.** Significantly, the Fifth Circuit explicitly rejected the characterization advanced by Santana in this case that its earlier holding in *Woods Exploration and Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), recognized a "commercial" exception to the *Noerr/Pennington* doctrine. *Greenwood,* 751 F.2d at 1505 n. 14.

governmental action then there is no liability for the private party, notwithstanding that the 'commercial' defendant urged the government to take 'commercial' action.'"); *Bright v. Ogden City*, 635 F.Supp. 31, 35 (D.Utah 1985); *United States v. Johns–Manville Corp.*, 259 F.Supp. 440, 452–53 (E.D.Pa.1966)("[A]ny concerted activities ... to influence the decision of public officials on pipe specifications are constitutionally protected and cannot be the basis of a finding of violation of the antitrust laws regardless of the intent with which they were undertaken.") (citation omitted).

The weight of the authority plainly preponderates against recognition of a commercial exception to *Noerr/Pennington* immunity. Moreover, the rationale for rejecting a commercial exception is consistent with Supreme Court pronouncements and is convincing. It is difficult to ascertain when a governmental actor is acting solely in a commercial capacity. As Bobrick points out, the specification decisions assailed here implicate not only price, but also safety, calling, at least arguably, for a policy decision. In addition, as the Ninth Circuit recognized in *In re Airport Car Rental Antitrust Litigation*, decisions concerning implementation of policy are just as important as the setting of policy, and petitioning regarding such decisions is entitled to as much protection as petitioning regarding strict policy matters. 693 F.2d at 87–88.[22] Moreover, determining whether a decision was motivated solely by commercial considerations becomes even more difficult when there are literally hundreds of governmental decisionmakers. Finally, courts would be called upon to deconstruct government decisions in order to determine whether improper conduct prompted those decisions, the type of intrusion into state and local governmental affairs that *Noerr/Pennington* is intended to avoid. As explained by Judge Walls in *Bristol–Myers*:

> Antitrust immunity is not destroyed by a commercial relationship between the government and a private actor. If that were so, courts would be called upon to frustrate First Amendment rights whenever the government stood to profit from its decisions.... Without express declaration of Congress, the [commercial] exception cannot swallow the reaching rule of immunity ....

77 F.Supp.2d at 615. Accordingly, *Noerr/Pennington* immunity is not defeated in this case by the fact that state and local governments were acting as product purchasers.

### 3. There Is No "Fraud" Exception to *Noerr/Pennington* Immunity

■ Santana asserts that, in any event, allegations that Bobrick engaged in fraud in seeking to affect specification decisions vitiates the *Noerr/Pennington* defense. In support of this assertion, Santana relies upon *Cheminor*.

Contrary to Santana's assertion, *Cheminor* did not hold that misrepresentations undermine a *Noerr/Pennington* defense. Indeed, the Third Circuit in *Cheminor* "decline[d] to carve out a new exception to the broad immunity that *Noerr/Pennington* provides." 168 F.3d at 123. Instead, *Cheminor* involved application of the settled two-step test for determining whether the "sham" exception to *Noerr/Pennington* immunity applied. The first prong of this test requires the courts to ascertain

---

**22.** The Ninth Circuit's rejection of a commercial exception in *In re Airport Car Rental Antitrust Litigation* undermines Santana's reliance upon that court's earlier decision in *Sacramento Coca–Cola Bottling Co. v. International Brotherhood of Teamsters*, 440 F.2d 1096 (9th Cir.1971).

whether the position taken by the defendant "is objectively meritless." *Id.* at 122–23. If so, the court is to ascertain whether the baseless petition was " 'an attempt to interfere *directly* with the business relationships of a competitor, through the use of governmental *process*—as opposed to the outcome of that process—as an anticompetitive weapon.' " *Id.* (quoting *Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 63, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993)). Santana's discussion ignores the fact that *Cheminor* concerned only the first prong of the "sham" exception.

■ Significantly, the Third Circuit in *Armstrong,* decided subsequent to *Cheminor,* held that it is unnecessary to determine whether the position advanced by the defendant is objectively meritless where it is clear that the defendant's purpose was to obtain the outcome of the process. 185 F.3d at 158 n. 2. In this case, there is no dispute that the defendants were focused on the outcome of their advertising campaign—to convince customers to use their product. Thus, the sham exception, which is limited to "situations in which persons use the governmental process—as opposed to the *outcome* of that process—as an anticompetitive weapon," *City of Columbia,* 499 U.S. at 380, 111 S.Ct. 1344, is not applicable here.

*Armstrong* also held that the alleged misrepresentation made by the defendants in connection with the Department of Health's consideration of the plaintiff's CON application did not undermine *Noerr/Pennington* immunity. Citing *City of Columbia,* in which the Supreme Court ruled that there is no exception to *Parker* and *Noerr/Pennington* immunity for conspiracies between governmental and private actors, the Third Circuit explained that "[l]iability for injuries caused by [states acting as regulators] is precluded even where it is alleged that a private party urging the action did so by bribery, deceit or other wrongful conduct that may have affected the decision making process." 185 F.3d at 162. The court explained that the remedy in such circumstances rests with other laws directed to that conduct, and "not with courts looking behind sovereign state action at the behest of antitrust plaintiffs."

*Armstrong* compels rejection of Santana's contention that Noerr/*Pennington* immunity is inapplicable where the defendant's otherwise protected activity is rife with fraud. *Noerr* itself recognized that immunity applies even though the defendants had employed deceptive and unethical means. 365 U.S. at 145, 81 S.Ct. 523. Thus, defendants are entitled to Noerr/*Pennington* immunity, at least to the extent that Santana seeks to recover damages resulting from decisions by governmental actors to specify phenolic toilet compartments or to prohibit HDPE toilet partitions.

### 4. The *Noerr/Pennington* Doctrine Is Applicable to Each of Santana's Claims

■ This conclusion applies with equal force not only to Santana's antitrust claims, but also to its claims of tortious interference with prospective contractual relationships and violations of the Lanham Act. In *Cheminor,* our Court of Appeals explicitly ruled that the *Noerr/Pennington* doctrine extends to bar immunity on common law tort claims of malicious prosecution, tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition. 168 F.3d at 128.

Santana does not contest the application of the *Noerr/Pennington* doctrine to its common law tort claim. It does, however, argue that *Noerr/Pennington* does not ex-

tend to its Lanham Act claim because commercial speech may be regulated without abridging First Amendment protections.

There is no Supreme Court or Third Circuit precedent addressing the applicability of Noerr/*Pennington* immunity to Lanham Act § 43(a) claims. The Supreme Court, however, has indicated that Noerr/*Pennington* is applicable in contexts other than antitrust suits. *See Prof'l Real Estate Investors*, 508 U.S. at 58–59, 113 S.Ct. 1920. Our Court of Appeals, in addition to extending *Noerr* to common law claims, has ruled that Noerr/*Pennington* extends immunity to claims under 42 U.S.C. § 1983. *See Herr v. Pequea Township*, 274 F.3d 109, 115–18 (3d Cir.2001). Emphasizing that the principle established by *Noerr* is intended to assure free flow of information to government decisionmakers, our Court of Appeals held that not only individuals, but also municipalities, are entitled to immunity from liability arising out of petitioning conduct. *Id.* at 120. Other courts have similarly extended Noerr/*Pennington* immunity beyond antitrust claims. For example, the Seventh Circuit has held that the Noerr/*Pennington* doctrine precluded liability under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.*, for alleged fraud committed by cigarette manufacturers in seeking to influence Congress to pass favorable legislation and to defeat unfavorable bills. *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818, 826 (7th Cir.1999).

The same rationale that has compelled courts to extend Noerr/*Pennington* immunity beyond the antitrust context persuades me that Noerr/*Pennington* should also extend to Lanham Act § 43(a) claims. Exercise of the right to petition the government would be restrained if immunity did not extend to Lanham Act claims. Just as the antitrust laws were enacted to regulate private business, so too was the Lanham Act. Like the Sherman Act, the Lanham Act is intended to control "business activity" and not "political activity." Thus, where, as here, the challenged conduct falls within the First Amendment right to petition the government, Noerr/*Pennington* immunity must extend even to Lanham Act § 43(a) claims.[23]

Extending Noerr/*Pennington* immunity to Lanham Act claims furthers not only the interest in assuring free-flowing information to government decisionmakers, but also the interest in avoiding judicial deconstruction of valid governmental decisions by public officials. *See Sessions*, 17 F.3d at 302. Santana acknowledges that its

**23.** None of the cases Santana cites for the proposition that commercial speech may be regulated—*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); and *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)— involved any petitioning activity. Commercial speech in the petitioning context adds an additional First Amendment concern not addressed by the case law cited by Santana. Indeed, Santana's argument appears to be a roundabout way of finding a commercial exception to the Noerr/*Pennington* doctrine. As noted above, courts have already held that misrepresentations by the petitioner do not vitiate *Noerr* immunity. Santana wants to except from this principle commercial speech. But if unethical and deceitful conduct does not eliminate *Noerr* immunity, even where the aim is to restrain competition, so too deceptive and misleading commercial speech directed at government actors should not undermine the protection otherwise afforded First Amendment petitioning activity, at least in the absence of a clear congressional directive to the contrary. To hold otherwise would create too large a loophole in *Noerr* immunity as many of the petitions aimed at government could be characterized as involving commercial speech.

right to recover monetary damages is dependent upon establishing "customer reliance" on the allegedly deceptive advertising. (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 9.) Thus, the factors that induced government decisionmakers would be at issue in this litigation. Just as "the antitrust laws are not intended to precipitate such deconstruction of public decision-making ...," *Sessions*, 17 F.3d at 302, so, too, should the Lanham Act be construed to avoid intrusive examination of the motives of government officials.

In conclusion, Bobrick is entitled to immunity on each of Santana's claims to the extent that Santana premises liability on decisions by governmental actors. *See Pennington*, 381 U.S. at 671, 85 S.Ct. 1585 (under the *Noerr* doctrine, jury should have been instructed to exclude any damages for injuries sustained as a result of government decisions to curtail coal purchases induced by defendants). Analysis of Santana's claims against Bobrick will, therefore, be restricted to injury purportedly sustained as a result of private sector conduct.[24]

## C. Affirmative Defenses Pertaining to the Timeliness of the Filing of this Action

Bobrick has raised statute of limitations defenses to each of the discrete claims asserted by Santana. In addition, Bobrick contends that Santana's Lanham Act claim should be dismissed under the doctrine of laches. The timeliness of the Sherman

Act, Lanham Act, and tortious interference with prospective contractual relations claims will each be addressed separately.

### 1. Timeliness of the Sherman Act Claims

A four-year statute of limitations governs claims under the Sherman Act. *See* 15 U.S.C. § 15b. Santana brought this action on October 1, 1996. The dispositive question on Bobrick's statute of limitations defense is whether Santana's claims accrued prior to October 1, 1992.

■ "Generally, a cause of action [under the antitrust laws] accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Contending that the alleged conspiracy was created and acts in furtherance of the conspiracy were taken before October 1, 1992, Bobrick maintains that Santana's claim under § 1 of the Sherman Act is time-barred and Santana's claim under § 2 of the Sherman Act is barred to the extent it relates to actions taken by Bobrick and others prior to October 1, 1992. Santana counters by arguing that Bobrick's conduct was part of a continuing conspiracy to violate the antitrust laws, so that Santana is entitled to recover at least those damages incurred within four years of the filing of this lawsuit.

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n. 15,

---

**24.** Co-defendants Hornyak and Vogel also moved for summary judgment on the basis of the *Noerr/Pennington* doctrine. Both Hornyak and Vogel presented evidence that their sales activity were directed exclusively at public entities. Santana did not dispute this characterization of the evidence. Indeed, Santana's opposition brief does not address the applicability of the *Noerr/Pennington* doc-

trine to the alleged actions of Hornyak and Vogel. Accordingly, Hornyak and Vogel are entitled to entry of judgment in their favor on all claims solely on the basis of the *Noerr/Pennington* defense. I will also address, however, other issues raised by the parties that pertain to the potential liability of Hornyak and Vogel.

88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court held that, in the context of a continuing violation of the Sherman Act, a plaintiff may recover damages sustained within the limitations period. In *Zenith,* the Court explained:

> In the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

401 U.S. at 338, 91 S.Ct. 795. As further explained by Justice Breyer in *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997):

> Antitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.,* each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.' But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period. [Citations omitted.]

■ Santana has presented evidence from which it may be inferred that it sustained injury within four years of filing this litigation by being unable to bid on building projects as a result of actions attributable to Bobrick and its alleged co-conspirators. The critical question here, therefore, is whether there is evidence of overt acts in furtherance of the conspiracy committed after September 30, 1992.

Citing precedents from the Sixth Circuit, Bobrick maintains that "an 'overt act' restarting the statute of limitations must have two elements: '(1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff.' " (Rev. Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 405, at 84, quoting *Advance Stores Co. v. Refinishing Specialties, Inc.,* 188 F.3d 408, 411 (6th Cir.1999.)) To the extent that Bobrick implies that there must be a causal relationship between the overt act committed within the limitations period and the injuries sustained by plaintiff, its argument is not consistent with Third Circuit law. Our Court of Appeals has held that overt acts committed within the limitations period need not themselves cause the alleged injury. *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1172 (3d Cir.1993). "It is the effectiveness of the overall conspiracy that causes damages." *Id.*

Santana proffers a 1993 videotape produced by Bobrick, titled "You Be The Judge," and a 1995 advertisement as examples of overt acts occurring within the limitations period. Contrary to Bobrick's assertions, the videotape and ad are not mere reaffirmations of acts occurring outside the limitations period. The creation of a new video production in support of "fire scare" marketing, as well as a new advertisement to be published in a national journal, and the use of both on prospective purchasers, are plainly new and independent acts. The fact that these new activities are consistent with the general tenor of the alleged conspiracy does not make them mere "reaffirmations" of previous conduct. Just as each sale to a plaintiff in a price-fixing conspiracy was recognized by Justice Breyer as " 'start[ing] the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times,' " *Klehr,* 521

U.S. at 189, 117 S.Ct. 1984, so, too, Bobrick's development of a new "fire scare" marketing piece to dissuade use of HPDE toilet partitions commenced anew the running of the four-year limitations period.[25]

Bobrick contends that the 1993 videotape and 1995 advertisement have not been shown by Santana to be part of the alleged conspiracy. In support of this argument, Bobrick points out that the TPMC was disbanded in 1991, and the 1995 advertisement came after Santana's litigation against members of the TPMC and Formica was settled in 1994.[26] The burden of establishing the absence of a genuine issue of material fact is, of course, on Bobrick. The fact that the marketing tools were used only after the TPMC was disbanded does not mandate a finding that they are unconnected to the alleged conspiracy. Bobrick has failed to establish that no rational jury could find that the conspiracy was in existence at least at the time of the production of the 1993 videotape. Of course, if the Sherman Act § 1 claim had survived a merits analysis at the summary judgment stage, at trial it would have been Santana's burden to establish that the conspiracy was still in effect after September 30, 1992, and that at least one of the conspirators took an overt action in furtherance of the conspiracy after that date. *See In re Lower Lake Erie*, 998 F.2d at 1173. A determination on this question, however, is not compelled by the evidence at this time. Thus, Bobrick's motion to dismiss all or part of the Sherman Act claims as time-barred will be denied.[27]

25. Plainly distinguishable is *Iron Workers Fund v. Philip Morris, Inc.*, 29 F.Supp.2d 801 (N.D.Ohio 1998), on which Bobrick places heavy reliance. That case involved a general marketing strategy by tobacco companies aimed at the general public. In contrast, Bobrick solicited sales from specific customers. Furthermore, *Iron Workers Fund* involved class action plaintiffs suing for aggregate injury to employee health funds, and not an individual plaintiff suing for lost profits attributable to adverse impact on sales resulting from an alleged antitrust conspiracy.

26. Bobrick does not reconcile the apparent contradiction in its assertion that the 1993 videotape and 1995 advertisement were mere "reaffirmations" of prior acts with its assertion that they were independent, unilateral actions.

27. Santana has not established a triable issue with respect to any alleged damages sustained prior to October 1, 1992. First, this is decidedly not the kind of case referenced in *Zenith*, where the fact of damage is speculative at the time of the illegal conduct. In this case, injury was both sustained and ascertainable at the time that the alleged illegal conduct precluded Santana from bidding on construction projects. And second, Santana has not presented sufficient evidence to substantiate its suggestion that the limitations period was tolled until 1994 by fraudulent concealment:

[T]he plaintiff has the burden of proving the three necessary elements of a fraudulent concealment claim—(1) "active misleading" by the defendant, (2) which prevents the plaintiff from recognizing the validity of her claim within the limitations period, (3) where the plaintiff's ignorance is not attributable to her lack of "reasonable due diligence in attempting to uncover the relevant facts."

*Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 256 (3d Cir.2001). In this case, Santana has not presented sufficient evidence to support a finding that Bobrick and its alleged co-conspirators engaged in any affirmative act of concealment intended to mislead Santana regarding facts supporting its Sherman Act claims. In this regard, that there was an agreement that there would be no publicity concerning the formation of TPMC, that Santana was not sent an application to join the TPMC, that other manufacturers' applications to join the TPMC were not acted upon, that Formica sent a cease and desist letter to Santana in July of 1990 without mentioning the TPMC, that Bobrick instructed architectural representatives to not leave the Formica videotape with potential customers, and that Bobrick controlled the use of its "You Be The Judge" videotape do not, in isolation or in combination, amount to "active misleading." Moreover, Santana has not shown that it exercised reasonable diligence under the cir-

## 2. Timeliness of the Lanham Act Claims

Because Congress has not prescribed a limitations period for Lanham Act claims, but does subject them to "the principles of equity," 15 U.S.C. § 1117(a), Bobrick's challenge to the timeliness of Santana's Lanham Act § 43(a) claim proceeds on separate, but parallel planes: Bobrick first contends that Santana's Lanham Act claim is barred, or closely confined, by a two-year statute of limitations period appropriated from Pennsylvania law; Bobrick additionally asserts that Santana's claim is barred by the doctrine of laches, with a presumption of undue prejudice arising from the lapse of time in bringing the claim after Santana was on notice of purportedly actionable conduct.

Bobrick's twin-approach to the timeliness issue is reflective of the uncertainty in this jurisdiction on the question of whether Lanham Act claims for damages are subject to traditional statute of limitations analysis, as some courts have held, or fall within the equitable doctrine of laches. *See Guardian Life Ins. Co. v. Am. Guardian Life Assurance Co.*, 943 F.Supp. 509, 518 (E.D.Pa.1996)(citing cases applying statutes of limitations to preclude damage claims under the Lanham Act that fall outside the limitations period and cases holding that the doctrine of laches governs the availability of damages and injunctive relief under the Lanham Act), *abrogated on other grounds by A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir.2000). For example, the Seventh Circuit has held that § 43(a) claims for damages and injunctive relief based upon false advertising are governed by the doctrine of laches because "[t]he Lanham Act specifically contemplates that both injunctive relief and awards of damages for violations of 11 U.S.C. § 1125 shall be subject to the principles of equity, which include the doctrine of laches." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 822 (7th Cir.1999). The Third Circuit, however, has not specifically addressed this issue.

Although laches is an equitable defense, ascertainment of an otherwise applicable limitations period is an integral component of the analysis. *See Conopco Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir.1996). The appropriate limitations period serves "as a baseline for determining whether a presumption of laches exists." *Hot Wax*, 191 F.3d at 821. Therefore, regardless of whether the timeliness of Santana's claim is governed by standard limitations analysis or the doctrine of laches, the first task is to ascertain the otherwise applicable limitations period.

The Supreme Court has held that "[w]hen Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261,

---

cumstances. The "fire scare" tactics of which Santana complains were known to it in the late 1980s and early 1990s. A plaintiff may not sit by and fail to investigate a claim when presented with facts " 'that should excite his suspicion ....' " *In re Lower Lake Erie*, 998 F.2d at 1179. Santana does not explain its failure to investigate the existence of its possible claims, even though it had hired a Bobrick salesperson in 1992, and she had provided information to Santana in early 1992 concerning Bobrick's use of the Formica videotape. (*See* Ex. 272, Appx. to Reply Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 344, Jones Dep. at 278–80.) Thus, as Judge Mishler in the parallel case of *Santana Products, Inc. v. Sylvester & Associates, Ltd.*, 121 F.Supp.2d 729, 734–35 (E.D.N.Y.1999), concluded, Santana's Sherman Act claims are limited to the injuries sustained within four years of the filing of this action.

266, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Our Court of Appeals has not definitively decided the question of what statute of limitations controls a Lanham Act false advertising claim brought in a Pennsylvania federal district court. It has, however, provided the analytical framework for resolution of this issue.

In *Island Insteel Systems, Inc. v. Waters,* 296 F.3d 200 (3d Cir.2002), the court was called upon to decide the applicable limitations period for trademark infringement under § 43(a) of the Lanham Act for an action brought in the District of the Virgin Islands. Three Virgin Islands statutory limitations periods were considered: (1) a "catch-all" six-year limitations period governing actions or claims created by a statute that lacks a statute of limitations; (2) the statute of limitations governing common law fraud claims; and (3) the statute of limitations applicable to claims brought under deceptive trade practices legislation enacted by the Virgin Islands legislature. The Third Circuit, speaking through Chief Judge Becker, rejected the catch-all six-year period because plaintiff had not identified a sufficiently analogous claim under Virgin Islands law governed by the residual limitations period. *Id.* at 208–09.[28] Chief Judge Becker then compared the elements of a trademark infringement claim with the elements of common law fraud and a claim under the Virgin Islands deceptive trade practices statute. While acknowledging a substantial body of precedent applying the fraud statute of limitations to Lanham Act claims for trademark infringement, *id.* at 211, Judge Becker wrote that the elements of a deceptive trade practices claim were more closely aligned with the elements of a trademark infringement claim under the Lanham Act:

> Like a trademark infringement action under § 43(a), but unlike an action for common law fraud, an action for deceptive trade practices does not require proof of scienter. Moreover, while a common law fraud claim requires a plaintiff to prove actual reliance, an action for deceptive trade practices simply requires proof that the practice at issue has the "tendency or effect of deceiving or misleading consumers," which more closely resembles the "likelihood of confusion" element that is the touchstone of a § 43(a) claim....

> \* \* \* \* \* \*

> Thus, although the Virgin Islands deceptive trade practices statute applies to a narrower range of transactions than common law fraud, within the range of covered transactions the conduct that renders a seller liable under the Virgin Islands deceptive trade practices statute bears a strong resemblance to the conduct that renders a seller liable for

---

**28.** Judge Becker explained that the problem with the argument in support of applying the residual limitations period was that "it focuse[d] on the source of law to the exclusion of the substance of the cause of action." *Id.* at 208. He observed that "it is more appropriate to borrow a limitations period under state law on the basis of the substantive elements of the analogous state cause of action, rather than on whether the cause of action is created by common law or statute." *Id.* This rationale compels rejection of Santana's argument, premised upon *Malley–Duff & Associ-* *ates, Inc. v. Crown Life Ins. Co.,* 792 F.2d 341 (3d Cir.1986), *aff'd on other grounds sub nom. Agency Holding Corp. v. Malley–Duff & Associates, Inc.* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), that one statute of limitations should be selected for the variety of causes of action created by § 43 of the Lanham Act. The Third Circuit's analysis in *Island Insteel* indicates that the limitations period governing the state law cause of action most closely resembling the particular Lanham Act claim should be selected.

trademark infringement under § 43(a)....

\* \* \* \* \* \*

We therefore hold that the cause of action under Virgin Islands law most analogous to a trademark infringement claim under § 43(a) of the Lanham Act, for purposes of borrowing a statute of limitations, is a cause of action under 12A V.I.C. § 108 for deceptive trade practices in violation of 12A V.I.C. § 101.

*Id.* at 204, 214.

The analysis employed in *Island Insteel* compels rejection of Bobrick's contention that Santana's § 43(a) claim should be governed by the statute of limitations applicable to common law tort claims, as opposed to the limitations period governing claims brought under Pennsylvania's unfair trade practices legislation. To prevail on a claim of false or deceptive advertising under § 43(a) of the Lanham Act, a plaintiff must show:

1) that the defendant has made false or misleading statements as to his own product (or another's); 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Johnson & Johnson–Merck Consumer Pharms, Co. v. Rhone–Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994). The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons.Stat. Ann. § 201–1 *et seq.*, includes as "unfair methods of competition" representations that "goods or services have ... characteristics ... that they do not have" and "[d]isparaging the goods, services or business of another by false or misleading representation of fact." 73 Pa. Cons.Stat. Ann. § 201–1(4)(v), (viii). Notably, unlike common law fraud, the false advertising components of the Lanham Act and the UTPCPL do not require proof of an intent to deceive, *see Serbin v. Ziebart International Corp.*, 11 F.3d 1163, 1166–67 (3d Cir.1993), or actual reliance upon a misrepresentation of fact. *See Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir.2002). Moreover, like the Lanham Act, the UTPCPL "supplements rather than supplants traditional common law remedies with *per se* liability for a variety of unfair trade practices." *Gabriel v. O'Hara*, 368 Pa.Super. 383, 534 A.2d 488, 491 (1987). Indeed, the UTPCPL is modeled on the Federal Trade Commission Act and the Lanham Act. *Id.* at 491 n. 7. Thus, consistent with the holding in *Island Insteel*, the cause of action under Pennsylvania law most analogous to Santana's § 43(a) claim, for purposes of borrowing a statute of limitations, is a cause of action under the UTPCPL for unfair methods of competition.[29]

**29.** Bobrick argues that the UTPCPL is not sufficiently analogous to Santana's § 43(a) claim because the Pennsylvania statute creates a cause of action for consumers, *see* 73 Pa. Cons.Stat. Ann. § 201–9.2, whereas consumers do not have standing to bring false advertising claims under the Lanham Act. *See Serbin*, 11 F.3d at 1179. Significantly, the Court of Appeals did *not* view as significant the fact that the Virgin Islands unfair trade practices statute created a cause of action only for consumers, but not for competitors. *See Island Insteel*, 296 F.3d at 209. Thus, the fact that Pennsylvania law, like the Virgin Islands statute, fails to provide a cause of action for competitors, does not undermine the conclusion that an unfair competition claim under the UTPCPL is the Pennsylvania

Unlike Virgin Islands law, there is no statutorily-prescribed limitations period for a claim under the UTPCPL. There is, however, Pennsylvania appellate court authority applying Pennsylvania's residual statutory limitations period to UTPCPL claims.[30] In *Gabriel*, 534 A.2d at 495–96, the Superior Court, reasoning that unfair methods of competition claims under the UTPCPL are not sufficiently analogous to claims of "fraud" or "deceit," ruled that UTPCPL claims should be governed by the six-year "catch all" statute of limitations.

Although this Superior Court decision is not controlling, it must be accorded " 'significant weight in the absence of an indication that the highest state court would rule otherwise.' " *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 528 n. 3 (3d Cir.1997). Bobrick has not presented any argument as to why the Pennsylvania Supreme Court would disagree with the holding in *Gabriel*. Thus, like the Eastern District of Pennsylvania in *Algrant v. Evergreen Valley Nurseries, Ltd.*, 941 F.Supp. 495, 499 (E.D.Pa.1996), I find that *Gabriel* is reflective of Pennsylvania law and determine that the six year limitations period applicable to claims under the UTPCPL also governs Santana's § 43(a)

false advertising claim.[31] Accordingly, under traditional statute of limitations analysis, Santana is entitled to pursue claims for conduct actionable under § 43(a) of the Lanham Act occurring up to six years prior to the commencement of this litigation. *See Island Insteel*, 296 F.3d at 214 n. 8.

■ Bobrick nonetheless insists that application of the doctrine of laches requires dismissal of Santana's Lanham Act claims. "In the Third Circuit, laches will serve to bar both monetary and injunctive relief in the face of (1) an inexcusable delay in bringing suit which results in (2) severe prejudice to the party defending the claims brought against it." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 53 F.Supp.2d 692, 712–13 (D.Del.1999), *aff'd on other grounds*, 266 F.3d 164 (3d Cir. 2001). Where the delay in bringing suit exceeds the applicable limitations period, the plaintiff "must 'come forward and prove that [its] delay was excusable and that it did not unduly prejudice' [its] opponents." *Id.* at 713. That is, "[p]rior to the running of the statute, the defendant has to prove laches, but thereafter the plaintiff has to disprove laches." *Churma v. Unit-*

---

cause of action bearing the strongest resemblance to a § 43(a) false advertising claim.

**30.** The residual six year period is established by 42 Pa. Cons.Stat. Ann. § 5527(6), which provides:

Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from application of a period of limitation by § 5531 (relating to no limitation) must be commenced within six years.

**31.** The fact that *Island Insteel* refused to apply the Virgin Islands "catch-all" statute of limitations to a trademark infringement claim does not compel rejection of Pennsylvania's residual statute of limitations here. Chief Judge Becker explained that the Virgin Islands residual limitations period could not be

applied "[b]ecause plaintiffs have failed to identify a specific statutory cause of action under Virgin Islands law that is analogous to their Lanham Act claim *and* is subject to the catch-all six-year limitations period for actions upon a liability created by a statute that lacks a statute of limitations ...." 296 F.3d at 204 (emphasis added). Here, by way of contrast, Santana has identified a specific statutory cause of action under Pennsylvania law that is both analogous to its Lanham Act claim *and* is subject to the Pennsylvania catch-all limitations period. Accordingly, a close reading of *Island Insteel* buttresses the conclusion that Santana's Lanham Act claim is governed by the residual limitations period of six years.

ed States Steel Corp., 514 F.2d 589, 593 (3d Cir.1975). For purposes of "determining the presumption of laches, the limitations period runs from the time the plaintiff knew or should have known about his § 43(a) cause of action." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir.2002). In the context of a continuing wrong, therefore, the presumption of laches is triggered if the plaintiff knew or should have known about the claimed wrongful conduct beyond the limitations period. *Id.* at 837. As explained in *Jarrow:*

> To hold otherwise would "effectively swallow the rule of laches, and render it a spineless defense." The plaintiff should not be entitled to the strong presumption against laches simply because some of the defendant's wrongful conduct occurred within the limitations period. Laches penalizes dilatory conduct; as such, the presumption is that a § 43(a) plaintiff is barred if he fails to file suit promptly when the defendant commences the wrongful conduct.

*Id.* at 837–38 (citations omitted).

■■■ Santana does not dispute Bobrick's assertion that Santana was aware of Bobrick's allegedly wrongful conduct in 1989, more than seven years before this action was brought. Therefore, a presumption of laches pertains, and the burden is on Santana to proffer evidence (a) that its delay in bringing this action was excusable, and (b) that Bobrick is not materially prejudiced as a result of the delay.

Santana purports to excuse its delay by claiming that it repeatedly provided notice to Bobrick that Santana considered the alleged "fire scare" tactics to be wrongful. Contrary to Santana's assertion, merely

"warning" a defendant does not justify delay in commencing litigation. *See Hot Wax,* 191 F.3d at 823–24.

Santana, however, has proffered sufficient evidence that Bobrick did not suffer material prejudice as a result of the delay. With respect to witnesses who are now unavailable, Santana has shown that there were no witnesses who passed away or otherwise became unavailable during the period of delay, i.e., from 1989 to October 1, 1996.[32] Santana has also persuasively argued that Bobrick was not materially prejudiced by the loss of any evidence that may have occurred prior to the initiation of this litigation.

As to any prejudice attributable to Bobrick's continued pursuit of its advertising campaign, Santana has proffered evidence that Bobrick characterized the financial resources devoted to its campaign as "negligible." Thus, this case stands in stark contrast to *Hot Wax,* 191 F.3d at 824, and *Conopco,* 95 F.3d at 192–93, in which there was evidence of enormous expenditures of resources in pursuit of advertising strategies during the period of delay. Accordingly, Bobrick's motion for summary judgment on the Lanham Act claim based upon the doctrine of laches will be denied.

### 3. Timeliness of the Interference With Prospective Contract Claim

■■■ Observing that Santana's intentional interference with prospective contractual relationships claim is based upon an averment that Bobrick "knowingly and intentionally made false and malicious allegations and misrepresentations with regard to [Santana's] products ...," (Complaint, ¶ 84), Bobrick asserts that this

---

**32.** Bobrick identified several witnesses who died during the pendency of this litigation. Difficulties in securing evidence arising during the pendency of a lawsuit, and not during

the delay in bringing the suit, do not constitute prejudice within the meaning of the laches doctrine. *Jarrow,* 304 F.3d at 839.

claim is governed by the one year limitations period applicable to actions for defamation.[33] In support of this assertion, Bobrick cites, *inter alia, Evans v. Philadelphia Newspapers, Inc.,* 411 Pa.Super. 244, 601 A.2d 330, 334–35 (1991), in which the court applied the one-year statute of limitations to a tortious interference claim that was based upon allegedly defamatory conduct. In reaching this result, the Superior Court, quoting the trial court, reasoned that " 'where the gravamen of an action for interference with a contractual relationship is based on the commission of a tort [such as defamation] the statute of limitations for that tort must govern.' " *Id.* at 333.

Santana, contending that the one-year limitations period should apply only when the plaintiff seeks to recover for damage to reputation, argues that the two year limitations period of 42 Pa. Cons.Stat. Ann. § 5524(3) controls its tortious interference claim.[34] In support of its position, Santana relies upon the Pennsylvania Superior Court's decision in *Pro Golf Manufacturing Inc. v. Tribune Review Newspaper Co.,* 761 A.2d 553 (Pa.Super.2000), *rev'd,* 570 Pa. 242, 809 A.2d 243 (2002). In *Pro Golf,* the Superior Court held that a claim of commercial disparagement, for which the plaintiff sought to recover damages for economic injury as opposed to harm to reputation, was governed by the two year limitations period. Santana reasons that because "the Pennsylvania court has likened commercial disparagement to unfair competition, the facts alleged in support of Santana's tortious interference claim would render it subject to the two-year

statute of limitations." (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 77.)

The Pennsylvania Supreme Court's reversal of the Superior Court's decision in *Pro Golf* undermines Santana's argument. The unanimous Supreme Court, speaking through Chief Justice Zappala, observed that the label attached to the claim, "commercial disparagement," did not remove the cause of action from the statute of limitations applicable to slander. 809 A.2d at 246. Central to the court's conclusion was the recognition that the underlying conduct animating the particular economic tort claim determines the appropriate limitations period.

In *Pro Golf,* the Pennsylvania Supreme Court stated that a claim labeled "commercial disparagement" could be termed " 'interference with prospective advantage.' " *Id.* Santana itself has acknowledged this fact. Because the "interference with prospective advantage" claim in this case is based upon allegedly defamatory conduct, Santana's interference with prospective contractual relationship claim, like the claim in *Pro Golf,* is governed by a one-year limitations period.

As pointed out by Bobrick, Santana has not identified any prospective non-public sector contractual arrangement lost during the one-year period before the commencement of this action. Accordingly, Bobrick's motion for summary judgment on the tortious interference claim based upon the running of the statute of limitations will be granted.[35]

---

**33.** Section 5523(1) of title 42 of the Pennsylvania Consolidated Statutes requires that "[a]n action for libel, slander or invasion of privacy" be brought within one year of its accrual.

**34.** Section 5524(3) provides a two-year limitations period for "[a]n action for taking, de-

taining or injuring personal property, including actions for specific recovery thereof."

**35.** It should be noted that because the tort of commercial disparagement requires a showing that the publisher of the statement either intended the publication to cause pecuniary

## D. Santana's Claim under Section 1 of the Sherman Act

Santana has moved for summary judgment on its claim under section 1 of the Sherman Act. It argues that the discovery record compels the conclusion that the defendants were part of a conspiracy to restrain trade in the toilet partition market and that the conspirators' conduct falls within the *"per se"* rule of liability. The defendants have moved separately for summary judgment on this claim, asserting that their conduct is not subject to the *per se* rule and that the voluminous discovery record fails to present sufficient facts to warrant a jury trial on any of the elements of a section 1 claim.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1. Unless the defendants' conduct falls within the parameters of the *per se* rule, a plaintiff pursuing a section 1 claim must show: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir.

1993).[36] "Without proof of all of these elements, a plaintiff cannot maintain a section 1 claim." *Id.*

### 1. Concerted Action

■■■ The *sine qua non* of section 1 liability is concerted action.[37] " 'Unilateral action, no matter what its motivation, cannot violate [section 1].' " *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1131 (3d Cir.1995)(quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110 (3d Cir.1980)). Thus, regardless of whether the conduct in question falls within the *per se* rule, the threshold question presented on the parties' summary judgment motions is whether the evidence establishes that the defendants were part of a concerted effort to restrain trade in the pertinent market, or that there is at least sufficient evidence to warrant submission of the issue to a jury.

"The very essence of a section 1 claim, of course, is the existence of an agreement." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir.1994). A " 'unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement' must exist to trigger section 1 liability." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)(quoting *Am. Tobacco*

---

harm or reasonably should recognize that the publication will result in such loss, *id.*, it does not provide an appropriate analogue to the false advertising claim created by the Lanham Act for purposes of determining the appropriate state statute of limitations. Application of such a short limitations period would also raise concerns that the remedial purposes of the Lanham Act would be undermined. *See Malley–Duff*, 792 F.2d at 351 (expressing concern that one-year limitations period would "contravene the broad remedial purposes of civil RICO").

**36.** Under the *per se* rule, the second and third prongs of the analysis are conclusively presumed. That is, the plaintiff need not establish harm to competition or that the objects of the conspiracy were illegal.

**37.** "The phrase 'concerted action' is often used as shorthand for any form of activity meeting the section 1 'contract ... combination or conspiracy' requirement." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 n. 3 (3d Cir.1999).

*Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

■ "A plaintiff may utilize either direct or circumstantial evidence in order to make out the element of concerted action." *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 465 (3d Cir.1998). "Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food,* 166 F.3d at 118. "[W]hen the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts ...." *Rossi,* 156 F.3d at 466. Where, however, the plaintiff fails to adduce direct evidence of conspiracy, the inferences to be drawn from circumstantial evidence are circumscribed. *Id.* at 465–66. In order to survive a motion for summary judgment in such circumstances, a plaintiff must proffer evidence "that tends to exclude the possibility of independent action." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). As explained in *Rossi:*

> The Supreme Court's concerns about permitting the inference of a conspiracy from ambiguous circumstantial evidence in the antitrust context stem from its conclusion that mistakes by an overzealous judiciary would be "especially costly ... chill[ing] the very conduct the antitrust laws are designed to protect." *Matsushita [Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ]; *Monsanto,* 465 U.S. at 763, 104 S.Ct. 1464; *Big Apple BMW [Inc., v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992) ]("Care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not infringe upon defendant's freedom, so long as it acts independently, to refuse

to deal.")(citing *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). For this reason, the plausibility of an antitrust plaintiff's claim is important. "[I]f the factual context renders [the plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[a plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citations omitted). Relatedly, in evaluating whether a genuine issue for trial exists, the antitrust defendants' economic motive is highly relevant. "[I]f [the defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596, 106 S.Ct. 1348. Moreover, even with a plausible motive to conspire, ambiguous conduct will not create a triable issue of fact with respect to the existence of a conspiracy. *See id.* at 597 n. 21, 106 S.Ct. 1348.

*Rossi,* 156 F.3d at 466.

In the absence of direct evidence, the record as a whole must be assessed to determine whether an inference of concerted action is warranted. *Id.* at 466–67. "[W]here the non-moving party has put forth evidence that provides an inference of concerted action, the moving party 'bears the burden of proving that drawing the inference of unlawful behavior is unreasonable.'" *Id.* at 467.

The evidence of record will be assessed against the backdrop of these standards to determine whether there is sufficient evidence to either compel or allow a jury to draw a conclusion that Bobrick engaged in concerted action. Before addressing this issue, however, it is appropriate to determine whether Bobrick's commission sales-

representatives, co-defendants Hornyak and Vogel, can be held accountable under section 1 of the Sherman Act.

### a. *The alleged concerted action of Bobrick's sales representatives*

■ Santana seeks to hold Hornyak and Vogel liable under § 1 of the Sherman Act based upon their interaction with their principal, Bobrick. Hornyak and Vogel counter by arguing that a captive sales agency, i.e., one exclusively selling only the principal's products, is incapable of conspiring with the principal as a matter of law.

In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Court ruled that a parent company and its wholly-owned subsidiaries are not legally capable of conspiring with one another for purposes of liability under § 1 of the Sherman Act. This holding was based upon the fact that, in such a relationship, the parent and subsidiary "have a complete unity of interest." *Id.* at 771, 104 S.Ct. 2731. As the Court explained:

> If a parent and a wholly-owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.
>
> ... [I]n reality a parent and a wholly-owned subsidiary *always* have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Id.* at 771–72, 104 S.Ct. 2731 (emphasis added).

In *Siegel Transfer*, our Court of Appeals extended the rationale of *Copperweld* to agents of a corporation, including separately incorporated entities that served as agents of the corporation. 54 F.3d at 1134–35. Judge Mansmann, writing for the unanimous court, explained that the fact that the agent's economic well-being was directly tied to the principal's success, as well as the fact that the agent did not compete with the principal, compelled the conclusion that the principal and agent "constituted one economic unit." *Id.* at 1135.

There is no dispute that Hornyak and Vogel were compensated by Bobrick based upon the amount of Bobrick product they sold. There also appears to be no dispute that Hornyak and Vogel exclusively sold Bobrick toilet partitions. It is thus clear that there exists in this case the requisite unity of economic interests that renders Hornyak and Vogel incapable of conspiring with Bobrick. *See Peerless Heater Co. v. Mestek, Inc.*, No. Civ. A. 98–CV–6532, 2000 WL 637082, at *6 (E.D.Pa. May 11, 2000).

■ Santana asserts that Vogel and Hornyak should be precluded from relying upon their commission relationship with Bobrick because they refused to disclose during discovery the *amount* of commissions they received. Indeed, the Special Master appointed to oversee discovery in this case issued a protective order to bar disclosure of the *amount* of commissions. The amount of the commissions, however, is not pertinent to the question of whether there was a unity of economic interests. Thus, the fact that Vogel and Hornyak refused to produce information concerning the amount of the commissions they earned does not preclude them from relying upon their relationship with Bobrick to avoid liability under § 1 of the Sherman Act.

Santana also appears to claim that Hornyak and Vogel may be held liable because they were aware of the role that

Formica and others played in the alleged conspiracy. The evidence that Santana cites in support of this contention shows only that Hornyak and Vogel conducted anti-HDPE marketing, including showing the Formica video and burning samples of HDPE, in order to sell Bobrick products. In other words, Hornyak and Vogel were advancing the cause of their corporate principal. There is no evidence that either Hornyak or Vogel assisted the efforts of other TPMC members. Indeed, Santana has not cited any evidence indicating that Hornyak and Vogel had any contact with Formica or the TPMC members. At most, Hornyak and Vogel were aware of the role of Formica in developing the Formica video. (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶¶ 111E, 111H.) Such evidence is insufficient to show the requisite unity of purpose, common design and understanding, or meeting of the minds in an unlawful arrangement that animates § 1 liability. Accordingly, Vogel and Hornyak are entitled to summary judgment on Santana's § 1 claim.

### b. *The alleged concerted action of Bobrick*

Santana contends that the evidence compels a conclusion that Bobrick, was a knowing participant in the TPMC anti-HDPE conspiracy. Santana points out that the TPMC members, including Formica and Metpar, undertook a collaborative effort to "address the competitive threat of HD Polyethylene (Santana)." (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶¶ 11, 34, 69.) Santana further claims that Bobrick was fully informed about the TPMC and its plan to attack HDPE toilet compartments on the basis of allegations that this material failed to meet the ASTM E–84 test.

In support of its motion for summary judgment, Santana relies upon evidence indicating that Bobrick had several conversations with a Formica officer who served as TPMC's Chairman and Secretary about the formation and operation of the TPMC. (*Id.,* ¶¶ 32, 34, 35, 37A.) Although Bobrick declined to join the TPMC, it stated that it "would be happy to support the Council in any way we could." (*Id.,* ¶ 32.) Bobrick obtained a copy of the Formica video, and, in 1990, obtained Formica's permission to use the video in marketing Bobrick's solid phenolic compartments. Santana also points to evidence showing that Bobrick shared anti-HDPE information with Metpar, including the results of tests relating to the ASTM E–84 standard. (*Id.,* ¶¶ 13–15, 15A, 16, 91B, 95.) Representatives of Bobrick and Formica met in February and May of 1990 to discuss the Formica video, at which time Formica described the video and discussed how it could be used against Santana. (*Id.,* ¶¶ 20, 22A, 22B, 24, 69.)

Notwithstanding Santana's characterization of the evidence to the contrary, however, there is no "direct" evidence of Bobrick's knowing participation in a conspiracy to restrain trade. As noted above, direct evidence must be explicit and require no inference to establish the proposition that Bobrick was a member of the alleged conspiracy. *In re Baby Food,* 166 F.3d at 118. Santana points to evidence that Bobrick exchanged information with Formica and another alleged conspirator, Metpar, concerning the flammability of HDPE. The mere exchange of information, even among competitors, is insufficient to establish the existence of a conspiracy. *Id.* at 121. Nor does the fact that Bobrick secured Formica's permission to use the Formica videotape in Bobrick's promotion of solid phenolic compartments necessarily establish concerted action. Formica was a supplier of some solid phenolic material to Bobrick, and the fact that Formica provided Bobrick with comparative pro-

motional material does not compel the conclusion that they were engaged in proscribed concerted action. Significantly, Santana has not presented any evidence from Formica or any other TPMC member that implicates Bobrick in a conspiracy to restrain trade, even though Santana settled its antitrust litigation against those parties. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1106 (9th Cir.1999)(finding that plaintiff's claim that defendant participated in a price-fixing conspiracy was undermined where none of the manufacturers who had admitted to conspiring to fix prices identified the defendant as a co-conspirator). Nor has Santana presented evidence that Bobrick agreed to participate in a collaborative anti-HDPE marketing campaign or that there was some plan to have Bobrick target certain geographic areas or accounts. Santana has also failed to suggest the existence of an enforcement mechanism if Bobrick or another alleged conspirator did not engage in an anti-HDPE campaign. *See Petruzzi's*, 998 F.2d at 1233 (recognizing importance of evidence of enforcement mechanism to support existence of concerted action). And, of course, the fact that Bobrick engaged in an anti-HDPE advertising campaign does not, standing alone, establish the existence of a conspiracy. *In re Baby Food*, 166 F.3d at 121–22.

In summary, the evidence upon which Santana relies does not meet the definition of "direct evidence"—"evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food*, 166 F.3d at 118. On the other hand, contrary to Bobrick's arguments, Santana has shown more than mere parallel behavior.

Bobrick concentrates on its refusal to join the TPMC and its belief that it could be hurt by standards, (Rev. Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 405, at 77–78), but Santana has presented evidence that shows that representatives of Bobrick were in close contact with two TPMC members, Formica and Metpar. At the meetings with Formica, the TPMC's goal of "targeting" Santana as well as the fire scare video were discussed. These meetings included the secretary of the TPMC and officers from Bobrick, who eventually obtained the Formica videotape and distributed it to its sales representatives with the explicit permission of Formica. Bobrick shared test information with Metpar. Indeed, it appears that Metpar's anti-HDPE advertisements were adapted by Bobrick for use in its advertisements. This evidence shows more than a mere "exchange of information" as in *In re Baby Food*, 166 F.3d at 118–121 (finding no conspiracy where sales representatives exchanged price information). Bobrick's contacts with two TPMC members are sufficient to support an inference that it had joined an anti-HDPE conspiracy. That Bobrick did not participate in any meetings of the TPMC, contribute money, or vote on any issues is not determinative.

Santana has proffered a plausible conspiracy theory: Bobrick and other non-HDPE toilet compartment manufacturers would have had a joint interest in excluding from the market HDPE partitions, thereby constraining supply and increasing prices. Santana has adduced evidence consistent with Bobrick's involvement in the conspiracy in the form of its communications with Formica and Metpar. The evidence is sufficiently unambiguous that it "tends to exclude the possibility of independent action." *Monsanto*, 465 U.S. at 768, 104 S.Ct. 1464. Indeed, the fact that Bobrick needed to secure Formica's permission to use the videotape supports an inference of collusive action. Under these circumstances, adjudication of the "concerted action" question on the parties'

summary judgment motions is inappropriate.[38]

## 2. Unreasonable Restraint of Trade

Santana, of course, must show more than that its competitors engaged in some type of collaborative efforts. It must also show that "this joint action amounted to an unreasonable restraint of trade." *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293 (5th Cir.1988). Although section 1 of the Sherman Act declares illegal "*every* contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1 (emphasis added), "[t]he Supreme Court has interpreted this provision to prohibit only unreasonable restraints." *Rossi*, 156 F.3d at 461.

Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called "rule of reason"—that is, " 'the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.' " *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)(quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). There are, however, certain agreements or practices which "because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Such agreements or practices are *per se* illegal without proof of anticompetitive effect. *In re Baby Food*, 166 F.3d at 117–18. "Under the *per se* standard, the proscribed conduct is " 'manifestly anti-competitive' or 'would always or almost always tend to restrict competition,' . . . ." *Rossi*, 156 F.3d at 461.

Santana argues that the conduct at issue in this case merits *per se* condemnation. Bobrick, on the other hand, argues that the rule of reason governs this case and that Santana has failed to produce sufficient evidence to withstand summary judgment under rule of reason analysis. The threshold question on this aspect of the case, therefore, is whether the challenged conduct falls within the narrow category of cases where an unreasonable restraint on competition is conclusively presumed.

---

**38.** The evidence proffered by Santana is sufficient to withstand summary judgment even without considering so-called "plus factors" in cases of conscious parallelism. As noted above, although "mere consciously parallel behavior alone is insufficient to prove a conspiracy, it is circumstantial evidence from which, when supplemented by additional evidence, an illegal agreement can be inferred." *Petruzzi's*, 998 F.2d at 1242. At a minimum, the evidence in this case shows Bobrick to be engaged in conduct consciously parallel to that of the TPMC members. It has also shown the existence of requisite "plus factors" to survive summary judgment. Such "plus factors" include, *inter alia*, whether the defendant acted in contravention of its individual economic interests, *Petruzzi's*, 998 F.2d at 1242–45, whether the defendant is unable or unwilling to rebut or explain the uniform behavior, *id.* at 1245, whether the defendant was involved in various meetings and exchanged correspondence with alleged co-conspirators, *see In re Baby Food*, 166 F.3d at 133–37, and whether the defendant has a motive to enter into the conspiracy, *see Matsushita*, 475 U.S. at 595–98, 106 S.Ct. 1348. Contrary to Bobrick's assertions, at least two of the plus factors are relevant here. In particular, Bobrick would have had a motive to enter the alleged conspiracy and was involved in several meetings with representatives of TPMC members. Thus, as discussed above, there is sufficient evidence to allow an inference that Bobrick was a member of the alleged conspiracy.

### a. *The Per Se Rule*

██ Contending that "[t]his case is a classic example of a conspiracy among competitors who agree upon and enforce against business rivals a single 'product standard' that excludes the rivals' technology," (Rev. Mem. in Support of Pl. S.J. Mot./Sherman Act, Dkt. Entry 381, at 3), Santana asserts that Bobrick should be held liable for engaging in a "group boycott" or "naked restraint of trade." Santana's self-serving characterization of the evidence as showing a joint effort to set and enforce a product standard, however, does not jive with the facts of record. The alleged co-conspirators did not create any product standard. Instead, they advanced their interpretation of general standards adopted by the NFPA and the ASTM. Santana has adduced no evidence that these standard-setting bodies were even approached by any of the defendants with respect to the matters at issue here. Nor has Santana shown any ability on the part of the alleged co-conspirators to enforce some product standard. There is no evidence that any member of the alleged conspiracy would be penalized for not subscribing to the group's view. Furthermore, there was no coercion of customers, no constraints on the supply of toilet partitions, and no refusals to deal. Those who purchased HDPE partitions were not threatened with suit by any member of the alleged conspiracy. This is simply *not* a case where competitors combined to establish and enforce a product standard. Thus, Santana's reliance on product standard cases is misplaced.

Santana's bald characterization of the conduct as a "group boycott" does not mean that this case must be judged under the *per se* rule. Santana points out that in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Court stated that "[c]ases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" Santana contends that the alleged collaborative effort to dissuade purchasers from specifying HDPE toilet partitions denied Santana and other HDPE toilet partition manufacturers the customers necessary for their survival. Santana ignores, however, the Court's observation in *F.T.C. v. Indiana Federation of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), that "the category of restraints classed as group boycotts is not to be expanded indiscriminately[;] the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor."

The cases upon which Santana relies involved activity clearly falling within this limited ambit of *per se* illegality. For example, in *Radiant Burners, Inc. v. Peoples Gas Light and Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), the Court applied the *per se* rule to an association of public gas utilities and manufacturers of metal gas burners who refused to give plaintiff's ceramic gas burner a seal of approval because the absence of a seal of approval meant that the utilities would not sell gas to the plaintiff's customers. This case, by way of contrast, does not involve such an enforcement device. No potential customer of Santana was deprived of the ability to utilize Santana's product, as was the case in *Radiant Burners.*

*Allied Tube,* another case cited by Santana, involved the manipulation of the process of establishing an influential body's

standards to exclude rival technology from the market. As noted above, this case does not involve efforts to influence standard-setting or enforcement by a body with a cachet of influence. A campaign of persuasion of architects and specifiers that toilet partitions are subject to fire and smoke development standards for interior wall finishes does not constitute standard setting or enforcement. Unlike *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), Bobrick and the TPMC members did not orchestrate an interpretation of a products standard from a standards setting organization that they then enforced.[39]

The fact that three TPMC members discontinued their HDPE lines of toilet partitions between October 18, 1989 and March, 1991 also does not warrant application of the *per se* standard.[40] Our Court of Appeals has cautioned that "assigning the label 'group boycott' to a concerted refusal to deal ... does not have a talismanic effect, automatically bringing the case under the *per se* rubric." *Rossi*, 156 F.3d at 463. Instead, trial courts must "carefully scrutinize the nature of the asserted refusals to deal to determine whether it fits within the *per se* 'boycott' pigeonhole." *Id.*

Pertinent factors are whether a competitor has been denied something needed to compete effectively, defendants' dominance in the relevant market, and "the absence of any plausible contention that the challenged behavior would 'enhance overall efficiency and make markets more competitive.'" *Id.*

> [A]lthough "a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment ... [a] plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive."

*Id.* (quoting *Northwest Wholesale Stationers*, 472 U.S. at 295, 298, 105 S.Ct. 2613).

Other than asserting that the TPMC members, collectively, dominated the toilet partition market, Santana has not shown that the decision of a few TPMC members to discontinue HDPE partitions had the anticompetitive effects that warrant *per se* condemnation.[41] Santana has not presented

---

**39.** In *Hydrolevel*, the defendants used their position within the American Society of Mechanical Engineers to obtain an interpretation of a product code adverse to Hydrolevel, and then used that interpretation to the competitive disadvantage of Hydrolevel. The issue addressed by the Court was whether the American Society of Mechanical Engineers could be held liable under the antitrust laws for the conduct of its agents. The Court did not address the question of whether the defendants' conduct was *per se* illegal.

**40.** It appears that, as of mid–1989, there were five distributors of HDPE partitions: Knickerbocker, Sanymetal, Capitol Partitions, Santana, and General Partitions. (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 109L.) General Partitions was a regional

distributor only; the other companies were national distributors. (*Id.*, ¶ 6.) By March of 1991, Knickerbocker, Sanymetal, and General Partitions discontinued HDPE compartments. (*Id.*, ¶ 89.) However, Compression Polymers, Inc., which had sold HDPE panels to these three companies, entered the toilet partition market with HDPE compartments through its subsidiary, Sanatec Industries, now known as Comtec. (Ex. 295, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 411, Sanatec Market Report dated April 1990, at 11.)

**41.** One of Santana's expert witnesses testified at his deposition that the toilet partition market is very competitive. (Ex. 240, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Pisarkiewicz Dep. Tr., at 9.) Manufacturers in the industry utilize a variety of

any evidence that it was deprived of something needed to compete in the marketplace. It retained its access to architects and others specifying compartments for building projects. Nor has Santana shown that the departure of three small HDPE toilet partition producers could not plausibly enhance overall efficiency and make the markets more competitive. The departing companies remained in the toilet partition market, competing against HDPE partitions. There is no contention that Santana and the other major HDPE toilet partition producer, Capitol Partitions, lacked the capacity to absorb the output of the three small producers. In any event, Comtec's entry into the market suggests that HDPE remained a competitive alternative for toilet partitions. Comtec's entry into the market also precludes a determination that the toilet partition market suffered a decrease in production capacity. In summary, a careful consideration of the evidence militates against a conclusion that a decision of TPMC members to discontinue HDPE partitions—conduct consistent with the position that HDPE partitions posed safety concerns—had marked anticompetitive effects.

The Court has admonished that *per se* treatment is appropriate only where the purpose and effect of the challenged conduct "are to threaten the proper operation of our predominately free market economy," or where the "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Thus, "the touchstone of *per se* illegality [in the group boycott context] is that the customers or suppliers of the plaintiff had, as a group, agreed or been forced to cease doing business with the plaintiff." *Consol. Metal*, 846 F.2d at 291. The evidence in this case does not show such an agreement among or coercion of Santana's customers or suppliers. The *per se* rule should be applied only " 'where the economic impact of certain practices is ... immediately obvious.' " *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). In this case, the economic impact of the challenged practices is far from obvious. Therefore, the *per se* rule is inapplicable in this case.[42]

---

materials. Thus, for example, two of the TPMC members who discontinued HDPE made compartments of steel, as well as plastic laminate and phenolic. The evidence reflects that there was strong competition in this market. Moreover, there is no evidence that the HDPE share of the market declined during the period 1989 through 1996. In fact, it appears that the HDPE share of the toilet partition market increased during the 1990's. (Ex. 24A, Appx. to Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 324, Arnaiz Dep. Tr. at 21–24.) In this regard, Santana alleges that it was injured because its rate of growth declined. It has not shown, however, that its share of the market declined from the preconspiracy period.

**42.** Santana argues that, if the *per se* rule does not apply, then the Court should apply the abbreviated, or "quick-look" rule of reason

analysis that has been applied to inherently suspect restraints of trade. *See United States v. Brown Univ.*, 5 F.3d 658, 659 (3d Cir. 1993). This intermediate approach applies where there is some naked restraint on price or output, or an agreement to withhold a desired service. *See Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 769–70, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). In such situations, the burden is placed upon the defendant to show " 'some competitive justification' for the restraint, 'even in the absence of detailed market analysis' indicating actual profit maximization or increased cost to the consumer resulting from the restraint." *Brown Univ.*, 5 F.3d at 669. If a competitive justification is not shown, a "presumption of adverse competitive impact prevails ...." *Id.* This "quick-look" analysis under the rule of reason is reserved for those cases in which "an observer with even a rudimentary understanding of economics could conclude that the arrange-

### b. *Application of the Rule of Reason*

 Under rule of reason analysis, the trial court "considers all relevant factors in examining a defendant's purpose in implementing the restraint and the restraint's effect on competition." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir.1996). As explained in *Orson:*

> [T]he traditional rule of reason inquiry has essentially remained unchanged since it was first announced by the Supreme Court ... and focuses on the competitive significance of the restraint:
>
> > The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Id.* (quoting *Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)). "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *Nat'l Soc. of Prof'l Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

The market in which this dispute occurred is, as noted above, highly competitive. Producers attempt to convince architects and building specifiers to utilize their particular products by, *inter alia,* touting their products' capabilities in a high vandalism setting. Durability, graffiti resistance, and flame and smoke resistance characteristics are clearly pertinent. Applicability of building code standards is also a significant consideration. Each participant in the market is free to advocate its position on these matters.

In similar circumstances, courts have concluded that the object of conduct intended to secure favorable action on bid specifications was not unlawful. For example, in *Stearns Airport Equipment Co. v. FMC Corp.,* 170 F.3d 518 (5th Cir.1999), a manufacturer of airline boarding bridges sued its competitor, FMC, on the theory that FMC violated the antitrust laws by inducing municipalities to adopt specifications that were tailored to fit FMC's product and to exclude Stearns'. In affirming the grant of summary judgment in favor of FMC, the court explained:

> The key factor courts have analyzed in order to determine whether challenged conduct is or is not competition on the merits is the proffered business justification for the act. If the conduct has no rational business purpose other than its adverse effect on competition, an inference that it is exclusionary is supported.

*Id.* at 522. The court found that FMC's behavior was economically rational—it was

---

ments in question would have an anti-competitive effect on customers and markets." *Cal. Dental Ass'n,* 526 U.S. at 770, 119 S.Ct. 1604. "The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick ... look, in

place of a more sedulous one." *Id.* at 781, 119 S.Ct. 1604. As stated above, the conduct at issue in this case is not so plainly anticompetitive as to constitute a naked restraint on trade. Stated otherwise, effect on price and output is not obvious. Accordingly, this case is not appropriate for the "quick look" rule of reason analysis.

trying to sell its product.[43] The court concluded that "jockeying over specifications and bid procedures is a valid form of competition." [44] *Id.* at 526.

In this case, the object of the challenged conduct was to convince specifiers of the purportedly superior characteristics of non-HDPE toilet partitions. Stated otherwise, the object of the alleged conduct was to portray HDPE as an inferior product for toilet partitions. Santana was free to counter this approach by asserting that toilet partitions were not subject to wall finish standards and that its HDPE products were superior to other kinds of toilet partitions. Indeed, it is evident that Santana was often successful in just such efforts. The fact that Santana may have had to engage in more effort than otherwise would have been required does not make the object of the challenged conduct—in Bobrick's case, to sell phenolic compartments—illegal.

Buttressing the conclusion that Santana is not entitled to redress under § 1 of the Sherman Act is Judge Easterbrook's analysis in *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F.2d 397 (7th Cir.1989). Judge Easterbrook addressed a claim brought by several ophthalmologists that the American Academy of Ophthalmology, along with rival ophthalmologists, conspired to restrain trade by issuing a press release that called radial keratotomy "experimental," and urged patients to approach the surgical procedure with caution. The court held that the claims should not have proceeded to trial, explaining:

> Ophthalmologists are each others' rivals for custom[ers]. They offer competing procedures .... Plaintiffs say that the Academy is in the grip of professors and practitioners who favor conservative treatment, forever calling for more research (the better to justify the academics' requests for grants); plaintiffs

---

**43.** The court also considered as significant the fact that the alleged anticompetitive effect required the approval of the municipality and the plaintiff had an opportunity to dissuade the municipality. In language particularly apropos here, the court stated:

> [T]hese arguments made by FMC to its potential customers may have been wrong, misleading, or debatable. But they are all arguments on the merits, indicative of competition on the merits. To the extent they were successful, they were successful because the consumer was convinced by either FMC's product or FMC's salesmanship. FMC—unsurprisingly—wanted to be picked over Stearns on a contract. Also unsurprisingly, for that purpose it calculated carefully what kind of specifications would insure that it would get the contract because Stearns could not bid on a project. But it could not ask municipalities to enter into a sole-sourcing agreement or specify smart-bridge technology merely by asking them to hurt Stearns. FMC had to convince the customer that FMC's approach was best for the customer, not best for

FMC. Inferring an attempt to circumvent competition on the merits is extraordinarily difficult when the alleged violator takes the facially rational and unproblematic step of attempting to sell its product, couches its arguments to the customer in favor of a sale on the merits of the product and procedures it recommends, and the consumer agrees. Without a showing of some other factor, we can only assume that a consumer will make his decision only on the merits. To the extent a competitor loses out in such a debate, the natural remedy would seem to be an increase in the losing party's sales efforts on future potential bids, not an antitrust suit.

*Id.* at 524–25.

**44.** It should be noted that Stearns' claim was brought under section 2 of the Sherman Act. The Fifth Circuit, however, relied heavily on cases deciding section 1 claims. *See id.* at 522–23 ("While all of these cases involve section 1 of the Sherman Act rather than section 2 ... their logic properly applies to our inquiry."). By a parity of reasoning, the logic of *Stearns* applies here.

portray themselves as the progressives, disdaining the Academy's fuddy-duddies in order to put the latest knowledge to work. Warfare among suppliers and their different products *is* competition. Anti-trust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundation of anti-trust law. Unless one group of suppliers diminishes another's ability to peddle its wares (technically, reduces rivals' elasticity of supply), there is not even the beginning of an anti-trust case, no reason to investigate further to determine whether the restraint is "reasonable."

*Id.* at 399 (citation omitted)(emphasis in original). Dismissing the plaintiffs' assertions that the Academy's representations were misleading, the court commented that "[i]f such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas." *Id.* at 400.

In *Sanderson v. Brugman,* No. IP00–459–CHG, 2001 WL 699876 (S.D.Ind. May 29, 2001), the court applied *Schachar* in a context very similar to that presented here. The plaintiff in *Sanderson* alleged a conspiracy to discredit magnetic water treatment through the improper use of various studies and reports, publication of these reports, and direct contact with customers and potential customers. *Id.* at *1. Like Santana, Sanderson alleged that the criticism of his products was deliberately false. As in this case, however, Sanderson had failed to show the existence of a boycott or other coercive measure that would have prevented customers from dealing with him or prevented him from selling his products to any willing buyer. "All Sanderson alleges is that defendants have joined together to criticize plaintiff and his products falsely." *Id.* at *3.

Sanderson also argued that a trade association—the Water Quality Association ("WQA")—adopted a standard that excluded his product. The court found that such standard-setting was not a restraint of trade because the standard was not incorporated into applicable law so as to impose legal barriers to the plaintiff's products. *Id.* at *3 n. 2. The fact that the defendants urged customers to purchase only those water purification products with the WQA seal of approval also failed to present a cognizable antitrust claim because customers were not coerced to buy only "gold seal" products. *Id.* at *5. The court concluded that "Sanderson was free to develop and use other means to reassure customers about the quality and efficacy of his products . . . ." *Id.*

This rationale applies with equal force here. Santana has merely shown that Bobrick may have joined together with others to criticize its products falsely. Bobrick did not conspire with the NFPA or other organization whose standards were incorporated into law. No prospective purchaser was compelled to specify non-HDPE partitions.

Santana contends that even if the object of the concerted conduct was legitimate, other factors make such conduct actionable under § 1 of the Sherman Act. In particular, Santana cites to *United States v. Realty Multi–List, Inc.,* 629 F.2d 1351 (5th Cir.1980), as demonstrating that a restraint with pro-competitive effects can be excessive. *Realty Multi–List* involved a government suit against a multiple real estate listing service. Among the membership requirements for this service were that the broker have a favorable credit rating and business reputation, maintain an active real estate office open during customary business hours, and pay a

$1,000 fee for a share of stock. The court found this unreasonable because the existing state regulatory scheme was a less restrictive alternative to the membership requirements while providing adequate protection against unethical realtors. *Id.* at 1376–81. From this, Santana argues that the defendants' selection and enforcement of the ASTM–E–84 test as the "standard" of fire safety was unreasonable because the actual codes enforced in various portions of the United States had less restrictive alternatives for approved plastics for use in buildings. (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 10–11.)

This argument collapses, however, when taken out of the standard-setting context. Bobrick and the other TPMC members did not adopt or enforce a standard. They advocated an interpretation of the very state building codes that Santana argues were the less restrictive alternative. Santana may be correct that the building codes authorized alternate smoke density tests in lieu of the ASTM E–84 standard. Still, the defendants' advocacy of a different interpretation of those codes does not and cannot equal enforcement. It is the absence of any means to coerce purchasers to specify non-HDPE partitions (i.e. enforce product standards) that removes this case from the purview of the antitrust laws. *See Consol. Metal,* 846 F.2d at 296 (denial of a valuable certification by a standard-setting body does not impose an unreasonable restraint on trade where there is no evidence of coercion of customers); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 558–59 (1st Cir.1974) (promotion of a product specification that excludes plaintiff's product is merely "salesmanship" and not in restraint of trade).

Considering (a) the nature of the market; (b) the history of the parties' jockeying over specifications and the comparative characteristics of each producer's type of compartments; (c) the absence of any evidence that Bobrick and others conspired with standard-setting organizations, such as the NFPA; and (d) the absence of evidence of any attempts to coerce purchasers to specify non-HPDE compartments, I find that the record does not permit a conclusion that the object of the challenged conduct was unlawful. *Stearns, Schachar* and *Sanderson* compel the conclusion that the activity at question here is simply not a restraint on trade. Accordingly, Bobrick is entitled to summary judgment on Santana's Sherman Act § 1 claim.

### 3. Anticompetitive Effects

■■■ Bobrick is also entitled to summary judgment because Santana has failed to adduce competent evidence of harm to competition attributable to the challenged conduct. For a restraint to be found unreasonable, the plaintiff must show that it produces adverse, anticompetitive effects within the relevant product and geographic markets. *Brown Univ.,* 5 F.3d at 668. The Third Circuit has held that a plaintiff may satisfy this burden by "proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services." *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1367 (3d Cir. 1996) (citations omitted).

The plaintiff, of course, must show more than injury to itself. *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 641 (3d Cir. 1996)(" 'An antitrust plaintiff must prove that challenged conduct affected the prices, quality of goods or services,' not just his own welfare.' ")(quoting *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 728 (3d Cir.1991)). "It is axiomatic that '[t]he antitrust laws ... were enacted for 'the protection of *competition,* not *compet-*

itors.'" *Tunis Bros.*, 952 F.2d at 727 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977))(emphasis in original); *see also Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)("Even an act of pure malice by one competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition ....."). Moreover, antitrust "'plaintiffs have a burden to show more than a de minimus restraint.'" *Tunis Bros.*, 952 F.2d at 728 (quoting *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.1978)). Santana has not met this initial burden.

Santana alleges two main anticompetitive effects to the market for HDPE. First, Santana points to statements by representatives of Capitol Partitions and Comtec—sellers of HDPE toilet partitions—that those companies felt the effect of the conspiracy and had to take measures to counteract the misinformation. (Rev. Mem. in Support of Pl. S.J. Mot./Sherman Act, Dkt. Entry 381, at 30–31.) In addition, several manufacturers of HDPE compartments who were alleged members of the conspiracy stopped selling HDPE compartments until after the TPMC settlement. (*Id.* at 31.) Specifically, as noted above, Knickerbocker, General Partitions, and Sanymetal stopped offering HDPE compartments after or between the TPMC meetings from October 18, 1989 to March 1991. (Pl.Rev. Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 89.) Compression Polymers Inc., a manufacturer of HDPE panels who sold panels to these three toilet partition

makers from 1987 to 1989, made no sales to these companies by 1992. (*Id.*, ¶ 88D.)

Bobrick correctly notes, however, that there is no evidence on the effect on competition in the toilet partition market.[45] Santana's insinuations that Capitol Partitions and Comtec had to take measures to counteract Bobrick's alleged misinformation are vague. The deposition of Comtec's Rule 30(b)(6) representative, Jeff Palfey, is illuminating:

Q. As far as you're aware, that didn't— there was no interference with any of your relationships?

A. No. And, again, the issue was and still is what is the product that's specified for the job. Does Comtec manufacture a product that meets those specifications; if so, we can bid the job.

If there are any questions that arise in doing normal business in understanding the market and the reps and dealers understand what we have to offer versus what they've heard about competitors, I don't call that interference. I call that doing business. You hear that every day about your competitors.

Questions arose, and we addressed those questions. I don't call it interference or scare tactics, any issues that we considered threatening, no.

(Ex. 25A, Appx. to Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 324, Palfey Dep. Tr. at 87–88.)

Bobrick is also correct that the fact that several TPMC members stopped buying HDPE sheets from Compression Polymers, while not insignificant, is inconclusive. The record is silent as to how much

---

**45.** Presumably, this is partly due to Santana's voluntary withdrawal of its expert reports on damages. But, the Pisarkiewicz Report does show a sixty-one percent *increase* in overall HDPE sales by Santana between 1989 and 1997. (Ex. 2, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Pisarkiewicz Report, ¶ 23.)

capacity was lost by their departure from the market. It is clear, however, that the "major suppliers" of HDPE compartments—Santana, Capitol Partitions, and Comtec—not only remained in business, but appear to have increased sales during the period of the alleged conspiracy. (Pl. Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 126.)

Most importantly, Santana does not provide evidence concerning the condition of the market. There is no evidence that the output of HDPE sheets or toilet partitions was reduced. There is no evidence that HDPE toilet partitions lost market share. There is no evidence that the anti-HDPE campaign constituted an effective barrier to market entry. Comtec introduced HDPE compartments during the pertinent period. In its Statement of Material Facts, Santana concentrates on the fact that solid phenolic partitions generally cost more than HDPE partitions, but this alone is not a basis for finding an anticompetitive effect. (Pl.Rev.Stat. of Material Facts/Sherman Act, Dkt. Entry 382, ¶ 88B.) Given the number and types of toilet partitions (such as baked enamel, stainless steel, etc.), there is insufficient evidence to conclude that the "fire scare"

marketing campaign must have adversely affected prices or supply.[46]

While Santana has demonstrated that it lost some sales to Bobrick and other solid phenolic manufacturers, it has not presented evidence of significant injury to competition, even when the analysis encompasses the public sector. "The 'reasonableness' of a restraint is judged by its general effect on the market, not by the circumstances of a particular application." *Consol. Metal,* 846 F.2d at 297. Comtec and Capitol Partitions may have lost some sales, but overall sales of HDPE compartments increased during the relevant time frame. (*See* Ex. 24A, Appx. to Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 324, Arnaiz Dep. Tr. at 22.) It is also clear that, like Santana, Capitol Partitions and Comtec had some success in counteracting the effects of the "fire scare" campaign. (Rev. Reply Mem. in Support of Pl. S.J. Mot., Dkt. Entry 424, at 55–57.) Santana has "made conclusive statements regarding the harmful effects of the questioned combination, but [has] provided us with no analysis with which to conclude that defendant has been a party to an unreasonable restraint." *Sitkin Smelting,* 575 F.2d at 448. Thus, Santana has failed to show the necessary anticompetitive effect.[47]

---

**46.** Market power may be used as a surrogate for a showing of actual detrimental effect to the market. *See Orson, Inc.,* 79 F.3d at 1367. Significantly, Santana, in moving for summary judgment, asserted that this case is governed by the *per se* rule, and thus did not address this surrogate for harm to competition. Furthermore, in opposing Bobrick's summary judgment motion, Santana did not rely upon market power. Instead, its argument was limited to the evidence of impact on Comtec and Capitol Partitions, as well as the exit of three small producers from the HDPE product line. (Rev. Reply Mem. in Support of Pl. S.J. Mot., Dkt. Entry 424, at 53–57.) Thus, there is no need to address market power as a surrogate for harm to competition.

**47.** In the context of Sherman Act § 2 cases based upon product disparagement, courts have applied a presumption of *de minimis* harm to competition. *See, e.g., Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.* 108 F.3d 1147, 1152 (9th Cir.1997). The anticompetitive conduct at issue in this case is essentially based on commercial disparagement. It would thus appear that the reasoning in the § 2 cases would be equally applicable here. To overcome the presumption of *de minimis* impact on competition, a plaintiff must show that the representations " 'were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or

The conclusion that Santana failed to show the requisite harm to competition is buttressed when conduct protected by the Noerr/Pennington doctrine is excluded from the analysis. Santana has made no showing whatsoever with respect to the non-public market for toilet partitions. No information was provided, for example, as to the percentage that the non-public market bears to the total market. Accordingly, Santana's failure to show harm to competition provides an independent basis for granting summary judgment in favor of Bobrick on the section one claim.[48]

### E. The Sherman Act Section Two Claim

 Count II of Santana's Complaint alleges that Bobrick, Hornyak, Vogel, Sylvester, and the TPMC members:

> conspired to monopolize at least a part of the trade in interstate commerce for toilet partitions and to maintain power to exclude or restrain manufacturers of HDPE partitions from marketing and selling their goods in interstate commerce in violation of Section 2 of the Sherman Act ... with the specific intent

of achieving and exercising such monopoly power.

(Complaint, ¶ 75.) Section 2 of the Sherman Act prohibits, *inter alia,* conspiracies to monopolize. 15 U.S.C. § 2. A claim of conspiracy to monopolize has three elements: (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize. *Santana Prods.,* 121 F.Supp.2d at 735.

Relying on Judge Mishler's dismissal of Santana's section 2 claim in the parallel litigation against Sylvester pending in the Eastern District of New York, Bobrick seeks summary judgment on Santana's § 2 claim brought in this action. Bobrick contends that Judge Mishler's ruling is conclusive under collateral estoppel principles. Alternatively, Bobrick asserts that Judge Mishler's reasoning should be applied here, not only because it is persuasive of its own force, but also because it is consistent with a substantial body of case law precedent.

Judge Mishler granted judgment in favor of Sylvester on Santana's section 2 claim on two independent bases: (1) San-

---

other offset by rivals.' " *Id.* All six elements must be shown to overcome the *de minimis* presumption. *Id.* In this case, Santana has failed to show that the challenged advertisements and other dissemination of information were made to unsophisticated buyers. On the contrary, the architects and specifiers were knowledgeable purchasers who were skeptical of the "fire scare" marketing. (*See, e.g.,* Ex. 138, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Winslow Dept. at 71; Ex. 142, *id.,* Hayashi 1/10/00 Dep. Tr. at 61; Def. Rev. Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 406, at 63.) Furthermore, the "fire scare" marketing was "readily susceptible to neutralization." *Am. Prof'l Testing Serv.,* 108 F.3d at 1152 ("The argument that its neutralization efforts were not completely successful is unavailing; the test refers to 'susceptible to neutralization' not ' successful in neutralization.' "). Santana

has acknowledged that it was often able to convince architects to change their specifications back to HDPE, (Pl.Rev.Stat. of Material Facts/Sherman Acts, Dkt. Entry 382, ¶¶ 113, 115), and persuaded state and local officials to change their interpretation of the fire codes to clarify that toilet partitions were furnishings rather than interior finish. (Pl. Response to Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 393, ¶¶ 155–57.) Thus, application of the *de minimis* presumption developed in § 2 product disparagement cases provides an independent basis for concluding that Santana has failed to make a threshold showing of harm to competition.

**48.** There is no need to address the final element of plaintiff's Sherman Act § 1 case—causation and injury—because Santana's claim fails the rule of reason analysis.

tana's complaint alleged only a conspiracy to exclude Santana from competition, as opposed to a conspiracy to monopolize an entire market; and (2) Santana essentially "alleged a conspiracy to form a 'shared monopoly,'" *id.* at 737, which cannot be maintained under section 2. Judge Mishler explained this alternative ground for dismissing the section 2 claim as follows:

Most district courts that have addressed the viability of a shared monopoly theory under Section 2 have rejected it as contrary to the plain language and legislative intent of the Sherman Act. *See, e.g., Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.,* 535 F.Supp. 225, 229 (S.D.N.Y.1982)(holding that shared monopoly does not violate § 2 of the Sherman Act absent an allegation that a particular Defendant, as opposed to all Defendants, monopolized or attempted to monopolize the market); *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n. Inc.,* 867 F.Supp. 925, 941 (D.Or. 1994)(where many competitors are alleged to form a shared monopoly, claim under § 2 fails); *see also H.L. Hayden [Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 672 F.Supp. 724,] 741 [ (S.D.N.Y.1987) ] (expressing "considerable discomfort" with shared monopoly theory and noting that the "notion that two competitors could conspire to monopolize is, seemingly, antithetical").

\* \* \* \* \* \*

Similarly, under the facts presented here, Plaintiff cannot assert a claim for conspiracy to form a shared monopoly under Section 2 of the Sherman Act. Assuming Plaintiff's allegations are true, the result of Defendants' actions would be the elimination of Plaintiff as a competitor in the toilet partition market. Plaintiff has not alleged, however, that competition among the many remaining manufacturers of toilet partitions would be diminished in any way. Absent such an allegation, Plaintiff's conspiracy to monopolize claim must fail. Thus, as an alternative basis to the one mentioned above, Defendants' motion for partial judgment on the pleadings on Plaintiff's Section 2 conspiracy claim is granted.

*Id.* at 737–38.

■ Santana contends that Judge Mishler's decision is not entitled to preclusive effect under collateral estoppel principles because it is still subject to appeal. Santana further contends that Judge Mishler's ruling rested on the erroneous assumption that Santana failed to allege that the conspiracy was directed at entities other than Santana.

■ As noted above, Judge Mishler articulated alternative rationales for dismissal of Santana's section 2 claim. Indeed, in denying Santana's motion for reconsideration and request for leave to amend the complaint, Judge Mishler emphasized his conclusion that a conspiracy to create a "shared monopoly," as alleged by Santana, is not cognizable under section 2 of the Sherman Act. *Id.* at 740–42. Thus, the fact that other HDPE toilet partition manufacturers may have been affected by the challenged conduct did not alter his determination that Santana could not present a viable section 2 claim.

As stated by Bobrick, the precise issue here, and which was decided against Santana by Judge Mishler, is "whether a group of eleven competitors who allegedly conspired to eliminate HDPE toilet partitions from the market can constitute an illegal conspiracy to monopolize under Section 2 in the absence of some proof that they conspired to create a single dominant defendant or that competition among them was diminished." (Rev. Reply Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry

408, at 63.) Significantly, Santana fails to address this issue. It has not sought to distinguish the decisions on which Judge Mishler relied. Nor has Santana cited any case that recognized the viability of a section 2 claim under circumstances similar to those presented here.

Having carefully considered Judge Mishler's well-reasoned opinion as well as the case law that he canvassed, I concur with his conclusion: Santana has presented no more than a claim of conspiracy among competitors to restrain trade, but has not shown that competition among the conspirators has been diminished in any way. Such a claim may not be maintained under section 2 of the Sherman Act. As explained in *Sun Dun, Inc. v. Coca–Cola Co.,* 740 F.Supp. 381, 391–92 (D.Md.1990):

> An examination of the history of the Sherman Act reveals that Congress' concept of "monopoly" did not include "shared monopolies" or "oligopoly" at all, but rather the complete domination of a market by a *single* economic entity
>
> . . . .
>
> The idea that a monopoly is composed of a single economic entity is also reflected in the requirement in an actual monopolization claim that the requisite power be

held by a single defendant. This idea in no way precludes the possibility of a group of firms conspiring to monopolize, *if the aim of the conspiracy is to form a single entity to possess the illegal market power. When, however, two or more competitors conspire to create a market environment in which competition and market entry is improperly restricted, but in which market power continues to be shared among these otherwise unrelated entities, . . . there is no conspiracy to monopolize claim stated under Section two* . . . . [Emphasis added.]

Accordingly, judgment will be entered in favor of Bobrick on Santana's claim under section 2 of the Sherman Act.[49]

## F. The Lanham Act Claims

■ Both Santana and Bobrick have moved for summary judgment on Count III, which alleges that the defendants violated § 43(a) of the Lanham Act. Section 43(a) states in part:

> (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination therefor, or any false designation of origin, false or mis-

**49.** In light of this disposition of the section 2 claim, there is no need to reach the collateral estoppel issue. It bears noting, however, that there is a substantial argument that Judge Mishler's ruling has the requisite "finality" for purposes of applying the doctrine of collateral estoppel. Our Court of Appeals has held that in determining whether an issue has been adjudicated with sufficient finality, the court "should consider whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed." *In re Brown,* 951 F.2d 564, 569 (3d Cir.1991). The first two considerations weigh in favor of application of collateral estoppel. Judge Mishler, in accordance with 28 U.S.C. § 1292(b), certified for interlocutory appeal his decision on Sylvester's motion for partial judgment on

the pleadings as to the section 2 claim. Santana, however, did not timely move for leave to appeal. Instead, it requested leave to appeal after the denial of its motion for reconsideration, an order which Judge Mishler did not certify under § 1292(b). The Second Circuit held that, under these circumstances, it lacked jurisdiction to consider Santana's request for leave to appeal. It is thus at least arguable that Santana should not be entitled to re-litigate the viability of its section 2 claim because it failed to take timely action in the appellate court when it had the opportunity to do so. *Cf. Cherokee Express, Inc. v. Cherokee Express, Inc.,* 924 F.2d 603, 607 (6th Cir.1991)(defendants could not challenge a preliminary injunction and subsequent contempt proceedings following dismissal of appeal as untimely).

leading description of fact, or false or misleading representation of fact, which

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). To establish a Lanham Act claim based on false or misleading representation of a product, the plaintiff must show:

1) that the defendant has made false or misleading statements as to his own product [or another's];

2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;

3) that the deception is material in that it is likely to influence purchasing decisions;

4) that the advertised goods traveled in interstate commerce; and

5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 129 (3d Cir. 1994). If the plaintiff proves that the challenged advertisement is "literally false, a court may grant relief without considering whether the buying public was misled." *Id.* Where the challenged advertisement is not literally false, however, the plaintiff bears the burden of proving actual consumer deception. *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir.1993). Thus, "a plaintiff must prove *either* literal falsity *or* consumer confusion, but not both." *Id.* (emphasis in original). Failure to disclose a material fact may also be actionable un-

der § 43(a). *See U.S. Healthcare, Inc. v. Blue Cross of Phila.,* 898 F.2d 914, 921 (3d Cir.1990); *Performance Indus., Inc. v. Koos Inc.,* Civ. A. No. 90–6435, 1990 WL 161253 (E.D.Pa. Oct. 17, 1990).

Santana relies exclusively on literal falsity, eschewing an approach that would necessitate proof of actual consumer deception. Santana argues that Bobrick's statements are literally false for several reasons. First, asserts Santana, the advertisements convey the purportedly false message that toilet partitions must be fire rated class B or higher to meet state or local building code standards. Second, according to Santana, the advertisements use the ASTM E–84 test to appraise the fire hazard of HDPE partitions under actual fire conditions, despite the warning that the test is not to be used for this purpose. Santana claims that this constitutes a failure to disclose a material fact, i.e., that flame spread and smoke development results do not describe the fire hazards of HDPE partitions under actual conditions. Finally, Santana claims that there are literal falsehoods specific to each advertisement, generally conveying misrepresentations concerning the fire hazards and ratings of Santana's and Bobrick's products. For example, the Bobrick "You Be the Judge" video allegedly shows a false side-by-side burn test of HDPE and solid phenolic core (SPC) toilet compartments.

Bobrick argues in response (and in support of its own summary judgment motion) along several lines. First, Bobrick contends that several of the promotional pieces challenged by Santana were not identified in the complaint and, therefore, cannot be considered now on summary judgment motions. Bobrick also contends that judgment against Santana is mandated by Santana's "unclean hands"—specifically, because Santana used the ASTM E–

84 test itself in advertisements for its Class A HDPE partition. Finally, Bobrick asserts that its promotional materials were not literally false and, in any event, Santana cannot show that it was damaged as a result of any purportedly false advertisement.

### 1. Advertising Statements Not Identified in the Complaint

 Bobrick argues that several of the alleged false advertisements for which Santana seeks damages were not identified in the complaint; specifically, the box lunch slides, the advertisements in the Sweet's Catalog, the 1990 "Lost Art" advertisement, and the Thrislington advertisement. The complaint explicitly mentioned only five false advertisements: the Formica video, the Bobrick "You Be the Judge" video, the TB–73 technical bulletin, a June 12, 1992 Bobrick memorandum about a publically-reported lawsuit filed against Santana,[50] and the April 1995 AS & U advertisement. Therefore, according to Bobrick, Santana cannot seek recovery for any advertisements beyond those listed in the complaint. (Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 406, at 64–65.)

The cases to which Bobrick cites, however, do not prohibit consideration of the advertisements not directly mentioned in the complaint. *Evans Products Co. v. West American Insurance Co.,* 736 F.2d 920 (3d Cir.1984), for example, dealt with an entirely new theory of liability. Not only had the new theory of relief not been presented in the complaint, but—critically—it was never "squarely presented and litigated by the parties at some stage or other of the proceedings." *Id.* at 923. The court observed that "relief may be based on a theory of recovery only if the theory was presented in the pleadings or tried with the express or implied consent of the parties." *Id.* at 923–24.

Similarly, in *Max Daetwyler Corp. v. Input Graphics, Inc.,* 608 F.Supp. 1549 (E.D.Pa.1985), the complaint alleged that the defendants had misstated the "quality and nature" of plaintiff's product, a blade. The only specific misrepresentation offered in the complaint was reference to a false advertisement concerning the blade's durability. *Id.* at 1555–56. The plaintiff argued later that the defendants also misrepresented their own product as being similar to the plaintiff's. The court concluded that the complaint's allegation that the defendants had misstated the "quality and nature" of the plaintiff's product could not be construed as alleging a misstatement of the "quality and nature" of the defendant's product. *Id.*

Santana has not interjected a new theory of liability following the close of massive discovery. Rather, Santana contends that all of Bobrick's advertising materials suffer from the same defect raised in the original complaint. The complaint alleges that the defendants published videotapes and distributed brochures and other advertising materials and made statements that included false and misleading representations with regard to the flammability of Santana's HDPE products compared to Bobrick's and the required ratings for all toilet partitions under state building codes. (Complaint, ¶ 80.) Santana's theory of the case has not changed. Nor can it be said that Santana's arguments concerning the box lunch scripts, other national trade journal advertisements, advertisements in the Sweet's Catalog, and the Thrislington script were never "squarely presented and litigated by the parties at some stage or

---

50. Santana does not mention this memorandum as an instance of false advertising in its brief in support of its Lanham Act claim, and it will not be addressed in this opinion.

other of the proceedings." During the course of the case, details concerning these specific representations have been presented through discovery, rulings on discovery issues, and in the motions for summary judgment. Santana's statement of material facts refer to these alleged false advertisements and cite to evidence from discovery supporting these claims. (Pl.Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶¶ 130–48.)

Bobrick will not suffer prejudice by allowing the Lanham Act claim to continue as to these statements and advertisements. As early as 1997, the issues concerning the Sweet's Catalogs, the AS & U advertisements, and the Thrislington architect's "script" were being actively litigated. (Rev. Reply Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 426, at 7–8.) Plaintiff's complaint met the requirements of notice pleading, see *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and the evidence produced during discovery contained additional materials which supported Santana's original allegations. Indeed, the central issue in the complaint is Bobrick's allegedly false *comparative* advertising of its toilet partitions against HDPE. Santana's inclusion of promotional materials beyond those mentioned in its complaint does not constitute "litigation by ambush."

### 2. Unclean Hands

 Bobrick argues that Santana's Lanham Act claim is barred under the doctrine of "unclean hands." "The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 174 (3d Cir.2001). The doctrine of unclean hands is available in an action under § 43(a) of

the Lanham Act. *Id.* ("The doctrine is applicable in actions seeking relief under the Lanham Act."); *Phillip Morris, Inc. v. Allen Distributors, Inc.,* 48 F.Supp.2d 844, 856 (S.D.Ind.1999)(recognizing the availability of unclean hands defense under Lanham Act); *Alpo Petfoods, Inc. v. Ralston Purina Co.,* 720 F.Supp. 194, 214 (D.D.C.1989)("The defense of unclean hands is available in an action brought under the Lanham Act seeking equitable and monetary relief."), *aff'd in part, rev'd in part,* 913 F.2d 958 (D.C.Cir.1990).

"To successfully avail itself of the doctrine of unclean hands under Federal law, a defendant must show that the plaintiff committed wrongdoing that is directly related to the claim which it has asserted, and that the plaintiff's wrongdoing injured the defendant." *Transclean Corp. v. Bridgewood Servs., Inc.,* 77 F.Supp.2d 1045, 1096 (D.Minn.1999), *aff'd in part and vacated in part on other grounds,* 290 F.3d 1364 (Fed.Cir.2002). Stated otherwise, "[c]ourts ... do not close their doors when plaintiff's misconduct has 'no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'" *Highmark,* 276 F.3d at 174 (quoting *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)).

Bobrick argues that, prior to 1990, Santana sold partitions by touting its fire rating as one of the product's positive attributes. (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶¶ 12–16, 38–49.) Specifically, from the mid–1980s to the mid–1990s, Santana sold partitions that it advertised were fire rated as Class A or Class B using the ASTM E–84 test. The evidence indicates that in 1985, Santana touted its HDPE partitions as the only

compartments satisfying the ASTM E–84 test. (Ex. 34, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, M. Lynch Sr. 1/12/00 Dep. Tr. at 307–08.) A marketing brochure distributed in the mid–1980s pertained to Santana's Class "A" Fire Retardant ("FR") series of toilet partitions. (Ex. 24, *id.*) This brochure represented that Santana's product met or exceeded strictest building codes for flame spread and smoke generation. The brochure also represented that Santana's product met the ASTM E–84 Steiner Tunnel Test. Specific values for flame spread and smoke generation were expressed. The brochure also added, parenthetically, that Santana had a "Class B" rated series of partitions that could be specified where flame spread values were between 25 and 75. This brochure did not include any disclaimer to the effect that the results of Steiner Tunnel Testing could not be used to assess the fire hazard of the materials in question.

The evidence also includes Santana's portions of the "Sweet's Catalog" for the years 1985 through 1990. In the earlier years, Santana made the claim that its partitions were "the only plastic products which have been tested utilizing ASTM E–84, Steiner Tunnel Test, or the equivalent of NFPA's 255 for flame spread and smoke generation." (Ex. 70, *id.*, 1985 Sweet's Catalog at S 66797.) The 1986 portion of the Sweet's Catalog touted Santana's HD Series as its "premiere line" and represented that it had "an equivalent Class 'B' flame-spread." (Ex. 60, *id.*, 1986 Sweet's Catalog at S 66787.) Once again, reference was made to the ASTM E–84 test without any disclaimer.

In the ensuing years, Santana's portions of the Sweet's Catalogs did not stress the flame and smoke spread characteristics of its products. It did, however, include as part of the "technical data" for its Poly-Mar HD line of toilet partitions a numerical flame spread value under the E–84 test. Again, however, no disclaimer to the effect that the test does not assess performance under actual fire conditions accompanied the reference to the test results. (*See* Exs. 71–73, *id.*, 1987–1990 Sweet's Catalogs.)

Bobrick contends that Santana discontinued its reference to the fire characteristics of its product only after Santana found that sales of its Class A partitions were unprofitable. According to Bobrick, Santana then decided to "reverse the process." (Rev. Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 405, at 165–66.) Bobrick contends that to allow Santana to exploit consumer confusion and then subsequently allow it to sue for damages because it claims defendant is causing similar confusion "is completely inconsistent with traditional notions of equity and fairness." *Metro Publ'g, Ltd. v. San Jose Mercury News,* 861 F.Supp. 870, 880 (N.D.Cal.1994).

Santana, in response, argues that there are clear differences between the advertisements. Santana's ads focused on its product, not on disparaging a competitor's product. Santana also claims that the ads were discontinued when it determined that a fire rating under ASTM E–84 was not necessary. (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 65.) Finally, Santana stresses that the doctrine of unclean hands requires that the plaintiff's alleged wrongdoing exist at the time of the suit. (*Id.* at 68.)

Santana's opposition to Bobrick's assertion of the doctrine of unclean hands is misdirected. Bobrick is correct to point out that its argument depends not on the similarity of the advertisements, but on the fact that Santana relied on the very ASTM E–84 test that it now contends has been wrongly used by Bobrick. Moreover, Santana, mostly in the mid–1980s, used the

ASTM E–84 test results to imply that its products did not pose a fire risk or hazard. That Santana discontinued the offending activity prior to bringing this suit does not render application of the doctrine ineffective. Indeed, so holding would eviscerate the usefulness of the doctrine, for plaintiffs could discontinue their inequitable activity whenever they desired to file suit. *Cf. Highmark*, 276 F.3d at 173–74 (defense of unclean hands was not barred because the plaintiff ran an offending advertisement two years before the defendant's advertisement, but because a nexus between the plaintiff's advertising and the defendant's wrong was lacking). Santana's reason for discontinuing the ads—be it quality-control issues and lost sales of its standard HDPE partition because of the Class A advertising, as Bobrick asserts, or a reassessment of the applicability of ASTM E–84, as Santana contends—is irrelevant. The relevant point is that Santana used the results of ASTM E–84 tests in precisely the manner that it now contends is false and deceptive: to imply fire resistant characteristics without the disclaimer that it contends the ASTM itself requires.

It seems incongruous for Santana to seek relief for the dissemination of test results that is not much different than its use of such information. But the unclean hands doctrine necessitates a determination *ab initio* that use of ASTM E–84 test results without a disclaimer is a false representation of fact. That is, both Santana's and Bobrick's hands must be dirty. As will be explained *infra*, Bobrick's use of the ASTM E–84 testing did not amount to a false representation by virtue of the absence of any disclaimer. Thus, Santa-

na's use of the test results cannot support application of the unclean hands doctrine.

■ There is, in any event, a more fundamental constraint on imposition of the unclean hands doctrine. As stated above, the plaintiff's wrongdoing must be directly related to the claim before the Court—i.e., to the defendant's wrongdoing. "The nexus 'between the misconduct and the claim must be close.'" *Highmark*, 276 F.3d at 174 (quoting *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir.1999)). The nexus between Santana's use of the ASTM E–84 test and Bobrick's "firescare" campaign is not so close as to require application of the doctrine of unclean hands. Bobrick suggests that it would not have developed the "fire scare" marketing campaign had Santana not first raised the fire rating issue. (Rev. Reply Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 408, at 83–84.) But, to challenge Santana's claims, it was not necessary that Bobrick go further and paint Santana's standard HDPE panels as fire hazards. Bobrick's conduct went well beyond merely providing results of testing. Its campaign is aptly characterized as a "fire scare," intended to portray not only the supposed safety of its products, but also the alleged extreme hazard of HDPE. The advertising materials and approach of the parties are not roughly comparable, and the unclean hands doctrine is thus not applicable here.

### 3. Literal Falsity

Santana's Lanham Act claim depends on a finding that Bobrick's advertisements were literally false.[51] Santana does not attempt to argue that the offending adver-

---

**51.** Bobrick argues that summary judgment for a plaintiff on a claim of literal falsity is not appropriate and cites in support *Nordictrack, Inc. v. Soloflex, Inc.*, Civ. No. 93–1432–JE, 1994 WL 635123, at *2–3 (D.Or. Apr. 21, 1994). *Nordictrack*, however, nowhere states

that summary judgment is not appropriate on a claim of literal falsity. Rather, the court, considering the advertisement in full context, concludes that a reasonable jury could find the advertisement literally true or ambiguous, or merely to be "puffing."

tisements were literally true but misleading, in which case Santana would be required to show that the targets of those advertisements—the architects and specifiers—were actually misled.[52]

■■■■ The determination of whether an advertisement is literally false is a two-step process. "In analyzing whether an advertisement ... is literally false, a court must determine, first, the unambiguous claims made by the advertisement ..., and second, whether those claims are false." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir.2002). Only an unambiguous message can be literally false, but a literally false message need not be explicit. It may also be "conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Id.* at 586–87 (quoting *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir.2000)). "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported." *Id.* at 587 (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir.1998)). "[I]n assessing whether an advertisement is literally false a court must analyze the message conveyed in full context." *Castrol*, 987 F.2d at 946. "[I]f a defendant's claim is untrue, it must be deemed literally false." *Id.* at 944. Each of the assailed promotional material will be assessed with these principles in mind.

### a. *The Formica Videotape*

■■■■ It is undisputed that Mark Moorhead of Formica gave Bobrick a copy of the "Formica videotape," with the explicit permission for Bobrick to use it in promoting its SPC toilet partitions. The videotape was prepared through collaboration between two TPMC members, Formica, a manufacturer of plastic laminate, and Metpar, a distributor of toilet partitions. It included a comparative analysis of compartments made of Formica's SPC and of Santana's HDPE. It discussed building codes and the ASTM E–84 test. A video clip provided by Metpar showing a small sample of Santana's HDPE material being burned in a time-lapse format was integrated in the production. All of the information implied that HDPE was not resistant to fire. (Ex. 91, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Formica Videotape.)

Santana contends that this videotape comparison is literally false for several

---

52. Specifically, a plaintiff who has failed to show that an advertisement was literally false "must produce consumer surveys or some surrogate therefor [sic] to prove" consumer perception of the advertisements. *Sandoz Pharms. Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 229 (3d Cir.1999); *see also Johnson & Johnson–Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992)(when a "plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse."). Moreover, unlike a claim of literal falsity, a plaintiff alleging a misleading advertisement has the burden of proving that a substantial portion of the advertisement's audience was actually misled. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir.1990). Santana has provided no evidence that a substantial number of architects and specifiers were deceived, though it has presented evidence of confusion of an insubstantial number of specific architects. Indeed, Santana states that since Bobrick's advertisements and statements were "literally false or untrue in a number of respects, this court can grant relief without considering whether the buying public was misled." (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 14–15.)

reasons. First, Santana asserts that the video is literally false because it uses the ASTM E–84 test to describe the fire hazard of Bobrick's SPC compartments under actual fire conditions. (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 10–12.) Santana points out the following excerpt from the narrative on the video:

> [O]ur standard thick stock laminate is classified as a Class B fire rated material. Fire ratings for partitions are extremely important since their primary applications are in public buildings, such as schools, restaurants, hotels, and commercial office buildings which require, by code, products that are fire rated or relatively non-combustible. . . .
>
> So, let's look a little closer at how our thick stock laminate rates in terms of fire ratings. Two of the most important qualifications used in determining *fire ratings* for a building product are in *flame spread and smoke generated.*
>
> \* \* \* \* \* \*
>
> [O]ur standard thick stock laminate is rated at 35 for *flame spread.* The other fire rating category, smoke developed, is perhaps more important than flame spread. As you might be aware, more people are killed in fires from a high concentration of smoke and toxic fumes than from the actual flames themselves. *The maximum allowable smoke developed rating in most fire codes is 450. Our product rates at a very acceptable 45 for 1″ stock, 90 for 3/4″ stock, and 100 for 1/2″ stock.*[53]

(*Id.*) Santana emphasizes that while the video gives numerical fire and smoke spread ratings for SPC, it does not repeat the following disclaimer to the ASTM E–84 test:

This standard should be used to measure and describe the response of materials, products, or assemblies to heat and flame under controlled conditions and should not be used to describe or appraise the fire-hazard or fire-risk of materials, products, or assemblies under actual fire conditions.

Santana contends that, in the absence of an express statement that the results of the ASTM E–84 test are not to be used to appraise the fire-hazard or fire-risk of materials under actual fire conditions, the Formica videotape's use of the test results is literally false.

Santana's argument, however, ignores the second sentence of ASTM E–84 § 1.7, which states:

> However, results of the test may be used as elements of a fire-hazard assessment or a fire-risk assessment which takes into account all of the factors which are pertinent to an assessment of the fire hazard or fire risk of a particular end use.

Thus, ASTM E–84 does not establish a categorical prohibition against use of test results for fire-hazard assessment purposes. Furthermore, the language of § 1.7 is merely precatory [the "standard . . . *should* not be used"], as opposed to mandatory, i.e., "must not be used." The videotape's use of test results to tout the characteristics of SPC in a fire setting is no different than Santana's own use of test results several years earlier. The absence of any caveat on the use of the test results did not render the implicit message conveyed by the quoted excerpt—SPC bathroom partitions are "fire rated"—literally false.[54] On the contrary, that message is undoubtedly true.

---

**53.** The underscored language was asserted by Santana to be literally false. (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 11.)

**54.** Santana does not claim that the represen-

Santana nonetheless maintains that a judgement in its favor is compelled by *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir.1993). In *Castrol*, plaintiff showed that defendant Pennzoil's claim that its product out performed any leading motor oil against viscosity *breakdown* was untrue. Specifically, plaintiff presented evidence that the results of industry-recognized laboratory tests showed that its product was superior in terms of viscosity breakdown. Pennzoil did not rely upon the industry-accepted testing, but instead asserted that its claim of superiority was substantiated by another test that showed its motor oil suffered less viscosity *loss* than the plaintiff's product. The Third Circuit affirmed the trial court's finding that Pennzoil's claim of superiority was literally false because (a) the accepted tests for viscosity breakdown did not corroborate Pennzoil's advertisement; (b) the test upon which Pennzoil relied did not measure viscosity breakdown, but only viscosity loss; and (c) the test on which Pennzoil relied specifically provided that the "test methods are not intended to predict viscosity loss in field service for different polymer classes or for different field equipment." There was no dispute that Pennzoil's product was from a different polymer class than the plaintiff's. Santana argues that the reference to the disclaimer in *Castrol* is in direct parallel to the language Santana cites from the ASTM E–84 standard.

*Castrol*, however, is distinguishable because, in this case, there can be no dispute that ASTM E–84 is the appropriate standard for assessing flame spread and smoke generation of materials. Indeed, Santana itself utilized the results from ASTM E–84 tests for this very purpose. Furthermore,

the standard itself says that test results "may be used as elements of a fire hazard assessment or a fire-risk assessment . . . ." Santana has not pointed to another testing protocol better suited for assessing fire hazards. Nor has it shown that Bobrick's partitions in actual fire conditions would not have the characteristics implied by the ASTM E–84 test results. In *Castrol*, an inapplicable test was the premise for a false claim of product superiority. In this case, by way of contrast, the indisputably applicable test was used for purposes of informing the consumer of the results of SPC in controlled testing. The failure to note that the E–84 test "should not be used to describe or appraise the fire-hazard or fire-risk of materials, products, or assemblies under actual fire conditions" does not render the statements in the video pertaining to SPC "literally false." [55]

Santana nonetheless insists that a finding of literal falsity is compelled by the failure of the videotape to include a disclaimer required by the FTC in a 1974 consent decree. *See In re Society of the Plastics Industry, Inc.*, 84 F.T.C. 1253 (1974). The consent decree stipulated that a representation of a numerical flame spread rating had to be accompanied by a statement that the rating "is not intended to reflect hazards presented by this or any other material under actual fire conditions." The 1974 consent order involved various plastics manufacturers and members of the Society of Plastic Industry, Inc. Bobrick has pointed out, and Santana does not dispute, that Bobrick was not a member of the Society nor is it a manufacturer of plastic. (Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 406, at 92.)

tations concerning the test results are false.

**55.** It should also be noted that Santana has not adduced any evidence to suggest that SPC

would react in a manner inconsistent with the test results under actual fire conditions.

An FTC consent order cannot be used to hold liable entities who are not a party to the decree. For this reason, the 1974 consent order did not impose any obligation upon Bobrick, and did not render the videotape's reference to the fire rating of SPC literally false.[56]

Santana contends that the Formica videotape is, in any event, literally false in its negative representations concerning HDPE toilet compartments. Santana points to the following excerpts from the narrative on the videotape:

[L]et's take a look at competitive material that is being used to manufacture partitions. This is a piece of high density polyethylene. This product is being marketed in panel form for toilet partition applications. There is one major problem with the material that makes it not suitable for use in toilet partition systems.

[caption "HIGHLY FLAMMABLE"]

It is highly flammable and generates a high level of smoke.

\* \* \* \* \* \*

Let's look at some data concerning the fire rating of [HDPE].... Independent test data we have obtained indicates that it is more accurately a 65 rating which falls at the high end of a Class B rating, bordering on a Class C rating. Comparatively, our standard thick stock has a *flame spread rating of 35* which is near the low end of the Class B rating .... [I]ndependent test data we have obtained list the smoke developed value at 440. The maximum value for smoke developed for fire codes is 450. Comparatively, our thick stock material falls

between 45 and 100 depending upon the thickness.

\* \* \* \* \* \*

The independent test results we obtained for [HDPE] were calculated in accordance with the standard *ASTM E–84 84A test for flame spread and smoke developed values*. Also included in the report were the following remarks about the [HDPE] tested. Ignition was noted at 1 minute 40 seconds along with charring, melting and blistering of the specimen directly exposed to the flame. Also observed were droppings, flame drippings and floor burning as the flame front advanced the complete length of the specimen at 5 minutes 45 seconds. Considerable after-flame was evident upon test completion.

(Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 12.) Santana contends that the underscored language compels a finding of literal falsity because it was not accompanied by a disclaimer. In this regard, Santana contends that the narrative necessarily implies that the numerical values equate to performance under actual fire conditions. (*Id.* at 13.)

For the reasons set forth above, the omission of any disclaimer or representation that performance under actual fire conditions may be different than results in controlled testing does not render the narrative literally false. Santana has not offered any evidence that the test results would not reflect the performance of HDPE under actual fire conditions. Nor does Santana dispute the literal accuracy of the values reported or the observations related in the test report. While the absence of any disclaimer may make the

---

**56.** It should also be noted that Santana did not comply with the consent decree when it made representations concerning numerical flame spread ratings.

results misleading, the statements made in the narration are literally true.

■ Santana also asserts that the description of HDPE as "highly flammable" is literally false. Bobrick's argument to the contrary runs along two lines. First, Bobrick points to the opinions of its experts and its independent lab tests, (Ex. 41A, 44A, 47A, 51A, 52A, 53A, Appx. to Bobrick's Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 325), as showing that HDPE is highly flammable and that, because Santana has withdrawn its experts for purposes of summary judgment, this evidence is uncontested and must be accepted as true. In this regard, Bobrick's fire expert has opined that Santana's HDPE partitions constitute a fire hazard. (Ex. 258, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Report of D. Demers, at 10.) In addition, Bobrick has supplied several videos of independent fire tests, including a dramatic "corner crib" test conducted by the Western Fire Center. (Ex. 47A, Appx. to Bobrick's Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 325, Videotape of Western Fire Center Corner Fire Tests.)

While this evidence is substantial and sufficient to defeat Santana's motion for summary judgment, it does not mandate granting summary judgment to Bobrick.[57] The report on the Western Fire Center test, for example, includes an explicit disclaimer which reads that the test "is used to measure and describe the properties of materials, product or assemblies in response to heat and flame under controlled laboratory conditions and is not intended to be used to describe or appraise the fire hazard of [sic] fire risk of the material, products or assemblies." (Ex. 46A, Appx. to Bobrick's Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 324, Western Fire Center Corner Fire Tests Report dated 12/17/99, at 2.) Also, the Glendale Fire Department's Field Incident Report, (Ex. 40A, id.), supports only the conclusion that HDPE panels are flammable, a fact undisputed on the record. Santana has pointed to evidence that supports an inference that HDPE is neither highly flammable nor appreciably increases a fire hazard. (Rev. Reply Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 426, at 23.) The absence of an expert witness on Santana's side does not mean that Bobrick's expert opinions must be accepted. There is sufficient evidence to create a genuine dispute as to the truth of the assertion that HDPE is highly flammable.

Bobrick argues, however, that the phrase "highly flammable" is a subjective term because of the word "highly." "What might appear to be highly flammable to one person might not be to another." (Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 406, at 112.)

Bobrick resolves this argument, however, when it states that "whether a material

---

57. The fact that Bobrick granted permission to an independent sales representative to market HDPE panels does not merit entry of summary judgment in Santana's favor. It is, however, relevant to determining whether a reasonable juror could find the video's characterization literally false.

As for Santana's argument that Bobrick's "fire hazard" evidence is a "litigation afterthought," the fact that Bobrick may not have been aware of any toilet compartment fires until 1997 is not persuasive given the Third Circuit's ruling that a Lanham Act plaintiff

"bears the burden of showing that a challenged advertisement is false or misleading, not merely that it is unsubstantiated by acceptable tests or other proof." *Sandoz,* 902 F.2d at 228. Nor was Bobrick's claim so completely unsubstantiated as to bring it under *Novartis,* 290 F.3d at 590 ("a court may find that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect"), because in this case testing had been done before the videotape was produced.

is considered highly flammable depends to a certain extent on what it is being compared with." (*Id.*) In this case, the description of Santana's HDPE panels as "highly flammable" was made in the context of a comparison to Formica's products and, despite Bobrick's assertion otherwise, there is more than a little doubt that HDPE is highly flammable when compared to SPC. The phrase "highly flammable" in this context is unlike the term "breathability," for instance, which means different things to different people. *See W.L. Gore & Assocs., Inc. v. Totes, Inc.,* 788 F.Supp. 800, 808–09 (D.Del.1992)(holding that claims that defendant's product was "best waterproof golf suit available" or "best way to keep dry" was not "mere puffery," and was literally false, where claim was juxtaposed with comparison to competitor's product). A reasonable jury could find this comparison between SPC and HDPE and the labeling of HDPE as "highly flammable" literally false.

■■■■. Santana also claims that the video's narration is literally false because "it proffers the idea that toilet partitions need to meet a Class B requirement by code." (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 13.) Santana points to the following excerpt from the video:

> [O]ur standard thick stock laminate is classified as a Class B fire rated material. Fire ratings for *partitions* are extremely important since their primary applications are in public buildings, such as schools, restaurants, hotels and commercial office buildings which require,

by code, products that are fire rated or relatively non-combustible.

> \* \* \* \* \* \*

> [O]ur Class B standard product will be sufficient to meet most fire codes for *partition* applications. . . . [T]hick stock laminate . . . is ideally suited for *toilet partition* applications . . . . [Emphasis supplied by Santana.]

Santana contends that the video necessarily conveys the message that toilet partitions must meet the requirements of a fire code, specifically that fire partitions must meet a Class B standard as to flame spread and smoke developed under the ASTM E–84 test. Santana argues that toilet partitions are not specifically addressed in applicable codes and that toilet partitions are "furniture" or "fixtures" that are not required to be fire rated. Bobrick, on the other hand, argues that the NFPA Life Safety Code 101 has been adopted in many jurisdictions, and that some experts and local code officials agree that toilet partitions must meet the fire rating requirements for interior finish.[58] According to Bobrick, because there is room for "honest interpretation," this message is not literally false. (Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 406, at 75–76.)

Section 6–5 of the NFPA Life Safety Code describes Interior Finish as follows:

> 6–5.1.1\* Interior finish includes interior wall and ceiling finish and interior floor finish.

> 6–5.1.2 Interior wall and ceiling finish means the exposed interior surfaces of buildings including, but not limited to,

**58.** Both Bobrick and Santana concentrate the majority of their arguments on the interpretation of the NFPA 101. The NFPA Life Safety Code was created in response to fires such as the Nov. 28, 1942 Cocoanut Grove fire in Boston which killed 492 patrons of the night club. (Ex. 258, Appx. to Mem. in Support of

Bobrick's S.J. Mot., Dkt. Entry 298, Report of David Demers at 1.) Demers' report states that "NFPA 101 is the leader and the model building codes have typically followed with adopting the Life Safety Code requirements within a code development cycle (one to three years) after adoption by the NFPA." (*Id.*)

fixed or *movable walls and partitions,* columns, and ceilings.

(Rev. Reply Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 426, at 14.) The asterisk preceding the text of subsection 6–5.1.1 draws reference to Appendix A, which states:

A–6.5.1.1 The requirements pertaining to interior finish are intended to restrict the spread of fire over the continuous surface forming the interior portions of a building. Furnishings, which in some cases may be secured in place for functional reasons, should not be considered as interior finish.

(*Id.* at 15.) Section 6–5 further provides for classification of interior wall finish materials by the ASTM E–84 test, also identified as NFPA Standard 255.

The NFPA Life Safety Code does not explicitly address toilet partitions. Santana asserts that the absence of an explicit reference renders false the message conveyed by the Formica videotape that toilet partitions must meet fire code standards. Bobrick counters by pointing out that the inclusion of movable partitions in § 6–5.1.2 arguably encompasses the products at issue in this case. In support of its position, Bobrick relies upon *Dial A Car, Inc. v. Transp., Inc.,* 82 F.3d 484 (D.C.Cir.1996).

In *Dial A Car,* a limousine service brought a Lanham Act false advertising action against taxicab companies that allegedly illegally provided corporate account transportation services outside their licensing counties. Plaintiff claimed that the defendants' representation that they were authorized to provide the same corporate account services as the plaintiff was false because an order of the pertinent regulatory body prohibited defendants from providing such services. The court held that the proper interpretation of the order was within the jurisdiction of the D.C. Taxicab Commission and that the plaintiff was "simply using the Lanham Act to try to enforce its preferred interpretation of Order No. 4 instead of adjudicating the issue before the Commission." *Id.* at 488. The court concluded that liability under the Lanham Act will lie for a statement of interpretation of a statute or regulation only if the law was unambiguous at the time of the offending statement. *Id.* at 489.

In reaching this conclusion, the D.C. Circuit relied on a decision of our Court of Appeals, *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990). That case involved a dispute between manufacturers of children's cough syrup over a comparative advertisement. The plaintiff, Sandoz, claimed that the defendant, who manufactured Vicks cough medicine, had falsely listed an ingredient in its cough formula as "inactive" even though the ingredient enabled the supposedly "active" ingredients to work faster. 902 F.2d at 230. Sandoz argued that, as a matter of common sense, if the ingredient in question helped to relieve coughs in any way, it must be considered an active ingredient for labeling purposes. The Third Circuit rejected Sandoz's Lanham Act claim because "Sandoz's position would require us to usurp administrative agencies' responsibility for interpreting and enforcing potentially ambiguous regulation." *Id.* at 231; *see also Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir.1999)(statement by defendant that plaintiff was not licensed in California as escrow agent not actionable under Lanham Act absent a prior clear and unambiguous ruling from a court or agency of competent jurisdiction because statements by lay persons purporting to interpret statutes or regulations are statements of opinion, not fact).

In this case, the Formica video's supposed implication that toilet partitions are

subject to fire rating standards is a reasonable interpretation of the NFPA Life Safety Code. Indeed, Santana had earlier reached that conclusion, as evidenced by its promotional materials in the 1980s.

 Santana, citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), contends that Bobrick cannot evade liability by characterizing its interpretation of the Life Safety Code as an "opinion." *Milkovich* held that a statement on matters of public concern must be provable as false before there can be liability under state *defamation* laws where a media defendant is involved. That decision is plainly not relevant to the question of whether an opinion can be "literally false" under the Lanham Act. While there is no absolute exception for opinions under the Lanham Act, "statements of opinion are generally not the basis for Lanham Act liability." *Groden v. Random House, Inc.,* 61 F.3d 1045, 1051 (2d Cir.1995). This general rule follows from the proposition that, for a statement to be literally false, it must be "both specific and measurable by comparative research." *Castrol,* 987 F.2d at 946 (discussing "puffery" in the context of comparative

advertising). In other words, the statement must be "capable of being proven to be false." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 27:109 (2002).

To determine the falsity of an opinion concerning code interpretation, therefore, there must be a clear and unambiguous statement from the authority having jurisdiction to interpret the code. Santana cites Formal Interpretation 88–12 in support of its position. Formal Interpretation 88–12 states that subsection 6–5.2.3 does not apply to less-than-ceiling height movable prefabricated panel furniture systems when a space so divided remains a single room. (Rev. Reply Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 426, at 15.) This is not conclusive, however. Subsection 6–5.2.3 prohibits textile materials from being applied to walls. It does not, however, define such dividers as furnishings, nor mandate a conclusion that toilet partitions are not interior finish. Indeed, it is clear that this formal interpretation is addressed towards cubicles and office dividers in the business office setting.[59]

The NFPA, in short, is ambiguous as to the treatment of toilet partitions.[60] The

**59.** As pointed out by Bobrick, the pertinent local authority has discretion to decide what constitutes wall finish. In this regard, Bobrick also states that the first edition of the NFPA's Life Safety Code Handbook contains the following commentary to Section 6–2.1.1:

Section 6.2.1.1 permits the authority having jurisdiction to exercise personal judgment in determining what constitutes interior finish. This is accomplished by the expression "but not limited to." Note that interior finish is defined as what would be the interior surface of a building before occupancy, prior to the time that the interior decorator moves the decorations into the building. Thus, wall, ceiling and column coverings would be in place and constitute the interior finish.... Movable walls or folding partitions would be in place and included. Furnishings, which are fixed in place, are

not normally [classified] as interior finish; however, this does not mean that they cannot be looked upon as interior finish if judged to be hazardous by the authority having jurisdiction.

(Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot./Lanham Act, Dkt. Entry 406, at 104.)

**60.** Bobrick claims that there is no evidence that Bobrick representatives used the Formica video (or any other promotional material) in any jurisdiction where the authority having jurisdiction issued a clear and unambiguous ruling that toilet partitions did not constitute interior finish. (Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot./Lanham Act, Dkt. Entry 406, at 105–06.) Santana points out, however, that not all jurisdictions have adopted the NFPA Life Safety Code. It notes, for example, that the Uniform Building Code, the National

supposed implication from the Formica video that fire ratings apply to toilet partitions is thus not actionable under the Lanham Act as a literally false representation.[61]

In summary, the decision as to whether toilet partitions are interior finish under state building codes lies with those state and local authorities having jurisdiction to interpret the codes. The evidence presented by both parties demonstrates that this issue is by no means settled in every jurisdiction. (*See* Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶¶ 154–55; Pl. Response to Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 393, ¶¶ 154–55; Ex. 56A, Appx. to Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 324.) Bobrick's reference to applicable code requirements reflected its opinion as to ambiguous terms. Santana has not demonstrated literal falsity in this regard, and Bobrick is therefore entitled to summary judgment on this aspect of the Lanham Act claim in reference to the Formica video.

■ The final claim of literal falsity with respect to the Formica video pertains to the burn test conducted by Metpar. The "Metpar segment" depicts a small piece of Santana's HDPE material being burned upon ignition by a lighter. The voice-over states:

> As you can see, the high density polyethylene supports a flame and reduces itself to a molten mass of burning material in less than half of an hour. Keep in mind that the sample shown was extremely small and not nearly the size of a full 50″ panel that would be used for an actual partition.

(Pl.Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 39.) Santana complains that this segment is literally false because the "small" sample of HDPE is not comparable to that used in Santana's toilet partitions. The HDPE used in toilet compartments is much larger and the compartments have a metal strip called a heat sink fastened along the lower edges of the panels and doors. Bobrick, on the other hand, argues that the Bobrick videotape and the Hughes Associates Sept. 14, 2000 burn test of an HDPE panel with a heat sink, (Ex. 52A, Appx. to Bobrick's Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 325), shows that HDPE will burn even with the heat sink. There is conflicting evidence on this point, (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 14; Vol. II, Ex. A 17, Appx. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 280, Morgan Dep. Tr. at 457, Morgan Dep.

Building Code, and the Standard Building Code have provisions regarding approved plastics that use a different smoke density standard than the ASTM E–84 test. (Pl.Rev. Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 203, and Bobrick's response thereto, Dkt. Entry 409, ¶ 203.) This argument misses the point. Santana does not refer to evidence that toilet partitions are excluded from the building codes. Furthermore, the Formica videotape did not reference any particular code. The fact that there are other applicable codes that arguably extend to toilet partitions only serves to reinforce the conclusion that the supposed implication drawn from the Formica video is not actionable under the Lanham Act.

**61.** It is, however, difficult to discern the implication that Santana claims is made: toilet partitions must meet a Class B requirement by code. The Formica video does not make this assertion explicitly, and its use of the word "code" hardly implies a specific fire rating that must be met. It may be that inclusion of references to "Class B" and "code" may be misleading. But even when the entire video is considered as a whole, it cannot be said that it necessarily conveys the message that toilet partitions *must* meet a certain fire rating.

Exhibit M2 (opining that videotape was inaccurate because there was no heat sink on the test sample); Ex. 258, Appx. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, Report of David Demers at 8–9 ("The so-called heat sink of metal strip that Santana installs on the bottom edge of their HDPE panels helps to disperse localized heat application from small-scale ignition sources that may have flame contact with the bottom edge of the panels.")), and summary judgment on the use of the Metpar clip is not appropriate at this time.

*Summary:* The Formica videotape is not literally false as to its use of the ASTM E–84 test results, nor is it literally false in its reference to code requirements. A fact issue exists as to the falsity of the "Metpar segment" depicting the burn test, as well as the representation that HDPE is highly flammable. Therefore, neither party is entitled to summary judgment on the literal falsity issue pertaining to the Formica video.

### b. *The TB–73 Technical Bulletin*

Santana alleges that Bobrick began writing drafts of the TB–73 Technical Bulletin shortly following its meeting with Formica in early 1990. (Pl.Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 56.) Once completed, this bulletin was distributed throughout Bobrick's sales organization. It was also distributed to architects throughout the United States. (*Id.,* ¶¶ 58–59.) Santana alleges that Bobrick continues to refer to TB–73 in its architectural catalogs. (*Id.,* ¶ 63.) Santana's principal complaint against TB–73 is that it uses results of the ASTM E–84 testing to suggest the relative performance of Bobrick's DuraLine Series and HDPE compartments under actual fire conditions. (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 16.)

The TB–73 bulletin is entitled "Surface Burning Characteristics of Solid Phenolic Paneling and Solid Polyethylene Paneling." It compares the results of each type of paneling under the ASTM E–84 test. The Bobrick product is shown to have a flame spread index of 69.3 and a smoke developed index of 93.1, while the HDPE product has a flame spread index of 71 and a smoke developed index of 715.4. The bulletin then provides the Class B standard for interior wall and ceiling finish under the NFPA Life Safety Code. Thus, the TB–73 bulletin clearly indicates that HDPE cannot meet the Class B smoke developed standard. (Ex. 96, Appx. to Mem. in Support of Bobrick's S.J. mot., Dkt. Entry 298, TB–73.) As a "Special Note" to the test results, the bulletin reports that "[a]fter the conclusion of the test, the solid polyethylene panel continued to burn and formed molten residue which also became ignited and sustained significant levels of temperature, flame and smoke. The solid polyethylene continued to burn until the paneling was completely consumed." The bulletin concludes that Bobrick's DuraLine product "may be used in buildings *that require* National Fire Protection Association Life Safety Code Class B Interior Wall and Ceiling Finish," and that HDPE "should not be used in buildings *where* Class B Interior Wall and Ceiling Finish is required." (Emphasis added.)

Santana does not contest the literal accuracy of the test results reported in TB–73. Nor does it contest the truth of the "Special Note." Its complaint focuses on the absence of any disclaimer that the test results may not depict performance in actual fire conditions. As noted above, however, the absence of such a qualification does not render literally false the explicit and implicit representations made by Bobrick. Furthermore, Santana has not presented any evidence that supports a con-

clusion that HDPE would perform better in actual fire conditions than material used by Bobrick in its toilet partitions. Thus, no reasonable juror could find that Bobrick's utilization of the ASTM E–84 test was literally false.

Santana also contends that TB–73 is literally false because it implies that toilet compartments are governed by the requirements of the NFPA Life Safety Code Class B classification for interior wall and ceiling finish. Again, as noted above, the NFPA does not directly speak to toilet compartments and their treatment under the Life Safety Code is ambiguous. Thus, to the extent that TB–73 may be construed as reiterating Bobrick's opinion that the NFPA standard does apply to toilet partitions, it is not literally false. In any event, TB–73 states that "Bobrick 1080 DuraLine Series ™ solid phenolic paneling may be used in buildings *that require* [NFPA] Life Safety Code Class B Interior Wall and Ceiling Finish." (*Id.*, emphasis added.) TB–73, by its words, implies that a Class B requirement is *not* required by every applicable building code. Accordingly, TB–73 does not falsely imply that toilet partitions must satisfy the NFPA standard anywhere in the United States.

*Summary:* Advisory Bulletin TB–73 is not literally false in any respect. Therefore, Bobrick is entitled to judgment in its favor on this aspect of Santana's Lanham Act claim.

### c. The Bobrick "You Be The Judge" Videotape

This videotape was filmed in 1992 after a series of draft scripts had been prepared. Following a test showing to a number of architects, the videotape was edited and re-scripted to create the final "You Be the Judge" video. (Pl.Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶¶ 87–94.) The video, *inter alia*, purports to show a side-by-side comparison of the effect of fires on SPC and HDPE toilet compartments. It is this comparison which Santana alleges is literally false.

Each fire test consisted of placing a lighter fluid soaked paper roll below the toilet compartment door at a distance from the nearest pilaster. Santana first contends that the demonstration is not truly side-by-side, but rather comprises two separate fire tests that were filmed and subsequently joined together in the video. This fact does not lead to a conclusion of literal falsity. However, Santana also argues that during the actual tests the ignition source under the HDPE door was moved against the pilaster, while the ignition source was not moved toward the SPC door/pilaster. (*Id.*, ¶ 109; Vol. II, Ex. A 11, Appx. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 280, Klein Dep. Ex. 31.) This movement, though, was not presented in the final videotape. Significantly, several members of Bobrick's test group of architects made note of this movement of the ignition source as being misleading. Bobrick has responded to Santana's argument on this factor by pointing to evidence that it conducted the same test with a separate independent laboratory without movement of the ignition source and the same results were observed. (Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 406, at 79.)

Whether the movement of the ignition source rendered the "side-by-side" testing literally false cannot be determined from this record. Thus, neither party is entitled to summary judgment on this aspect of the Lanham Act claim.

Santana also points out that the Bobrick video paraphrases the message of TB–73, namely, that SPC meets NFPA Class B standards while HDPE does not. Santana argues that the ASTM E–84 test is again used to improperly describe actual fire

hazards. In accordance with the above analysis of these questions, Bobrick's utilization of ASTM E–84 testing does not render its message literally false. Nor does the reference to NFPA standards necessarily imply that they apply universally to toilet partitions.

*Summary:* There is a genuine issue of material fact as to the falsity of the side-by-side comparison. The video's use of the ASTM E–84 test does not render the message literally false, and there is no necessary implication that toilet partitions are subject to a Class B fire rating standard.

#### d. *Bobrick's Box Lunch Program and Slides*

■ Box lunch presentations are a standard promotional tool of toilet partition distributors. Santana alleges that Bobrick's box lunch script was re-written to target Santana's HDPE compartments. In particular, the box lunch script stresses vandal resistance. At one point, a slide depicts an actual restroom with Santana's white Poly–Mar HD toilet compartments, while the accompanying script reads: "Sometimes, polyethylene is used as the material for toilet compartment problems. However, this material has shortcomings. It supports combustion ...." A later slide then shows a photograph of a fire on the face of a door panel of a Poly–Mar HD compartment, while the commentator notes: "As I mentioned, polyethylene sure supports combustion." (Vol. I, Ex. A 7, Appx. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 280, Graves Dep. Ex. 9; Vol. II., Ex. A 18, *id.,* Pane Dep. Ex. 18.)

Santana argues that the script and the photograph are literally false because the fire was created by using a high pressure butane blow torch, an ignition source unlikely to be in the typical vandal's arsenal. Santana also argues that the box lunch script was literally false when it stated that: "Solid phenolic is an excellent solution for wet and hose-down areas. It doesn't rust, it doesn't swell, and the added benefits are that it *does not support combustion,* and graffiti is easily removed." (Pl.Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 137 (emphasis added.))

Without question, the statement that SPC does not support combustion—i.e. does not burn—is false. The Bobrick "You Be The Judge" videotape demonstrates this conclusively—the Bobrick sample in the side-by-side comparison burned. Thus, Santana has conclusively established that these aspects of the box lunch script are literally false.

*Summary:* The Bobrick box lunch is literally false in its description of SPC as non-combustible. It is also literally false in its necessary implication that HDPE partitions will burn, but Bobrick's compartments will not. Thus, Santana is entitled to summary judgment on this aspect of its Lanham Act claim.

#### e. *Bobrick's Ads in Sweet's Architectural Catalogs*

Bobrick's advertisements in Sweet's Architectural Catalogs for the years 1990 to 1996 made reference to numerical flame spread ratings under the ASTM E–84 test. As stated above, use of the ASTM E–84 ratings without a disclaimer does not render the advertisements literally false.

■ Santana also complains, however, that the advertisements falsely stated that Bobrick's plastic laminate compartments were safer than HDPE. For example, the 1990 catalog stated: "Safety advantage: Laminated plastic, with particle board or solid phenolic compartments, reduces combustion and smoke generation compared to [HDPE] or vandalized metal compart-

ments with exposed honey comb fiber board cores." (Vol. III, Ex. E 1, Appx. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 280, at B–0166.) Santana claims that, in fact, plastic laminate with a particle board core had a flame spread index of 218.5, whereas Santana's HDPE compartment had a flame spread index of 71. Thus, Santana concludes, this statement is literally false.

Santana's argument has considerable merit, and has not been directly addressed by Bobrick with respect to the 1990 Sweet's Catalog. Thus, at least as to the comparison made in the 1990 edition of Sweet's Catalog, Santana has shown literal falsity.

Bobrick, however, modified its advertisement in subsequent years. Ads in later years did not include reference to plastic laminate compartments. Instead, the "fire safety advantage" was limited to solid phenolic material in Bobrick's 1080 and 1180 series of products. Santana does not contend that HDPE had a better flame spread rating than these products. Instead, it complains about the use of ASTM E–84 test results in the later ads. For the reasons set forth above, Bobrick's use of the test results is not actionable as literal falsity.

Santana also claims that the following statement in later Sweet's Catalogs is literally false: "BOBRICK IS SUPERIOR TO CONVENTIONAL METAL AND POLYETHYLENE COMPARTMENTS, SETTING THE INDUSTRY QUALITY STANDARD FOR DESIGN AND DURABILITY." Bobrick responds by asserting that this statement is no more than "puffing" and does not violate the Lanham Act. "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol*, 987 F.2d

at 945. The Third Circuit has held that statements which are "both specific and measurable by comparative research," *id.* at 946, are not puffery. In this case, Santana has failed to show that the naked claim of being "superior" to other types of compartments is anything other than a broad, commendatory claim.[62] Thus, Bobrick is entitled to judgment in its favor with respect to Sweet's Catalogs appearing after 1990.

***Summary:*** The Sweet's Architectural Catalog for 1990 is literally false in its claim of superior fire resistant characteristics of plastic laminate toilet partitions in comparison to HDPE toilet partitions. Santana has not shown literal falsity with respect to catalogs appearing after 1990.

### f. *National Trade Journal Advertisements*

Bobrick placed several advertisements in a trade journal entitled "American School & University" in the early 1990s. These advertisements were entitled "We're Working to Make This a Lost Art," referring to graffiti and other acts of vandalism on toilet partitions. The ad compared the results of Bobrick's ASTM E–84 tests on SPC and HDPE compartments (as in the TB–73 advisory memorandum). This advertisement was distributed to subscribers of AS & U throughout the United States and Bobrick sales representatives were sent a bulletin and copies of the ad. (Pl. Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶¶ 157–165.)

Bobrick placed a different style of advertisement in the April 1995 issue of AS & U magazine. It had the appearance of an article, and was entitled "Washing Your Hands of Vandalism." The advertisement, written by Bobrick's Alan Gettelman, compared HDPE and SPC compartments.

---

**62.** In any event, this statement makes no reference to fire performance.

HDPE compartments were called a "fire and smoke hazard." Bobrick's product was contrasted as "exceed[ing] the minimum standards for smoke contribution of the [NFPA] Life Safety Code." (*Id.*, ¶¶ 166–68.)

Again, Santana argues that these advertisements improperly use the ASTM E–84 test, and inappropriately proffer the idea that toilet compartments must meet the smoke contribution standard of the NFPA Life Safety Code. For the reasons stated in the analysis of the Formica videotape, the reference in the ads to the ASTM E–84 testing and NFPA standards does not provide a basis for recovery under the literal falsity approach pursued by Santana.

Santana also complains, however, that the ads falsely describe HDPE as a "fire hazard," and, in the case of the Gettelman ad, as a "fire and smoke hazard." As explained above, whether these characterizations are literally false cannot be determined on the present record.

*Summary:* The AS & U advertisements are not literally false because of their use of the ASTM E–84 test or their reference to NFPA standards. A genuine issue of material fact exists as to the literal falsity of the description of HDPE as a "fire and smoke hazard."

### g. Bobrick's Thrislington "Script"

Santana alleges that Bobrick held a series of meetings for its sales representatives in 1992 to introduce a new series of toilet compartments known as "Thrislington." At these meetings, a sales script was introduced which was to be used by the representatives. (*Id.*, ¶¶ 181–83.) In part, the script states: "Polyethylene compartments that entered the market a few years ago appear mostly in school installa-

tions. This puzzles us since they are highly flammable as well as exceeds smoke development codes." (*Id.*, ¶ 189.) Santana complains that Bobrick failed to state that its plastic laminate or Thrislington series compartments also failed to meet smoke development codes. As stated above, Bobrick's plastic laminate had a flame spread rating exceeding 200 at the time, and the Thrislington series had not been evaluated under the NFPA Life Safety Code. Santana asserts that, at best, the Thrislington compartments were Class C rated and did not comply with the NFPA Life Safety Code.

Bobrick, in defense, argues that Santana has presented no evidence that any architectural representatives ever distributed a copy of the Thrislington script, or even repeated the script to architects or specifiers. This is an objection to likelihood of injury, however, and not properly considered here.

*Summary:* The Thrislington script is not literally false because of its use of the ASTM E–84 test. A fact issue exists, however, as to the assertion that HDPE is highly flammable, as well as whether the ad falsely represented the proper rating of Thrislington compartments.

### 4. Likelihood of Injury to Santana

Bobrick has not contested materiality or that the advertised goods travel in interstate commerce. The final element to consider on Santana's Lanham Act claim, therefore, is whether Santana has shown actual injury caused by actionable conduct to support a claim for damages.[63]

"To recover damages, a plaintiff must show that the 'falsification [or misrepresentation] actually deceives a portion of the buying public.'" *U.S. Healthcare,*

---

**63.** Santana seeks both injunctive and mone- tary relief under the Lanham Act.

*Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir.1990)(quoting *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir.1958)); *Synygy, Inc. v. Scott–Levin, Inc.*, 51 F.Supp.2d 570, 577 (E.D.Pa.1999)("If, as in this case, the plaintiff is asking for money damages in addition to injunctive relief, however, the plaintiff must show actual damages."); *see also Rhone–Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515–16 (8th Cir.1996); *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir.1993). Santana need not, however, prove every single injury suffered by it at this stage. *See Parkway Baking Co.*, 255 F.2d at 648 ("This does not place upon the plaintiff a burden of proving detailed individualization of loss of sales. Such proof goes to quantum of damages and not to the very right to recover."). Santana must, nonetheless, establish a causal nexus between Bobrick's alleged false statements and its damages. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir.1998)("[T]o recover money damages under the Act, a '[p]laintiff must proves both actual damages and a causal link between defendant's violation and those damages.' "); *Synygy*, 51 F.Supp.2d at 578 (finding that "[w]hile plaintiff may have suffered a decrease in profits, plaintiff tenders no evidence as to what caused that decrease.").

The issue, then, is whether Santana has sufficiently demonstrated actual injury to claim monetary damages for those advertisements that remain actionable after the literal falsity analysis. Specifically, Santana must show that the Formica video, the "You Be the Judge" video, the box lunch

scripts, the 1990 Sweet's Catalog, the AS & U advertisements, and/or the Thrislington script, to the extent that they described HDPE as "highly flammable," or a "fire and smoke hazard," or relied upon false graphical depictions, caused compensable harm to Santana in order to allow Santana to maintain a claim for damages.

Santana argues that it lost sales and was required to expend resources to counteract Bobrick's false advertising. (Rev. Mem. in Support of Pl. S.J. Mot./Lanham Act, Dkt. Entry 385, at 15–16, 19–20, 22–23, 27, 28–29, 32, 34.) Bobrick, on the other hand, argues that Santana has been unable to show lost sales and disputes those instances cited by Santana. (Bobrick's Rev. Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 406, at 82–84.)

■ Contrary to Bobrick's assertion, there is sufficient evidence to create an issue of fact as to whether Santana lost sales and incurred "loss control" costs as a result of some of the challenged promotional materials. In this regard, Santana has cited instances when specifications were changed to exclude HDPE or it otherwise lost sales in the wake of the Formica and Bobrick videos. (See Rev. Reply Mem. in Supp. of Pl. S.J. Mot., Dkt. Entry 424, at 29–48.)[64]

Bobrick contends that there is insufficient evidence to support an inference that Santana's lost sales or "loss control activities" were causally linked to Bobrick's alleged misrepresentations. Specifically, Bobrick argues that, at the time in question, Santana was attempting to reverse the trend toward specifying fire rated par-

---

**64.** It should be noted that much of the alleged lost sales were sustained in the public sector. Recovery for such lost sales is now foreclosed in light of the determination that the *Noerr/Pennington* doctrine applies to Bobrick's sales efforts directed at public institu- tions. It cannot be said with certainty, however, that all of Santana's lost sales occurred in the public sector. Thus, the *Noerr/Pennington* ruling does not obviate consideration of the Lanham Act claim.

titions which it had started by its promotion of its Class A fire rated partitions. Bobrick points to a May 31, 1993 memorandum from Santana's Patrick McGartland which stated that: "these specs for a 'class A' or fire rated material are the direct results of your and Santana's efforts. Now, we must reverse the process." (Ex. 191, Appx. to Mem. in Support of Bobrick's S.J. Mot., Dkt. Entry 298, at S14333.)

There are no cases, however, holding that the defendant's alleged misrepresentations must be the sole factor causing injury. Bobrick's reliance on *Synygy* for such a proposition is misplaced. In *Synygy,* the plaintiff alleged a Lanham Act violation on the basis of two oral statements and one slide show. The plaintiff, however, lacked any evidence to show that there was a connection between the loss of a sales contract and the two isolated statements. *See Synygy,* 51 F.Supp.2d at 577 (alternatively holding that there was no Lanham Act violation for an "isolated, individualized, informal and oral" statement not made in the course of a commercial transaction). Indeed, the plaintiff could not find anyone who recalled the statement maligning the plaintiff. As the court pointed out, "[i]f no attendee can remember a false or misleading statement published at the conference, it is unlikely indeed that there would be a resulting injury." *Id.* at 578.

In the matter *sub judice,* while Bobrick has alleged that there were other factors contributing to Santana's alleged injury, Santana's evidence is more compelling than that presented in *Synygy.* Indeed, while contesting causation, Bobrick admits that some architects remembered the alleged false advertising in the videos. (Bobrick's Rev. Stat. of Material Facts, Dkt. Entry 407, ¶¶ 86–103 (Formica video), 121–26 (Bobrick video)).

Thus, there is an issue of material fact to be resolved as to the causal relationship between Santana's alleged damages and the two videotapes. The evidence presented by Santana shows that architects and specifiers saw these promotional materials and may have been influenced by them, at least to the point of conducting independent burn tests and re-evaluating code requirements. Bobrick argues otherwise, but this is an issue of fact. Summary judgment may not be granted either party on the damages issue as to the two promotional videos.

The same is not true for the other promotional materials—the box lunch scripts, the Sweet's 1990 Catalog, the AS & U advertisements, and the Thrislington script. Santana has not presented any evidence suggesting that it sustained injury from these advertisements. No architect or specifier testified that they changed a specification because of the box lunches (only two remembered seeing it). (*Id.,* ¶ 136–37.) Santana points to an internal Bobrick memorandum which stated that, after making the lunch box presentation to thirty-five architects in Sacramento in conjunction with the Formica videotape, "several specifiers who had previously approved Santana polyethylene compartments said they would no longer do so because of their flammability." (Pl.Rev. Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 146.) Bobrick contends that this hearsay does not establish that the architects in fact stopped specifying HDPE. (Bobrick's Response to Pl.Rev. Stat. of Material Facts/Lanham Act, Dkt. Entry 409, ¶ 146.) Bobrick appears correct—this memorandum may show that Bobrick believed that it had persuaded thirty-five architects to stop specifying HDPE, but it cannot be used to show that they actually did so. Santana provides no evidence on damages caused by the 1990

Sweet's Catalogs or the Thrislington "script." [65] As for the AS & U advertisements, Bobrick is quite correct in asserting that a memorandum by Gillis stating that the fact that the NFPA requires a smoke developed value of 450 or less "could be devastating" to Santana does not mean it actually was devastating. (Pl.Rev. Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 180.)

 The fact that an advertisement was misleading or false does not automatically entitle the plaintiff to damages. There must be proof of causation, and Santana's evidence on this issue is very thin. Indeed, it is no more than a mere scintilla as to promotional devices other than the videos. Thus, summary judgment will be granted to the defendants as to Santana's claim for damages for Lanham Act violations relating to promotional materials other than the Formica and Bobrick videos.[66] Accordingly, should this case proceed to trial, Santana will be limited to seeking recovery of damages based upon harm causally attributable only to the two videos.

65. Santana does refer to a deposition that indicates that Santana competed with Bobrick's Thrislington compartment under circumstances where Bobrick's representative painted HDPE as failing to comply with the NFPA Life Safety Code. (Pl.Rev.Stat. of Material Facts/Lanham Act, Dkt. Entry 387, ¶ 197). A showing of competition, alone, is insufficient to show injury. There is, in fact, no evidence that the Thrislington script was ever followed word for word by architects. Hornyak testified in his deposition that he used the script as a "guide" for his presentations, but did not recall repeating the objectionable statement that HDPE was highly flammable. (Ex. 7A, Appx. to Bobrick's Mem. in Opp. to Pl. S.J. Mot., Dkt. Entry 324, Hornyak Dep. Tr. at 188–89.) Vogel gave similar testimony. (Ex. 57A, id., Vogel Dep. Tr. at 227.)

66. This does not, however, affect Santana's claim for injunctive relief. A party seeking

## G. Tortious Interference with Prospective Contract

As found above, the statute of limitations for the claim of tortious interference of contract in this case is only one year. See *supra* Section III.C.3. Santana focuses on only one specific allegedly prospective contract that it lost between October 1, 1995 and October 1, 1996. Specifically, Santana attempted to bid on a project at the Rio Hondo Community College in California on October 3, 1995. (Ex. 47, Exhibits to Pl. Response to Bobrick's Stat. of Material Facts, Dkt. Entry 314.) Santana asserts that its partition was the "product of choice" until Bobrick employed its "fire scare" tactics. (Rev. Mem. in Opp. to Bobrick's S.J. Mot., Dkt. Entry 391, at 73.)

There is no dispute that the *Noerr/Pennington* doctrine applies to the tort of interference with prospective contractual relations. As the only claim of a lost contract during the limitations period concerned a public entity, the Rio Hondo Community College, it is evident that Santana cannot maintain a tortious interference claim. Even if *Noerr/Pennington* did

injunctive relief under § 43(a) must establish "something more than a 'mere subjective belief that he is … likely to be damaged,' but that the plaintiff 'need not quantify the losses actually borne.'" *Warner–Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 93 (3d Cir.2000)(quoting *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980)). As in *Breathasure*, the promotional materials used by Bobrick were "implicitly aimed" at Santana's HDPE products. The likelihood of injury from characterizations of HDPE as "highly flammable" or a "fire and smoke hazard" is patent. Thus, Santana has satisfied this burden. But, as there are still genuine issues of material fact as to the falsity of certain of the promotional materials and it appears that the claims found to be literally false are not presently being made, judgment will not be granted Santana on its request for injunctive relief at this time.

not apply, however, Santana has failed to present sufficient evidence to support its common law cause of action.

■ The tort of interference with prospective contract has four elements in Pennsylvania: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979). Bobrick's argument focuses on the first element—the necessity of a prospective contractual relationship.

■ A prospective contractual relationship is "something less than a contractual right, something more than a mere hope." *Id.* A plaintiff must show that there was a "reasonable probability that a contract will arise from the parties' current dealings." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir.1994). Therefore, to avoid summary judgment, Santana must show that an issue of fact exists as to whether, but for Bobrick's "fire scare" campaign, there was a reasonable probability that Santana would secure a contract from Rio Hondo. *Id.*

A favorably cited opinion of the Eastern District of Pennsylvania, *General Sound Telephone Co. v. AT & T Communications, Inc.*, 654 F.Supp. 1562 (E.D.Pa. 1987), is instructive. General Sound Telephone ("GST") installed a telephone system at the Quakertown, Pennsylvania office of Lawrence Schiff Silk Mills ("LSSM") and recommended that two telephone lines connecting LSSM's Quakertown office with its New York sales office be changed. *Id.* at 1563. An order to replace the lines was placed with defendant AT & T. The order for the new lines was not completed in time, however, and

the old lines were disconnected. Meanwhile, LSSM's New York office replaced its telephone system with phones from an AT & T subsidiary. GST filed suit, alleging that AT & T intentionally interfered with its prospective contractual relationship with LSSM's New York office. *Id.* at 1564.

The court granted summary judgment to AT & T on the claim for tortious interference with prospective contract, observing:

> [P]laintiff may have had the hope and expectation of future business from LSSM if it could meet its customer's needs with the Omega system, but we conclude that there is no evidence to establish that GST had a reasonable probability of *obtaining* the specific contract at issue here. Even assuming that a jury might find that ATTCOM's actions precluded LSSM's *consideration* of giving GST an *opportunity to bid* on providing a telephone system for the New York office, such a finding is insufficient to establish the existence of a prospective contractual relation under the law of Pennsylvania which, as noted, requires considerably more than a reasonable probability of a *chance* to obtain a contract.

*Id.* at 1565–66 (emphasis in original). The court relied on the Pennsylvania Supreme Court's holding in *Thompson Coal* that an ongoing relationship between the plaintiff and a third party in the form of an existing year-to-year lease on certain property did not amount to a reasonable probability that the lease would be renewed. *See Thompson Coal*, 412 A.2d at 471–72 ("[T]he fact that the parties agreed to extend this year-to-year lease only until the specifically mentioned date of March 1, 1975 would provide no reasonable basis for either party to expect a perpetuation of

the leasehold beyond that point or the acquisition of title to the property interests therein.").

Similarly, Santana has shown only that Bobrick may have interfered with the specification process for toilet partitions on the Rio Hondo project; i.e. with Santana's opportunity to bid for the project. Santana has failed to show more than a "reasonable probability of a *chance* to obtain a contract." The fact that Santana had, in the past, obtained contracts for Rio Hondo projects does not prove that, but for Bobrick's actions, Santana would have obtained the contract for this project, even if it had been specified. After all, another manufacturer could have underbid Santana for the project, or Santana may have had to drop out for various reasons.

Nor are the cases cited by Santana persuasive. For example, Santana cites *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358 (3d Cir.1992), as a case in which the Third Circuit reversed a

grant of summary judgment. In that case, the plaintiff had reached an "agreement in principle" with the third party. *Id.* at 1381. No such agreement is alleged here. In any event, the court in *Big Apple* focused on the privilege element and reversed the grant of summary judgment because the evidence presented a material factual issue as to whether the interference amounted to actionable improper conduct. *Id.* at 1381–82. The court did not hold, as a matter of law, that there was a prospective contractual relationship.[67]

While Santana may have hoped for and expected to receive a contract for the Rio Hondo project, Santana cannot show a reasonable probability that a contractual relationship would have occurred between it and Rio Hondo (or on any other building contract).[68] Therefore, Bobrick's motion for summary judgment on Santana's claim for tortious interference with prospective contract will be granted.[69]

---

**67.** Santana also cited in its opposition brief *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 130 F.3d 1009 (11th Cir. 1997). Not only did this decision rely on Georgia law, but it was vacated and superseded on rehearing, 139 F.3d 1396 (11th Cir. 1998). The case involved two competing hotels near an Atlanta airport. The plaintiff claimed that the defendant hotel had used improper actions to induce a number of guests who had made reservations at the plaintiff's hotel to instead stay at the defendant's hotel. On rehearing, the court affirmed the district court's grant of summary judgment because the plaintiff failed to establish a causal connection between the defendant's tortious activity and the interruption of any particular business relationship. *Id.* at 1407–09 ("The evidence, construed in Camp Creek's favor, merely shows that the Gateway offered to meet or beat the Inn's rates when these guests arrived at their door. . . . Camp Creek has presented no evidence that suggests these guests canceled their reservations at the Inn because of the Gateway's alleged wrongful activity . . . .").

**68.** Because Santana has failed to establish facts demonstrating a prospective contractual relationship, the Court need not address the remaining elements of the claim. *See Thompson Coal*, 412 A.2d at 472 n. 8. It is noteworthy, however, that there is a substantial question as to whether Bobrick's action was sufficiently privileged or justified as to preclude liability for tortious interference with contract. *See Glenn v. Point Park Coll.*, 441 Pa. 474, 272 A.2d 895, 899 (1971)("[W]here, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated.")(quoting Harper & James, *The Law of Torts*, § 6.11, at 513). Bobrick's ad campaign was clearly motivated, at least in part, to further the legitimate goal of increasing its sales. Because the parties do not address this element, I decline to do so.

**69.** Santana's claim for punitive damages cannot survive the dismissal of its claim for tortious interference with prospective contract, and summary judgment will necessarily also

## IV. CONCLUSION

The parties have fought valiantly in this protracted case. Ultimately, the *Noerr/Pennington* immunity issue, not presented until the close of discovery, largely forecloses Santana's claims. In deference to the parties' extensive efforts directed at other affirmative defenses as well as the substantive merits, and to provide fully reasoned rulings on those matters in the event that the *Noerr/Pennington* ruling is found lacking, this Opinion has endeavored to resolve all of the germane questions. As a result of these rulings, judgment will be entered in favor of Hornyak and Vogel as to all claims, and in favor of Bobrick as to the Sherman Act and tortious interference claims. The accompanying Order includes requisite language under Fed. R. Civ. p. 54(b) and 28 U.S.C. § 1292(b) to afford an aggrieved party an immediate avenue for potential appellate court review. The Order also schedules a status conference to address the next steps in this case on the Lanham Act claim against Bobrick in the event that an appeal is determined to be inadvisable or unavailable at this time.

### ORDER

**NOW, THIS 7th DAY OF MARCH,** 2003, for the reasons set forth in the foregoing opinion, **IT IS HEREBY ORDERED THAT:**

1. Defendant Hornyak Group, Inc.'s motion for summary judgment, (Dkt. Entry 287), is **GRANTED**.

 (a) Defendant Hornyak Group, Inc. is **DISMISSED**.

 (b) This is a **FINAL JUDGMENT** in accordance with Fed.R.Civ.P. 54(b).

2. Defendant Vogel Sales Co.'s motion for summary judgment, (Dkt. Entry 291), is **GRANTED**.

 (a) Defendant Vogel Sales Co. is **DISMISSED**.

 (b) This is a **FINAL JUDGMENT** in accordance with Fed.R.Civ.P. 54(b).

3. Defendants Bobrick Washroom Equipment, Inc. and Bobrick Corp.'s ("Bobrick's") motion for summary judgment, (Dkt. Entry 294), is **GRANTED IN PART and DENIED IN PART**.

 (a) Defendant Bobrick's motion for summary judgment is **GRANTED** as to Counts I, II, and IV of the Complaint.

 (b) Defendant Bobrick's motion for summary judgment is **DENIED** as to Count III of the Complaint.

 (c) This is a **FINAL JUDGMENT** in favor of Bobrick as to Counts I, II and IV, in accordance with Fed.R.Civ.P. 54(b).

4. Plaintiff Santana Products, Inc.'s motion for partial summary judgment on Count I, (Dkt. Entry 43), and motion for summary judgment on Count III, (Dkt. Entry 271), are **DENIED**.

5. Injury suffered by the plaintiff due to petitioning activity immunized by the *Noerr/Pennington* doctrine shall not be recoverable by plaintiff under Count III.

6. Because the instant Order involves "a controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), this Order is **CERTIFIED FOR IMMEDIATE APPEAL** pursuant to 28 U.S.C. § 1292(b).

be granted as to the claim for punitive damages.

7. In the event that no party files a notice of appeal or leave to pursue an interlocutory appeal, a telephonic status conference will be held on **Friday, March 28, 2003, at 9:00 a.m.** Counsel for the plaintiff is responsible for placing the call to (570) 207–5720 and all parties shall be ready before the undersigned is contacted.